

UNITED STATES COURT OF APPEALS
FOR THE D.C. CIRCUIT

**LUCERO POOL PLASTER, INC.**

      *Petitioner.*

**v.**

**SECRETARY OF THE UNITED
STATES DEPARTMENT OF
LABOR,**

      *Respondent.*

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

No. _____

25-1108

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

APR 1 4 2025

RECEIVED

## PETITION FOR REVIEW OF ORDERS

TO THE HONORABLE COURT OF APPEALS:

1.     The Petitioner in this action is LUCERO POOL PLASTER, INC. The Respondent is the Secretary of the United States Department of Labor.

2.     The Petitioner listed in Paragraph 1 petitions the Court to review the the following Decisions and Orders from the United States Department of Labor:

        ***a.*** The June 20, 2023 Decision and Order of the Administrative Law Judge, a copy of which is attached as Exhibit "A."

        ***b.*** The February 27, 2025 Decision and Order of the Administrative Review Board, a copy of which is attached as Exhibit "B."

        ***c.*** The March 26, 2025 Notice of Non-Referral, a copy of which is attached as Exhibit "C."

3.     This case arises under the H-2B provisions of the Immigration and Nationality Act (INA),

as amended, and its implementing regulations.

4.     On June 20, 2023, an Administrative Law Judge (ALJ) issued a Decision and Order (D. & O.) finding that Petitioner, Lucero Pool Plaster, Inc., violated provisions of the INA covering the period of April 1, 2016, to September 30, 2017. *See* Exhibit A.

5.     The Petitioner and the Administrator for the Wage and Hour Division (WHD) of the U.S. Department of Labor each separately timely appealed to the Administrative Review Board (Board).

6.     On February 27, 2025, the Board issued a Decision and Order affirming in part and vacating and modifying in part. *See* Exhibit B.

7.     On March 13, 2025, the Petitioner filed a Petition Seeking Further Review by the Secretary of Labor.

8.     On March 25, 2025, the Board issued its Order and "Notice of Non-Referral to the Secretary." *See* Exhibit C.  This notice states that the Board's decision becomes the final action of the Department of Labor on April 10, 2025 unless the Seecretary of Labor independently directs the Board to refer the matter to her.  The Secretary has not directed such a referral, and Petitioner desires to appeal from the administrative orders reflected above.

9.     Without limitation, the following issues are to be addressed in this petition for review.

     a.    **Issue 1:** The Supreme Court established a multi-step evidentiary procedure applicable to circumstances in which an employee claims he has not been paid for all hours worked and the employer has inadequate records available to prove the employee's recoverable wages. The ARB Decision and Order conflates the steps, including conflation of the threshold liability element with the burden-shifting steps. *Did the ARB misapply* Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946)'s burden-shifting elements to the threshold liability element, and misapply the burden-shifting steps to the evidence, and fail to address evidence negating inferences asserted by the*

*Administrator?*

b. **Issue 2**: The ARB Decision and Order ignores Lucero's many pages of discussion of *McLaughlin v. Richland Shoe*, Inc., 486 U.S. 128 (1988), that draws a distinction between an employer's *willful* conduct and *negligent* conduct. The ARB uniformly applied a standard for "willfulness" that finds this standard met based solely upon an employer's signature to the Application for Temporary Employment Certification. This applied standard eviscerates the different treatment the DOL represented would be applied to first-time offenders versus repeat offenders at the time the regulations were adopted. *Is the "willfulness" standard applied by the ARB consistent with* McLaughlin v. Richland Shoe, Inc., *486 U.S. 128 (1988).*

c. **Issue 3:** The ARB declared that civil monetary penalties are not subject to constitutional standards because they are dictated by statute or regulation. *Are civil monetary penalties subject to constitutional constraints, and if so, do the penalties assessed against Lucero violate those due process and excessiveness standards?*

10.     Each of these issues concerns core concepts in wage and hour cases and, more particularly, H-2B worker cases. The second and third issues potentially involve the validity portions of the Code of Federal Regulations,[1] and to the extent they do, the Secretary did not delegate jurisdiction to the ARB to pass upon them. *See* Secretary's Order 01-2020, 85 F.R. 13186, No. 5. Thus, the Secretary retained jurisdiction to review these more weighty questions, and for that reason, the Secretary should review these issues.

11.     The first and second issues involve the application of frequent bread-and-butter standards. The first issue involves apparent misunderstandings between proof required to establish threshold liability and proof permitted (by *Mt. Clemens*) to address proof of damages. It also involves a

---

[1] Statutes and regulations are narrowly construed to avoid infirmity. *See Concrete Pipe & Prods. v. Constr. Laborers Pension Tr.,* 508 U.S. 602, 629 (1993).

**PETITION FOR REVIEW OF ORDER – PAGE 3**

misapplication and blending of separate steps of inquiry as to proof of damages that are dictated

by *Mt. Clemens.* This established standard is so pivotal to wage-and-hour cases, that the Secretary

should review this matter to ensure that the standard is applied correctly and consistently.

12.     Not every failure to adhere to the terms and conditions of an Application for Temporary

Employment Certification is actionable. The ARB nonetheless determined that any failure to

comply with any item in the Application is "willful," making every such violation subject to

maximum civil penalties.  The Secretary should examine this core question to clarify the agency's

approach to this standard. The ARB's failure to even cite, much less address, *Richland Shoe* makes

it all the more important that the Secretary examine his issue.

13.     The Petitioner reserves the right to amend or supplement this petition as necessary.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Petitioner prays that this Court grant

this Petitoin for Review.  Petitioner further requests that upon review of the Decisions and Orders

issued by the the Administrative Review Board and the Administrative Law Judge that the Court

vacate and reverse those decisions and orders in all things, and render judgment in favor or

Petitioner.  In the alternative, Petitioner prays that the Court vacate and reverse the the decisions

and orders and remand this to the Department of Labor.  Petitioner prays for such further and

additional relief to which it may be entitled at law and in equity.

Respectfully submitted,

*/s/ Casey S. Erick*
R. MICHAEL NORTHRUP
Texas Bar No. 15103250
mnorthrup@cowlesthompson.com

CASEY S. ERICK
Texas Bar No. 24028564
cerick@cowlesthompson.com
**COWLES & THOMPSON, P.C**.
901 Main Street, Suite 3900
Dallas, TX 75202
(214) 672-2000
(214) 672-2020 (FAX)
***Attorney Admission Pending***
**ATTORNEYS FOR PETITIONER,**
**LUCERO POOL PLASTER, INC.**

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 10, 2025, this Petition was served first class mail

on all parties to this appeal through counsel shown below:

JENNIFER HUGGINS, Senior Attorney
JENNIFER STOCKER, Attorney
U.S. Department of Labor Office of the Solicitor
200 Constitution Ave., N.W.
Washington, D.C.  20210

*/s/ Casey S. Erick*
**Casey S. Erick**
**Attorney Admission Pending**

# UNITED STATES DEPARTMENT OF LABOR
## OFFICE OF ADMINISTRATIVE LAW JUDGES
### Washington, DC

**Issue Date: 20 June 2023**

*In the Matter of:*

**ADMINISTRATOR**
**WAGE & HOUR DIVISION**
**U.S. DEPARTMENT OF LABOR,**
    *Plaintiff,*

    *v.*

**LUCERO POOL PLASTER, INC.,**
    *Respondent.*

**Case No. 2019-TNE-00011**

## DECISION AND ORDER

*Appearances:*

    Kevin M. Wilemon, Esquire and Nicholas R. Flores, Esquire
    Office of the Solicitor, U.S. Department of Labor, Chicago, Illinois
        *For the Plaintiff*

    Sim Israeloff, Esquire and Brian T. Farrington, Esquire
    Cowles & Thompson P.C., Dallas, Texas
        *For the Respondent*

*Before*:   **THEODORE W. ANNOS**
        Administrative Law Judge



EXHIBIT

_A_

# I.  INTRODUCTION

The Immigration and Nationality Act ("INA") of 1952, 8 U.S.C. § 1101 *et seq.*, authorized a temporary foreign worker program referred to as the H-2B program. The program permits employers to hire foreign workers to perform temporary, nonagricultural services or labor if there are not sufficient U.S. workers who are qualified and available to perform the temporary work, and if the employment of the foreign workers will not adversely affect the wages and working conditions of similarly employed U.S. workers.[1]

Employers who seek to hire foreign workers under the H-2B program must first apply for and receive a labor certification from the U.S. Department of Labor ("Department").[2] The Department administers and enforces the H-2B labor certification process through two internal agencies: The Office of Foreign Labor Certification of the Employment and Training Administration ("OFLC") and the Wage and Hour Division ("Administrator" or "Plaintiff").[3]

The OFLC generally reviews and either accepts or denies applications for temporary labor certification. The Administrator has enforcement responsibility concerning the statutory and regulatory rights of H-2B workers and employer's obligations under the program. This enforcement authority allows the Administrator to carry out investigations, inspections, and law enforcement functions, and to impose administrative remedies on violators of the H-2B program, including the recovery of unpaid wages, the assessment of civil money penalties ("CMP"), and debarment.[4]

---

[1] 8 U.S.C. § 1101(a)(15)(H)(ii)(b); 8 C.F.R. §§ 214.2(h)(1)(ii)(D), 214.2(h)(6)(i)(A); 20 C.F.R. § 655.1(a); 29 C.F.R. § 503.1(a).

[2] 8 C.F.R. § 214.2(h)(6)(iii); 29 C.F.R. § 503.1(a).

[3] *See* 20 C.F.R. Part 655, subpart A; 29 C.F.R. Part 503. *See also Temporary Non-Agricultural Employment of H-2B Aliens in the United States*; Interim Final Rule, 80 Fed. Reg. 24042 (Apr. 29, 2015) (to be codified at 20 C.F.R. Part 655, subpart A, and 29 C.F.R. Part 503) ("2015 Interim Final Rule").

[4] 8 U.S.C. § 1184(c)(14); 20 C.F.R. §§ 655.2(a)-(b); 29 C.F.R. §§ 503.1(b)-(c); 503.7(a)-(b), 503.20.

## II. STATEMENT OF THE CASE

On January 26, 2016, Lucero Pool Plaster, Inc. ("Lucero" or "Respondent") filed an *Application for Temporary Employment Certification* ("TEC"). The OFLC accepted the TEC and granted Respondent certification to hire 20 construction laborers for the period April 1, 2016 to September 30, 2016.[5]

On January 12, 2017, Respondent filed a TEC for the 2017 season. The OFLC accepted the TEC and granted Respondent certification to hire 20 construction laborers for the period April 1, 2017 to September 30, 2017.[6]

On November 14, 2018, Plaintiff issued to Respondent a *Determination Pertaining to Violations Involving H-2B Nonimmigrant Workers and Notice of Debarment* ("Determination"). The Determination stated that an investigation covering the period from January 1, 2016 through September 8, 2017 revealed that Respondent committed several violations related to its 2016 and 2017 TECs. The Determination identified $334,195.09 in unpaid wages, assessed CMPs in the amount of $396,440.67, and debarred Respondent for three years.[7]

On December 10, 2018, Respondent timely appealed the Determination to the Office of Administrative Law Judges.[8] The case was assigned to the undersigned on February 25, 2019.[9] Discovery commenced on March 19, 2019 and concluded on July 23, 2019.[10] Thereafter, the case was stayed from August 7, 2019 through August 24, 2020 while the parties engaged in mediation.[11]

---

[5] JX C (Application No. H-400-15320-194291). As used in this decision, "JX" refers to joint exhibits, "PX" refer to Plaintiff's exhibits, "RX" refers to Respondent's exhibits, "ALJ" refers to the Administrative Law Judge exhibits, "Tr." refers to the transcript from the July 27-29, 2021 hearing, "Pl. Br." refers to Plaintiff's brief, and "Res. Br." refers to Respondent's brief.

[6] JX D (Application No. H-400-16280-1169839).

[7] JX A. *See* 29 C.F.R. § 503.41(a) ("Whenever the Administrator … decides to assess a civil money penalty, to debar, or to impose other appropriate administrative remedies, including for the recovery of monetary relief, the party against which such action is taken will be notified in writing of such determination.").

[8] JX B. *See* 29 C.F.R. §§ 503.43(a), (c).

[9] *See* 29 C.F.R. § 503.48(a).

[10] ALJ 1, 2.

[11] ALJ 4 (staying case "until 60 days after the completion of mediation"); *Order Appointing Mediator* (Chief ALJ July 22, 2019); *Supplemental Order Extending Mediation* (Chief ALJ Oct. 7, 2019); *Second Supplemental Order Extending Mediation* (Chief ALJ Feb. 20, 2020); *Third Supplemental Order Extending Mediation* (Chief ALJ May 21, 2020); *Supplemental Order Concluding Mediation* (Chief ALJ June 25, 2020).

From July 27 through July 29, 2021, a virtual hearing was held via Microsoft Teams.[12] Plaintiff and Respondent were both represented at the hearing, and the parties were afforded the full opportunity to present evidence and argument.[13] Testifying live at the hearing were Francisco Javier Romo Villanueva (former H-2B worker for Respondent), Fernando Daniel Hernandez (Assistant District Director, Wage & Hour Division), Hector Alvino Guzman (co-owner of Respondent), Angelo Cesario Garcia Aguilar (U.S. employee of Respondent), and Efrain Gomez Gomez (U.S. employee of Respondent).[14]

Admitted into the record were Joint Exhibits A-T, Plaintiff's Exhibits A-N and P, Respondent's Exhibits 1-45 and 1A-31A, and Administrative Law Judge Exhibits 1-10.[15]

Plaintiff and Respondent timely filed closing argument briefs on January 6 and 7, 2022, respectively.

---

[12] ALJ 6; Tr. *See also* Administrative Order and Notice, *Suspension of Hearings and Procedural Deadlines Due to COVID-19 National Emergency*, 2020-MIS-00006 (Chief ALJ Mar. 19, 2020); Administrative Order and Notice, *Continued Suspension of In-Person Hearings Due to COVID-19 National Emergency*, 2020-MIS-00008 (Chief ALJ June 1, 2020).

[13] *See* Tr.

[14] Tr. at 20-21, 165, 412, 546, 555-556.

[15] Tr. at 5-8, 121, 163. *See also* ALJ 9 (*Order Overruling Plaintiff's Evidentiary Objections*); ALJ 10 (*Order Overruling Respondent's Evidentiary Objections*). In a post-hearing Order, I denied Respondent's motion to strike Sr. Romo's testimony and excluded from the record Plaintiff's proposed exhibits O, Q, R, and S as well as all testimony elicited from those proposed exhibits - i.e., Tr. at 252:22-25, 253:1-15, 522:23-25, 523:1-25, 524:1-25, 525:1-25, 526:1-6, 526:22-25, 527:1-25, 528:1-12, 528: 24-25, 529:1-25, 530:1-25, 531:1-9. *See Order: (1) Motion to Amend, (2) Evidentiary Objection, (3) Motion to Strike, and (4) Closing Brief Deadline* (Nov. 30, 2021).

Administrative Law Judge Exhibits 1-10 are as follows:

ALJ 1 - *Notice of Assignment and Preliminary Order* (March 19, 2019)
ALJ 2 - *Order Granting Unopposed Motion for Extension of Time for Discovery* (May 10, 2019)
ALJ 3 - *Order Denying Administrator's Motion to Quash and Granting Administrator's Motion for Protective Order* (July 19, 2019)
ALJ 4 - *Order Granting Joint Motion for Stay* (August 7, 2019)
ALJ 5 - *Order Denying Motions for Leave and Summary Decision* (May 12, 2021)
ALJ 6 - *Notice of Hearing and Prehearing Order* (May 12, 2021)
ALJ 7 - *Second Amended Joint Prehearing Statement* (filed July 14, 2021)
ALJ 8 - *Order Denying Plaintiff's Motion for Protective Order* (July 23, 2021)
ALJ 9 - *Order Overruling Plaintiff's Evidentiary Objections* (July 23, 2021)
ALJ 10 - *Order Overruling Respondent's Evidentiary Objections* (July 23, 2021).

### III.  APPLICABLE LAW

The regulations require an employer utilizing the H–2B program to abide by several conditions of employment with respect to its foreign workers. Those conditions relate to, *inter alia*, non-discriminatory hiring practices, prohibition against preferential treatment of foreign workers, rates of pay, abandonment/termination of employment, area of intended employment and job opportunity, transportation and visa fees, transportation from the place of employment, disclosure of job order, contracts with third parties, and retention of documents and records.[16]

The foregoing conditions become applicable upon the date that the employer's TEC is accepted, and the filing of the approved Appendix B of the TEC and other required documentation constitute the employer's representation that the statements on the forms are accurate and that it knows and accepts the obligations of the H-2B program.[17]

A violation occurs when there is a "willful misrepresentation of a material fact on," or a "substantial failure to meet any of the terms and conditions of," the TEC or other mandatory forms.[18] A violation is "willful" if the "employer, attorney, or agent knows its statement is false or that its conduct is in violation, or shows reckless disregard for the truthfulness of its representation or for whether its conduct satisfies the required conditions."[19] A "substantial failure" is defined as a "willful failure to comply that constitutes a significant deviation from the terms and conditions of the" TEC or other submitted documentation.[20] A determination that a violation is a "significant deviation" may be based on the following nonexclusive list of factors:

---

[16] 29 C.F.R. §§ 503.16, 503.17. The *Assurances and Obligations of H-2B Employers* under 29 C.F.R. § 503.16 are identical to the *Assurances and Obligations of H-2B Employers* under 20 C.F.R. § 655.20.

[17] 29 C.F.R. § 503.19(d).

[18] *Id.* § 503.19(a); *see also* 2015 Interim Final Rule, 80 Fed. Reg. at 24086-87 ("In evaluating whether a first-time violation constitutes a willful violation, [the Administrator] will look at all circumstances, including the fact that employers submit a signed [TEC] attesting under penalty of perjury that that they know and accept the obligations of the program, which are listed clearly in Appendix B of the [TEC], as well as submitting a signed *H–2B Petition,* which requires employers to certify under penalty of perjury that the information is true and accurate to the best of their knowledge.") (citing 29 C.F.R. § 503.19(d)).

[19] 29 C.F.R. § 503.19(b).

[20] *Id.* § 503.19(a)(2).

(1) Previous history of violation(s) under the H-2B program;
(2) The number of H-2B workers, workers in corresponding employment, or U.S. workers who were and/or are affected by the violation(s);
(3) The gravity of the violation(s);
(4) The extent to which the violator achieved a financial gain due to the violation(s), or the potential financial loss or potential injury to the worker(s); and
(5) Whether U.S. workers have been harmed by the violation.[21]

Plaintiff bears the burden to establish by a preponderance of the evidence that a violation occurred.[22] If a violation has been established, an employer is subject to the recovery of unpaid wages, the assessment of a CMP, and possible debarment from the H-2B program for no less than one and no more than five years.[23]

In this case, Plaintiff determined that Respondent substantially failed to meet several terms and conditions of the TECs in violation 29 C.F.R. §§ 503.16 and 503.17. Plaintiff assessed back wages and CMPs, and debarred Respondent for three years.[24]

## IV.  STIPULATIONS

The parties entered the following stipulations:[25]

1.  Respondent is a swimming pool plastering and remodeling firm based in Schaumburg, Illinois.

2.  Carlos Lucero and Mr. Guzman each own 50% of Respondent.

3.  Mr. Guzman represented Respondent during Plaintiff's investigation.[26]

---

[21] 29 C.F.R. § 503.19(c).

[22] 5 U.S.C. § 556(d); *see also G Farms, LLC*, ALJ No. 2018-TAE-00034, slip op. at 17 (OALJ May 10, 2021).

[23] 29 C.F.R. § 503.20(a). *See also* 29 C.F.R. § 503.23 (*Civil money penalty assessment*); 29 C.F.R. § 503.24 (*Debarment*).

[24] JX A.

[25] ALJ 7; Tr. at 6-7. The stipulations are accepted as they are consistent with and supported by the record.

[26] PX A at 25:13-15 and 354:24-355:12.

4. After investigating Respondent, Plaintiff alleged Respondent had violated various H-2B regulations promulgated under the INA. Plaintiff alleged those violations occurred between January 1, 2016 and September 8, 2017.[27]

5. Plaintiff issued the Determination to Respondent on November 14, 2018, alleging violations involving failures to comply substantially with H- 2B regulations regarding: (1) non-discriminatory hiring practices (2017 season); (2) preferential treatment (2016 and 2017 seasons); (3) paying the offered wage (2016 and 2017 seasons); (4) notification to the U.S. Citizenship and Immigration Services ("USCIS") and OFLC (2017 season); (5) placing workers outside the area of intended employment (2016 and 2017 seasons); (6) paying inbound transportation and subsistence costs (2016 and 2017 seasons); (7) paying outbound transportation and subsistence costs (2016 season); (8) job order disclosure (2016 and 2017 seasons); (9) contractually forbidding third parties from seeking payment from employees (2016 and 2017 seasons); and (10) document retention (2016 and 2017 seasons).[28]

6. Plaintiff determined and alleges $334,195.09 in back wages are due to twenty-six H-2B workers and one qualified U.S. applicant.[29]

7. As a result of these violations, Plaintiff assessed and seeks civil money penalties ("CMPs") in the amount of $396,440.67.[30]

8. Plaintiff seeks debarment of Respondent from the H-2B Program for a period of three years.[31]

9. On December 10, 2018, Respondent appealed Plaintiff's Determination.[32]

10. In 2016, Respondent requested twenty H-2B workers to perform work from April 1, 2016, to September 30, 2016, as construction laborers, Standard Occupational System ("SOC") (Occupational Information Network ("O*NET")/Occupational

---

[27] JX A.

[28] *Id.* at 8-12.

[29] *Id.*

[30] *Id.*

[31] *Id.* at 2-3.

[32] JX B.

Employment Statistics ("OES")) Code 47-2061, who were required to be paid a basic rate of pay of $27.46 per hour and an overtime rate of $41.19.[33]

11. Respondent had an annual dollar volume ("ADV") of gross sales of $1,736,953 in 2016.[34]

12. Mr. Guzman signed Appendix B to the 2016 TEC.[35]

13. In 2017, Respondent requested twenty H-2B workers to perform work from April 1, 2017, to September 30, 2017, as construction laborers, SOC (O*NET/OES) Code 47-2061, who were required to be paid a basic rate of pay of $27.35 per hour and an overtime rate of $41.03.[36]

14. Mr. Guzman signed Appendix B to the 2017 TEC.[37]

15. Respondent had an ADV of $2,557,892 in 2017.[38]

16. According to Respondent's 2017 TEC, no training for the job opportunity was required.[39]

17. According to Respondent's 2017 State Workforce Agency ("SWA") job order, Respondent required "3 months experience" to perform the following job duties: "Lift bags of plaster on mixer, add water, carry materials to pools, shovel materials onto pools for plastering. Lifting required up to 99 lbs."[40]

18. Respondent does not know if all of its H-2B workers in 2017 had three months of "pool finisher" experience, even though Respondent's 2017 job order states

---

[33] JX C at 3. *See also* Tr. at 6.

[34] JX P at 1.

[35] JX C at 11; PX A at 25:13-15; 154:8-13.

[36] JX D at 4.

[37] *Id.* at 12; PX A at 201:15-17.

[38] JX P at 1.

[39] JX D at 7.

[40] JX E at 1.

"3 months experience required" for its "finisher" position.[41] On-the-job training occurred during both seasons, as Respondent's job orders indicated.[42]

19. One of Respondent's H-2B worker's alleged that crew leaders provided regular, extensive training.[43]

20. U.S. worker Luis Ochoa applied for a job with Respondent in 2017.[44]

21. Mr. Ochoa stated as follows:
   i. When he applied, Mr. Ochoa had ten years of experience working in mixing and applying concrete.
   ii. Mr. Ochoa applied for a "finisher" position at Lucero paying $25 per hour through Respondent's advertisement on the Illinois Job Link website.
   iii. Mr. Ochoa called Respondent in 2017 and spoke to a woman who told him Respondent was not hiring. Mr. Ochoa was not told whether Respondent would be hiring in the future.
   iv. Mr. Ochoa was not hired by Respondent, but he would have worked for Respondent if he had been given the opportunity.
   v. Instead, Mr. Ochoa worked as a carpenter for another firm for 40 hours per week making $18 per hour until the end of July 2017, when he went on unemployment.[45]

22. Respondent's 2017 Summary Recruitment Results Letter states the following: "We spoke with Luis Ochoa and he told us that he did not have the required experience. Since he did not have the required experience we are unable to offer him a position."[46]

23. Plaintiff determined $21,634.34 in back wages are due to one U.S. worker (Mr. Ochoa) for Respondent's failure to recruit and hire U.S. workers in violation of 29 C.F.R. § 503.16(r).[47]

---

[41] JX E at 1; PX A at 214:23-215:8.

[42] PX A at 176:6-14, 224:5-13; JX E at 1; JX I at 1.

[43] JX J.

[44] PX C.

[45] *Id.*

[46] JX M.

[47] JX A at 3.

24. In 2016 and 2017, Respondent owned a house at 1047 Carol Avenue, Wheeling, IL 60090, where some of its H-2B workers lived.[48]

25. Respondent provided housing to eleven H-2B workers in 2016 and seven H2B workers in 2017.[49]

26. Each year, Respondent charged each of the H-2B workers who lived at its employer-provided housing $200 per month.[50]

27. Respondent's 2016 and 2017 job orders both state: "Assistance finding and securing board & lodging is not available."[51]

28. Twelve of Respondent's H-2B workers in 2016 worked at least one week on union projects paying approximately $75 per hour, instead of the offered wage of $27.46 per hour.[52]

29. One of Respondent's H-2B workers in 2017 worked one week on a union project paying $75 per hour, instead of the offered wage of $27.35 per hour.[53]

30. In 2016, Respondent failed to disclose employer-provided housing and the possibility of higher-paying union jobs in its SWA job order, ETA Form 9142B, and newspaper advertisements.[54]

31. In 2017, Respondent failed to disclose employer-provided housing and the possibility of higher-paying union jobs in its SWA job order, ETA Form 9142B, and newspaper advertisements.[55]

---

[48] PX D, Respondent's Objections and Responses to Plaintiff's Request for Admission ("RFA") No. 1.

[49] JX Q at 2.

[50] PX B at 2-3; PX D, RFA No. 3; JX J ¶ 19.

[51] JX E at 1; JX I at 1.

[52] PX D, RFA Nos. 7-10.

[53] Id., RFA Nos. 14-15.

[54] Id., RFA Nos. 4-6, 11-13; JX I.

[55] PX D, RFA Nos. 16-21; JX E.

32. H-2B worker Juan Evelio Carralez Muniz separated from Respondent's employment on or about April 8, 2017.[56]

33. Respondent first notified USCIS and OFLC on September 11, 2017, of the separation of Juan Evelio Carralez Muniz.[57]

34. Heriberto Nuncio Ramirez separated from Respondent's employment on April 29, 2017.[58]

35. Respondent first notified USCIS and OFLC on September 11, 2017, of the separation of Heriberto Nuncio Ramirez.[59]

36. Mario Alberto Saenz Muniz separated from Respondent's employment on August 29, 2017.[60]

37. Respondent first notified USCIS and OFLC on September 11, 2017, of the separation of Mario Alberto Saenz Muniz.[61]

38. Respondent's 2016 TEC lists only the Cook County-Chicago-Naperville-Joliet Metropolitan Division as the area of intended employment.[62]

39. Respondent's H-2B workers in 2016 performed work in the following locations in Wisconsin: Sheboygan, Williams Bay, Kenosha, Lake Geneva, Delavan, and Milwaukee.[63]

40. Respondent's H-2B workers in 2016 performed work in the following locations in Michigan: Union Pier and Three Oaks.[64]

---

[56] PX D, RFA No. 22.

[57] *Id.*, RFA Nos. 24-25.

[58] *Id.*, RFA No. 26.

[59] *Id.*, RFA Nos. 27-28.

[60] *Id.*, RFA No. 29.

[61] *Id.*, RFA Nos. 30-31.

[62] *Id.*, RFA No. 39; JX C at 6.

[63] PX D, RFA Nos. 40-45; *see also* JX K; JX J ¶ 44; PX B at 2.

[64] PX D, RFA Nos. 46-47; JX K; JX J ¶ 44.

41. Respondent's H-2B workers in 2016 performed work in the following locations in Indiana: Granger, Syracuse, Merrillville, South Bend, and Warsaw.[65]

42. Respondent's 2017 TEC lists only the Cook County-Chicago-Naperville-Arlington Heights Metropolitan Division as the area of intended employment.[66]

43. Respondent's H-2B workers in 2017 performed work in the following locations in Wisconsin: Milwaukee, Madison, Green Lake, Waunakee, Somers, Kenosha, Fedonia, Rice Lake, Waukesha, Wisconsin Dells, Mequon, Wauwatosa, Menomonee Falls, Glenbeulah, Lakeside, Green Bay, Lake Geneva, Oak Creek, Baraboo, Middleton, Heartland, Elm Grove, River Falls, Windsor, Newton, Glendale, Sheboygan, and Hazel Green.[67]

44. Respondent's H-2B workers in 2017 performed work in the following locations in Michigan: New Buffalo, Sawyer, Cassopolis, Grand Beach, and Buchanan.[68]

45. Respondent's H-2B workers in 2017 performed work in the following locations in Indiana: Elkhart, Michigan City, and West Lafayette.[69]

46. Respondent's H-2B workers in 2017 performed work in Decorah, Iowa.[70]

47. In its 2016 and 2017 TECs, Respondent attested it would retain all documents relating to the TECs for three years, as required by 20 C.F.R. § 655.56 and 29 C.F.R. § 503.17.[71]

48. In 2016 and 2017, Respondent attested it would pay for its H-2B workers' inbound transportation and subsistence costs or reimburse them for those costs.[72]

---

[65] PX D, RFA Nos. 48-52; JX K; JX J ¶ 44.

[66] JX D at 7.

[67] PX D, RFA Nos. 54-82; *see also* JX L; JX J ¶ 44.

[68] PX D, RFA Nos. 83-87; JX L; JX J ¶ 44.

[69] PX D, RFA Nos. 88-90; JX L.

[70] JX L at 5; JX J ¶ 44.

[71] JX C at 11, Attestation ("Att.") 26; JX D at 12, Att. 26.

[72] JX C at 10, Att. 17; JX D at 11, Att. 17.

49. In 2016 and 2017, all of Respondent's H-2B workers were processed at the U.S. Consulate in Monterrey, Mexico.[73]

50. In its 2016 TEC, Respondent attested it would reimburse its H-2B workers for their outbound transportation and subsistence costs.[74]

51. In its 2016 and 2017 TECs, Respondent attested it would prohibit contractually any of its agents from seeking or receiving prohibited fees from H-2B workers.[75]

52. In 2016 and 2017, Respondent employed a company in Monterrey, Mexico, called Monarch Butterfly ("Monarch") to process visas for its H-2B workers at the U.S. Consulate in Monterrey.[76]

53. Respondent and Monarch had no written contract in either 2016 or 2017.[77]

54. Respondent failed to contractually forbid Monarch from seeking payments from Respondent's H-2B workers.[78]

55. In its 2016 and 2017 TECs, Respondent attested it would provide a copy of the job order to its H-2B workers in a language they understood.[79]

56. Respondent did not provide any of its 2016 or 2017 H-2B workers with a copy of the job orders.[80]

57. Plaintiff alleges she has reconstructed H-2B workers' hours worked using the average weekly hours for U.S. workers who performed the same work.[81]

---

[73] PX A at 323:10-16.

[74] *Id.* at 196:21-197:13; JX D at 11, Att. 18.

[75] JX C at 11, Att. 22; JX D at 12, Att. 12.

[76] PX A at 337:4-339:14; PX D, RFA Nos. 19, 123.

[77] PX D, RFA Nos. 120, 124.

[78] PX A 338:22-24; PX D, RFA Nos. 121, 125; JX P at 1.

[79] JX C at 10, Att. 19; JX D at 11, Att. 19.

[80] PX D, RFA Nos. 115-118.

[81] PX M at 9-12.

58. Respondent's 2016 payroll records reflect an hourly rate of $27.11 paid to its H-2B workers, which is lower than the required offered wage rate of $27.46, and an overtime hourly rate of $40.67 versus the required offered wage rate of $41.19 for overtime.[82]

59. Respondent's 2017 payroll records reflect an hourly rate of $27.11 paid to its H-2B workers, which is lower than the required offered wage rate of $27.35, and an overtime hourly rate of $40.67 versus the required offered wage rate of $41.03 for overtime.[83]

# V. ISSUES[84]

A. Non-Discriminatory Hiring Practices: Whether Respondent substantially failed to meet the terms and conditions of Attestation 3 in violation of 29 C.F.R. § 503.16(r)?[85]

B. Prohibition Against Preferential Treatment of Foreign Workers: Whether Respondent substantially failed to meet the terms and conditions of Attestation 4 in violation of 29 C.F.R. § 503.16(q)?

C. Rate of Pay: Whether Respondent substantially failed to meet the terms and conditions of Attestation 5 in violation of 29 C.F.R. §§ 503.16(a)(1), (a)(4), and (b), and whether Plaintiff's assessment of back wages for the alleged violations are appropriate?

D. Separation of Employment: Whether Respondent substantially failed to meet the terms and conditions of Attestation 10 in violation of 29 C.F.R. § 503.16(y)?

E. Area of Intended Employment: Whether Respondent substantially failed to meet the terms and conditions of Attestation 11 in violation of 29 C.F.R. § 503.16(x)?

---

[82] PX D, RFA Nos. 165-168.

[83] PX L; PX D, RFA Nos. 175-177.

[84] ALJ 7; Tr. at 6-7.

[85] The "Attestation [#]" refers to a specific "condition of employment" that is listed on the "Employer Declaration" contained in Appendix B to the TECs. The conditions are derived from the *Assurances and Obligations of H–2B Employers* provided in 29 C.F.R. § 503.16 and 20 C.F.R. § 655.20. By signing the Declaration, the employer certifies that it has knowledge of and agrees to comply with the 26 conditions of employment listed in Appendix B. *See* JX C at 9-11; JX D at 10-12.

F. Transportation and Subsistence Fees: Whether Respondent substantially failed to meet the terms and conditions of Attestation 17 in violation of 29 C.F.R. §§ 503.16(j)(1)(i)(i)-(ii), and whether Plaintiff's assessment of back wages for the alleged violations are appropriate?

G. Disclosure of Job Order: Whether Respondent substantially failed to meet the terms and conditions of Attestation 19 in violation of 29 C.F.R. § 503.16(*l*)?

H. Contracts with Third Parties to Comply with Prohibitions: Whether Respondent substantially failed to meet the terms and conditions of Attestation 22 in violation of 29 C.F.R. § 503.16(p)?

I. Document Retention Requirements: Whether Respondent substantially failed to meet the terms and conditions of Attestation 26 in violation of 29 C.F.R. § 503.17?

J. Civil Money Penalties: Whether Plaintiff's assessment of CMPs for the alleged violations are appropriate under 29 C.F.R. § 503.23?

K. Debarment: Whether a three-year debarment of Respondent is appropriate under 29 C.F.R. § 503.24?

## VI. FINDINGS OF FACT AND CONCLUSIONS OF LAW[86]

### A. Non-Discriminatory Hiring Practices: Attestation 3 and 29 C.F.R. § 503.16(r)[87]

Attestation 3 and 29 C.F.R. § 503.16(r) require employers to consider any *qualified* U.S. worker regardless of race, color, national origin, age, sex, religion, disability, or citizenship and only reject U.S. applicants for lawful, job-related reasons.[88]

Plaintiff argues that Respondent substantially failed to engage in non-discriminatory hiring practices when it rejected a U.S. worker who applied for a position with Respondent.[89] I disagree.

In 2017, Respondent advertised job openings to U.S. workers.[90] According to Respondent's 2017 TEC and 2017 SWA job order, Respondent required "3 months experience" to perform the following job duties: "Lift bags of plaster on mixer, add water, carry materials to pools, shovel materials onto pools for plastering. Lifting required up to 99 lbs."[91] The 2017 TEC required three months of employment experience as a pool finisher, but did not require any training.[92] Meanwhile, the 2017

---

[86] The findings of fact and conclusions of law contained herein are based upon my analysis of the entire record, the arguments of the parties, and the applicable statutes, regulations, and case law.

[87] **Non-Discriminatory Hiring Practices**

| Applicable Attestation & Regulation | Applicable Application | Back Wages Assessed | CMPs Assessed |
|---|---|---|---|
| Attestation 3 & 29 C.F.R § 503.16(r) | 2017 TEC | $21,634.34 | $12,383.00 |

[88] 29 C.F.R. § 503.16(r); JX D at 10, Att. 3.

[89] Pl. Br. at 16-19; *see also* JX A.

[90] JX E.

[91] ALJ 7; JX D, E; Tr. at 204. At the hearing, Mr. Hernandez testified that he asked both the H-2B workers and the U.S. workers whether they were required to lift 99 pounds, and all stated that they were not required to lift 99 pounds to obtain the job. Tr. at 209-10. Mr. Hernandez testified that he therefore determined Respondent did not enforce the 99-pound requirement. Tr. at 210. On cross-examination, Mr. Hernandez explained that Respondent changed the job title from "construction laborer" in 2016 to "finisher" in 2017 and added the experience requirement to hire more experienced workers. Tr. at 512-13.

[92] ALJ 7; JX D.

SWA job order did not specify the type of employment experience required and included "[o]n the job training," which in fact occurred during the 2017 season.[93]

Luis Ochoa, a U.S. worker, applied for the pool finisher position.[94] Respondent did not hire him, stating that he lacked the requisite experience.[95] When interviewed by the Department, Mr. Ochoa reported:

> I applied for the job in earlier this year in 2017 through the job link adds [*sic*] the company had. I applied position was for the company Lucero Pool Plaster that was posted that paid about $25 an hour. I have over 10 years working experience in concrete, mixing and applying concrete. I called the company and I spoke to a women [*sic*] and she told me that the company was not hiring at the moment. I was not told if they were to hire in the future.

> I was able to find a carpenters job in February 2017 working 40 hours a week at $18 an hour for Parenti & Rafaeli. I was being paid about $700 a week. I worked until the end of July and I have been in unemployment ever since. If I had been given the job with Lucero Pool Plaster I would have worked until they no longer needed me.[96]

According to Respondent's 2017 Summary Recruitment Results Letter, Respondent represents: "We spoke with Luis Ochoa and he told us that he did not have the required experience. Since he did not have the required experience we are unable to offer him a position."[97] Mr. Guzman testified at the hearing that this was correct.[98] Mr. Guzman also testified that Respondent hired one U.S. worker, Daniel Rychtarik, as a driver, who applied in the same way as Mr. Ochoa.[99] Respondent argues that hiring Mr. Rychtarik demonstrates its efforts to hire U.S. workers when possible.[100]

---

[93] ALJ 7; JX E. Respondent does not know if all of its H-2B workers in 2017 had three months of "pool finisher" experience. ALJ 7; PX A at 214-15.

[94] ALJ 7; PX C.

[95] Res. Br. at 18-19; JX M; RX 42.

[96] PX C.

[97] JX M; RX 42.

[98] Tr. at 451-52.

[99] *Id.* at 455. Mr. Rychtarik worked for Respondent from approximately 2012 to 2019. ALJ 7.

[100] Res. Br. at 18.

Mr. Hernandez testified, "I learned from Mr. Ochoa that he applied for the job in 2017, and that he called a company and spoke to a woman, and that woman told him that the company was not hiring at the moment, and he was not told if they were going to be hire [sic] in the future."[101] He also testified that he followed up with Respondent's counsel, Mr. Kershaw, who represented via email:

> Hector attempted to call Luis Ochoa in January 27, 2017. No one answered. We did not have an address or email to contact the applicant. Hector also tried calling on January 31, 2017 and no one answered then either. Hector once again left a voicemail. On February 1st Hector spoke with him on the phone and he stated he had no experience as a pool laborer. The job requires 3 months experience. Because we have a short season, we cannot take time to train the workers.[102]

After receiving Mr. Kershaw's response, Mr. Hernandez spoke with Mr. Ochoa. Mr. Hernandez testified:

> Mr. Ochoa had informed me that he had not spoken to Mr. Guzman, that the only person he spoke to was a woman on the phone. At no time did they talk about his work experience. So I started looking into his work experience to see if it would meet the criteria, because I had conflicting statement[s] from Mr. Guzman and Mr. Ochoa . . . . Mr. Ochoa indicated that he had over 10 years of experience working in construction. Mixing concrete and applying concrete.[103]

Respondent argues that Mr. Hernandez substituted his "layman's view" for that of Mr. Guzman's.[104] At the hearing, Mr. Guzman testified that general construction experience was not helpful to the advertised position.[105] He explained that Mr. Ochoa's experience was insufficient because he had no experience with "vertical walls" or "swimming pools."[106]

---

[101] Tr. at 204.

[102] JX Q; Tr. at 204-05.

[103] Tr. at 205-07.

[104] Resp. Br. at 19.

[105] Tr. at 449.

[106] Id. at 517.

The evidence establishes that Mr. Ochoa applied for a position with Respondent in 2017 and was not hired. It is not clear whether Mr. Guzman communicated directly with Mr. Ochoa, but even assuming he did not speak to Mr. Ochoa, it is unreasonable to conclude that Mr. Ochoa's experience working in construction is equivalent to the required experience of a pool laborer. Mr. Guzman's hearing testimony regarding the difference between experience in general construction and pool labor is consistent with the 2017 Summary Recruitment Results Letter and Mr. Kershaw's email to Mr. Hernandez. Although Mr. Kershaw's response that Respondent "cannot take time to train the workers" contradicts the "[o]n the job training" Respondent represented in the SWA job order, it is consistent with the 2017 TEC's requirement of three months of prior work experience as a pool finisher.[107] The job opportunity was open to Mr. Ochoa and Respondent provided a job-related reason for rejecting Mr. Ochoa's application. Respondent also documented the rejection as required by the regulations.[108]

Therefore, I find that Plaintiff did not establish by a preponderance of the evidence that Respondent substantially failed to comply with Attestation 3 and 29 C.F.R. § 503.16(r).

## B. Prohibition Against Preferential Treatment of Foreign Workers: Attestation 4 and 29 C.F.R. § 503.16(q)[109]

Attestation 4 and 29 C.F.R. § 503.16(q) prohibit employers from giving preferential treatment to H-2B workers.[110] An employer's job offer to U.S. workers must include at least the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2B workers.[111]

---

[107] JX Q; Tr. at 204-05; JX D, E.

[108] JX M; *see also* 29 C.F.R. §§ 503.17(c)(7); 503.19(r).

[109] **Prohibition Against Preferential Treatment of Foreign Workers**

| Applicable Attestation & Regulation | Applicable Application | Back Wages Assessed | CMPs Assessed |
|---|---|---|---|
| Attestation 4 & 29 C.F.R § 503.16(q) | 2016 TEC | $0.00 | $6,191.50 |
| | 2017 TEC | $0.00 | $6,191.50 |

[110] JX C at 9, Att. 4; JX D at 10, Att. 4; 29 C.F.R. § 503.16(q).

[111] *Id.*

Plaintiff argues that Respondent substantially failed to comply with the 2016 and 2017 TECs' prohibition against preferential treatment of foreign workers when it failed to advertise opportunities for employer-sponsored housing and union jobs to U.S. workers.[112] I disagree.

### i. Failure to Advertise Housing

In 2016 and 2017, Respondent owned a house at 1047 Carol Avenue, Wheeling, IL 60090, where some of its H-2B workers lived.[113] Respondent provided housing to eleven H-2B workers in 2016 and seven H-2B workers in 2017.[114] Each year, Respondent charged each of the H-2B workers who lived in its housing $200 per month.[115] Respondent's 2016 and 2017 SWA job orders both state: "Assistance finding and securing board & lodging is not available."[116]

At the hearing, Mr. Guzman testified that he did not advertise that housing was available because he "didn't have the time to provide that service" and he "didn't intend to give anyone any type of help doing that."[117] Mr. Guzman also testified that in 2016, he was out of town when the H-2B workers arrived from Mexico, and when he came back, he found out "that they were staying in what I thought was my uncle's house."[118]

I am not persuaded by Respondent's contention that it "did not intend to provide housing or housing assistance in 2016 and 2017."[119] While it is possible that Mr. Guzman was not aware Respondent would provide housing in 2016, Respondent clearly had made housing arrangements for the H-2B workers upon their arrival. Further, Mr. Guzman offers no explanation for Respondent's failure to advertise housing in 2017. Therefore, I find that Respondent was required to advertise this benefit to U.S. workers.

---

[112] Pl. Br. at 34-35.

[113] ALJ 7; PX D, RFA Nos. 1-2; Tr. at 192.

[114] ALJ 7; JX Q; Tr. at 192.

[115] ALJ 7; JX J, Q; PX B; PX D, RFA No. 3.

[116] ALJ 7; JX E, I.

[117] Tr. at 463.

[118] *Id.* at 464.

[119] Res. Br. at 19; Tr. at 463-64.

## ii. *Failure to Advertise Union Jobs*

In 2016, twelve of Respondent's H-2B workers worked at least one week on union projects paying approximately $75 per hour, instead of the offered wage of $27.46 per hour.[120] In 2017, one of Respondent's H-2B workers worked one week on a union project paying $75 per hour, instead of the offered wage of $27.35 per hour.[121]

Respondent argues that it did not advertise the possibility of union jobs in 2016 and 2017 because it "didn't expect to do any."[122] Specifically, Respondent contends that its H-2B workers were "hired for union-pay jobs only rarely, and that it was totally unpredictable and unknowable in advance."[123] At the hearing, Mr. Guzman testified that he "didn't know when they would come in, if they did," that there were only one to four union jobs available each year since 2013, and that many of the U.S. and H-2B employees worked at the same large union job.[124] In the alternative, Respondent argues that the violation was insignificant, since Plaintiff determined that "[i]n the relevant two years, for all H-2B employees the calculated FLSA overtime back wages for union-pay job totaled only $1,847.12."[125]

The preponderance of the evidence shows that Respondent intended to offer union jobs when they became available, and therefore the regulations required it to advertise the opportunity. Mr. Guzman's testimony that the union jobs were rare and unpredictable, with only one to four opportunities a summer, is uncontroverted.[126] But because *at least one* higher-paying union job opportunity was available every year since 2013, it would be unreasonable to conclude that no opportunities would possibly exist in 2016 and 2017. Further, based on the twelve H-2B workers in 2016 who worked at least one week at union jobs, Respondent should have been aware of a real possibility of union jobs in 2017. Therefore, I find that Respondent was required to advertise this benefit to U.S. workers.

---

[120] ALJ 7; PX D, RFA Nos. 8-10.

[121] ALJ 7; PX D, RFA Nos. 14-15.

[122] Tr. at 465.

[123] Res. Br. at 20; Tr. at 465-66.

[124] Tr. at 465-66, 508.

[125] Res. Br. at 20.

[126] *Id.*; Tr. at 507-08.

### iii. Substantial Failure

Respondent's actions demonstrate that it either knew or should have known that it would provide housing and offer onion jobs, when available.[127] However, while Respondent's actions were willful, I do not find they were a significant deviation from the terms and conditions of the TECs.[128] Respondent has no history of violations under the H-2B program, and while Plaintiff alleges that Respondent's violation "*possibly* deterred potential U.S. applicants from applying for the job,"[129] Plaintiff offers no evidence showing that U.S. applicants were *actually* deterred.[130] Therefore, Plaintiff's argument is merely speculative. I further find that the gravity is at most, minimal. Accordingly, I find that Plaintiff did not establish by a preponderance of the evidence that Respondent substantially failed to comply with Attestation 4 and 29 C.F.R. § 503.16(q).

## C. Rate of Pay: Attestation 5, 29 C.F.R. §§ 503.16(a)(1), (a)(4), and (b), and Back Wage Assessments[131]

Attestation 5 states as follows:

The offered wage equals or exceeds the highest of the most recent prevailing wage for the occupation that is or will be issued by the Department to the employer for the time period the work is performed, or the applicable Federal, State, or local minimum wage, and the employer will pay at least the offered wage, free and clear, either in cash or in a negotiable instrument payable at par, during the entire period of this application. The employer guarantees to supplement a piece rate wage if at the end of the work week, the piece rate does not result in

---

[127] *See* 29 C.F.R. § 503.19(b) (stating that a violation is willful where the "employer, attorney, or agent knows its statement is false or that its conduct is in violation, or shows reckless disregard for the truthfulness of its representation or for whether its conduct satisfies the required conditions").

[128] 29 C.F.R. § 503.19(c).

[129] Tr. at 229 (emphasis added); *see also* PX M at 7 ("[S]uch violations *may have* deterred potential U.S. applicants from applying for the job.") (emphasis added).

[130] Tr. at 229. Plaintiff provided no additional support in its brief. Pl. Br. at 34, 48.

[131] **Rate of Pay**

| Applicable Attestation & Regulation | Applicable Application | Back Wages Assessed | CMPs Assessed |
|---|---|---|---|
| Attestation 5 & 29 C.F.R §§ 503.16(a)(1), (a)(4), (b) | 2016 TEC | $133,960.50 | $133,960.50 |
| | 2017 TEC | $167,487.56 | $161,590.73 |

average hourly piece rate earnings during the work week at least equal
to the offered wage.[132]

Plaintiff alleges that Respondent substantially failed to comply with
Attestation 5 in violation of 29 C.F.R. §§ 503.16(a)(1), (a)(4), and (b). Specifically,
Plaintiff argues that Respondent failed to pay the offered wage because its hourly
rates were less than the basic pay and overtime rates and it failed to pay its H-2B
workers for all the hours they worked.[133] I agree.

In 2016, Respondent requested twenty H-2B workers to perform work from
April 1, 2016 to September 30, 2016 as construction laborers, SOC (O*NET/OES)
Code 47-2061, who were required to be paid a basic rate of pay of $27.46 per hour and
an overtime rate of $41.19 per hour.[134] In 2017, Respondent again requested twenty
H-2B workers to perform work from April 1, 2017 to September 30, 2017 as
construction laborers, SOC (O*NET/OES) Code 47-2061, who were required to be
paid a basic rate of pay of $27.35 per hour and an overtime rate of $41.03 per hour.[135]
In the Job Offer Information section of both the 2016 TEC and the 2017 TEC,
Respondent indicated the basic number of hours of work per week was 40 hours and
that overtime was "N/A."[136]

Respondent's 2016 payroll records reflect an hourly rate of $27.11 paid to its
H-2B workers, which is lower than the required offered wage rate of $27.46, and an
overtime hourly rate of $40.67 versus the required offered wage rate of $41.19 for
overtime.[137] Respondent's 2017 payroll records reflect an hourly rate of $27.11 paid
to its H-2B workers, which is lower than the required offered wage rate of $27.35,
and an overtime hourly rate of $40.67 versus the required offered wage rate of $41.03
for overtime.[138] Respondent does not dispute these underpayments and "is willing to
pay back wages" for them.[139]

---

[132] JX C at 9, Att. 5; JX D at 10, Att. 5.

[133] Pl. Br. at 19-33.

[134] JX C; Tr. at 6.

[135] JX D; Tr. at 6.

[136] JX C, D.

[137] ALJ 7; PX D, RFA Nos. 165-168.

[138] ALJ 7; PX D, RFA Nos. 175-178; PX L.

[139] JX B.

Respondent's actions demonstrate a reckless disregard for ensuring that it paid its workers the required wage.[140] The violation is also a significant deviation because all of the H-2B workers were affected, the gravity was severe, and Respondent experienced financial gain, as shown by the back wages owed. Therefore, I find that Plaintiff has established by a preponderance of the evidence that Respondent substantially failed to comply with Attestation 5 in violation of 29 C.F.R. §§ 503.16(a)(1), (a)(4), and (b).[141]

### i.  Payment for All Hours Worked

Before addressing the calculation of back wages, I find it necessary to address Plaintiff's argument that Respondent did not pay its H-2B workers for all hours worked. Plaintiff has charged Respondent with failure to pay the offered wage, as required by Attestation 5. To prove this violation, Plaintiff relies on evidence that Respondent did not pay the H-2B workers for all hours worked. Although the language of Attestation 5 and the applicable regulations at 29 C.F.R. §§ 503.16(a)(1), (a)(4), and (b) do not explicitly mention payment for all hours worked, I interpret them as implicitly requiring that employers pay workers the required wage for every hour worked. Therefore, I find it necessary to discuss Plaintiff's calculation of the actual hours worked by the H-2B workers to determine the proper amount of back wages owed to each worker.

Plaintiff asserts that H-2B workers and U.S. workers worked side-by-side, performing the same tasks on the same pool plastering jobs for substantially the same number of hours, but that H-2B workers were paid for fewer hours on a weekly basis.[142] Therefore, Plaintiff contends that "Respondent's payroll records for U.S. field

---

[140] *See* 29 C.F.R. § 503.19(b) (stating that a violation is willful where the "employer, attorney, or agent knows its statement is false or that its conduct is in violation, or shows reckless disregard for the truthfulness of its representation or for whether its conduct satisfies the required conditions").

[141] Plaintiff argues that at least some of Respondent's H-2B workers were paid on a piece-rate basis (per pool), suggesting that they violated 29 C.F.R. § 503.16(a)(4) in addition to 29 C.F.R. §§ 503.16(a)(1) and (b). The regulations state that if an employer pays its workers on a piece-rate basis, it must pay each worker "an amount at least equal to … the amount the worker would have earned had the worker been paid at the offered hourly wage" for the number of hours worked in a given week. 29 C.F.R. § 503.16(a)(4). I do not find it necessary to analyze whether the workers were paid on a piece-rate or hourly basis because in either case, Respondent was required to pay the same minimum amount (an amount at least equal to the offered wage rate for the number of hours they worked). As discussed above, I find that Respondent failed to do so.

[142] Pl. Br. at 20.

workers are the best – and only – evidence of the hours actually worked by Respondent's H-2B workers."[143]

Respondent admitted that it failed to maintain original records of hours worked each day for its H-2B workers[144] but argues that its payroll records accurately reflect the hours its employees worked.[145] Respondent asserts that the primary job of H-2B workers was to plaster the pools[146] but that U.S. workers typically had additional roles, such as driver, "detail man," crew leader, tile cutting, chipping out old plaster below the tile before replastering, waterblasting, polishing, "damage control," acid washing, and equipment maintenance.[147]

Respondent is subject to the Fair Labor Standards Act ("FLSA") and therefore was required to maintain accurate records of the hours worked for its H-2B workers.[148] Plaintiff alleges that Respondent failed to do so. Under *Anderson v. Mt. Clemens Pottery Co.*,[149] if the employer's records are "inaccurate or inadequate," Plaintiff must show that the workers "in fact performed work for which [they were] improperly compensated" by producing "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."[150] If Plaintiff meets its burden, then:

> The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.[151]

---

[143] *Id.*; *see also* PX K at 1, 9, 17, 36.

[144] Res. Br. at 17; *see also* Tr. 474-75, 483-84, 509-10.

[145] Tr. at 445; *see also* PX A at 280-82.

[146] Tr. at 435-36.

[147] *Id.* at 436-41.

[148] Pl. Br. at 21-23; Resp. Br. at 5-7. Both parties briefed this issue in terms of the U.S. Supreme Court's *Mt. Clemens* standard.

[149] 328 U.S. 680 (1946).

[150] *Id.* at 687.

[151] *Id.*

(1) Respondent's Recordkeeping System

Plaintiff argues, and I agree, that Respondent's recordkeeping did not allow Respondent to accurately compensate employees for all hours worked. First, Respondent's recordkeeping system was described in vague terms, and the payroll records do not match the description of the recordkeeping process. At the hearing, Mr. Guzman credibly testified about the recordkeeping system as follows:

> So first I would send the guys the job information, pretty much the day before. Then they would go and perform the work. They would, on the sheet of paper, write down the job name, the job -- I guess who we were doing it for, the client pretty much. Then they would write down a drawing of the pool. They would measure out the pool so we could invoice it. They would draw, kind of like where their returns are so they wouldn't leave them covered. They would write out the names of the people that went to the job. And they would -- some of them would write driver and asterisks or something to highlight the people that drove, which were the U.S. workers. But since the crews changed sometimes, they always notated it. And then if someone went back to do something else, they would just put it on that sheet of paper. Then from that sheet of paper, I would take it and put it on the whiteboard whenever I did the invoicing and did their hours.
>
>                         \*\*\*
>
> I would tally [the hours] up and then get them to our accountant, Marie Chevalar (ph).[152]

Based on this testimony, it is not clear how Respondent calculated and recorded hours worked.[153] Mr. Hernandez, however, noted that the crew leader's recorded number was an estimate. At the hearing, he testified, "I asked [Mr. Guzman] what was the number, was that an accurate representation of the hours worked, and Mr. Guzman said it was an estimate of the number of hours the workers would have

---

[152] Tr. at 459-61.

[153] One of the U.S. workers' employee interview statements corroborates Mr. Guzman's testimony but does not clarify how the time was tracked. The U.S. worker stated:

> The company did not record our hours worked, they simply provide us with the job order form for the day and the group leader rights [sic] down the names of all of the workers that worked on that job and at the end of the day we turn that job order to the office secretary, we do not write on there our start or end time.

PX K at 36-37.

taken to finish that pool. That number was then put up on a whiteboard."[154] Mr. Hernandez noted that the whiteboard only included whole numbers, and when he asked Mr. Guzman, "[w]hat happens when workers work a quarter of an hour or half an hour, how do you record such time? Mr. Guzman then replied that they always round up to the whole numbers."[155]

Respondent offered no evidence to refute that the numbers recorded were an estimate. At the hearing, Mr. Guzman testified that sometimes he rounded up the H-2B workers' hours "to 40, and sometimes I think up to 35 or 36, because I believe that that was a requirement."[156] Indeed, Respondent's payroll records reflect that base hours were recorded as whole numbers (with a few exceptions), but overtime hours were not.[157] Despite Mr. Guzman's explanation that workers were paid according to the number on the whiteboard, the payroll records reflect that H-2B workers worked vastly different hours compared to each other and compared to U.S. workers.[158]

(2) Payroll Records

Additionally, Plaintiff argues, and I agree, that the payroll records do not show the full hours worked. The payroll records show that H-2B workers worked an average of 31.79 hours a week in 2016 and 36.42 hours a week in 2017.[159]

Plaintiff relies on Sr. Romo's notebook of hours worked to show that Respondent did not pay its H-2B workers for all hours worked.[160] However, I do not find Sr. Romo's explanation credible regarding his method of recording hours worked. Previously, in his declaration, Sr. Romo stated that he recorded his hours based on "the time I arrived at the jobsite" and "the time I left the jobsite after we cleaned

---

[154] Tr. at 195-96.

[155] *Id.* at 196-97.

[156] *Id.* at 442.

[157] JX S (2016 payroll records); PX L (2017 payroll records).

[158] JX S; PX L.

[159] JX T. According to Plaintiff's comparison of average hours, 11 of 17 H-2B workers were paid for less than 35 hours a week, on average, in 2016, and none of the workers were paid for more than 39 hours a week, on average. The difference between the average hours paid to each H-2B worker and the average hours worked by U.S. workers in 2016 was 12.16 hours. In 2017, 2 out of 16 were paid for an average of less than 35 hours a week and 15 out of 16 were paid for an average of less than 40 hours a week, but the difference between the average hours paid to each H-2B worker and the average hours worked by U.S. workers was 16.36. *Id.*

[160] Pl. Br. at 4-5.

it."[161] He further declared that he excluded the following information from his records:

    a.  the time I spent loading the trucks at the shop at the beginning of the day;

    b.  the time I spent driving the truck (I only drove in 2017) or riding in the truck from the shop to the jobsite;

    c.  the time I spent driving the truck or riding in the truck from one jobsite to a second jobsite; or

    d.  the time I spent driving the truck or riding in the truck from a jobsite back to the shop.[162]

At the hearing, though, Sr. Romo testified that the start and stop times he recorded "indicate[] the time when I woke up and we were in the shop until we finish the work, the pool."[163] His records included the time loading the trucks at the shop in the morning but not the time spent driving back after completing the work.[164] When asked if any of the times in his notebook include the drive back to the shop, Sr. Romo replied "[y]es."[165] Based on these inconsistencies, I find that Sr. Romo's testimony regarding his timekeeping method is not credible and give his notebooks no weight.

In addition to Sr. Romo's notebooks, Plaintiff relies on informal employee interview statements. Five U.S. employees stated that the H-2B workers worked the same jobs and hours as U.S. workers.[166] In his declaration, Sr. Romo similarly stated that "U.S. workers and H-2B workers worked side by side, doing the same work. There were no tasks at any job that were exclusively for U.S. workers and not H-2B workers. . . . Generally, the nature of each job-related task made it impossible for only the U.S. workers to complete them."[167]

---

[161] JX J ¶ 6.

[162] *Id.* ¶ 9.

[163] Tr. at 62.

[164] *Id.* at 63.

[165] *Id.* at 148.

[166] PX K at 1-2, 7-8, 9-10, 32-33, 36-37.

[167] PX K at 11-12, 23-24, 40-41; RX 33-35. The other employee interview statement that Plaintiff references in its brief, at PX K at 1, is the summary of a U.S. worker who was a supervisor, not an H-2B worker. Pl. Br. at 8.

Several H-2B employees also reported that they worked five to seven days a week for 10 to 11 hours a day.[168] In his interview statement, Chrystian Orozco also stated, "[i]n 2016 I worked 6 days a week, Monday - Saturday. But from April - June we were working all 7 days a week. Once July came the work became less, working 4-6 days a week. . . . We would work on average 10-11 hours a day."[169] He further stated that in 2017, "[w]e worked about the same hours as last year."[170] Based on the consistency of the statements among U.S. and H-2B workers, I find that the H-2B workers, on average, worked 10 to 11 hours a day for 5 to 7 days a week, and therefore more than 40 hours a week.[171] However, according to the payroll records, H-2B workers only worked an average of 31.79 hours a week in 2016 and 36.42 hours a week in 2017.[172]

Based on the foregoing, I find that H-2B workers worked substantially the same hours as U.S. workers, which the recordkeeping system fails to reflect.[173] Therefore, I find that Plaintiff has demonstrated that the payroll records are an inadequate representation of the hours that H-2B workers worked.

(3) Workday Start Time

Plaintiff argues that "all of the time H-2B workers spent at the job sites at Respondent's direction … were compensable hours worked," including "duties performed at the shop at the beginning and end of each day, the time spent traveling

---

[168] PX K at 11-12, 23-24, 40-41; RX 33-35. The other employee interview statement that Plaintiff references in its brief, at PX K at 1, is the summary of a U.S. worker who was a supervisor, not an H-2B worker. Pl. Br. at 8.

[169] PX B.

[170] *Id.*

[171] Plaintiff did not allege that Respondent willfully misrepresented a material fact when it represented on the TECs that the hours of work would be forty per week with no overtime. Therefore, I cannot find a violation of the TECs and am limited to making a narrow finding for the purpose of calculating back wages owed only.

[172] JX T. According to Plaintiff's comparison of the average hours worked, 11 of 17 H-2B workers were paid for less than 35 hours a week, on average, in 2016, and none of the workers were paid for more than 39 hours a week, on average. The difference between the average hours paid to each H-2B worker and the average hours worked by U.S. workers in 2016 was 12.16 hours. In 2017, 2 of 16 H-2B were paid for an average of less than 35 hours a week and 15 out of 16 were paid for an average of less than 40 hours a week, but the difference between the average hours paid to each H-2B worker and the average hours worked by U.S. workers was 16.36. JX T.

[173] While there appears to be a difference in the number of hours worked and types of tasks that U.S. supervisors worked compared to H-2B workers and non-supervising U.S. workers, there is insufficient evidence to quantify this difference, and therefore I find it unsubstantial.

from the shop to the job site and back, and the time spent traveling among job sites."[174] Respondent avers that "[n]o violations were cited for this supposed practice, which suggests that Plaintiff brought it up merely to characterize Lucero as a bad actor."[175] Still, Respondent disputes the allegations, stating that H-2B workers were not paid for the time spent at the shop because their workdays began at the first job site.[176]

However, multiple workers stated that they were required to meet at the shop in the mornings before heading to the first worksite. One of the H-2B workers reported that in 2016, "we would arrive to the yard at about 6am and load up the trucks with the work tools."[177] Another explained that in 2017, "we have to be at the company by 6am every day, we report there and we are split into work groups, we load the work tools needed for the day onto the trucks."[178] That same worker also stated, "I am not paid for the time spent at the yard, only when we start work at the first job site."[179] A third H-2B worker, who was also employed in 2017, stated: "We arrive to the yard at 6:00am; we load up work tools onto the work pickup trucks. We load up what we will need for the day."[180] Similarly, Sr. Romo declared that in the mornings at the shop he would load "the supplies and tools needed for the day into the trucks."[181] In his personal interview statement, Sr. Orozco explained that they reported to the company shop in the mornings.[182] He stated that in 2016, "[w]e had to start our working day here, getting all the work tools ready at 5am, and in 2017, "we have to report to the yard at 5:30/6am every morning, we don't have an option."[183]

At the hearing, Mr. Guzman testified that H-2B workers were not required to gather at the shop before going to the job site and they were not needed to load materials or tools onto the trucks.[184] I find that Mr. Guzman's testimony alone is insufficient to refute the numerous consistent reports that the workers were

---

[174] Pl. Br. at 26.

[175] Res. Br. at 15.

[176] Res. Br. at 15-16; Tr. at 447-49.

[177] PX K at 40; RX 35.

[178] PX K at 12; RX 33.

[179] PX K at 12; RX 33.

[180] PX K at 23; RX 34.

[181] JX J ¶¶ 23, 29.

[182] PX B at 2.

[183] *Id.*

[184] Tr. at 449, 472-73, 487-88.

- 30 -

"required" to be at the shop early in the morning to load materials onto the trucks for the day. I do not have sufficient evidence to determine if Respondent paid the workers for the time spent traveling from job site and back, or the time spent traveling among job sites. However, I do find that the workers should have been paid for their time at the shop in the mornings and for their time spent traveling from the shop to the first work site, which the payroll records do not reflect.

(4) Plaintiff Met Burden Under the *Mt. Clemens* Standard

Consistent with the foregoing, I find that Plaintiff demonstrated that Respondent's records are "inaccurate or inadequate" and provided sufficient evidence to reasonably infer the amount and extent of that work.

(5) Respondent Did Not Meet Its Burden Under the *Mt. Clemens* Standard

Because I found that the payroll records are inadequate, the burden shifts to Respondent to proffer evidence of the precise amount of work performed or to negate the reasonableness of the inference to be drawn from the Plaintiff's evidence.[185]

Respondent argues that U.S. workers were paid for more hours than H-2B workers because U.S. workers worked more and different jobs than H-2B workers.[186] However, the payroll records do not reflect the different jobs workers worked or the time spent on jobs that were not plastering, and Respondent has proffered no other evidence that demonstrates these differences.[187] I cannot give full weight to the affidavits of 18 H-2B workers, all of whom attested the hours recorded were correct and that they were paid for all the hours they worked.[188] The affidavits provide, in the same or substantially similar language, that the foreman of the group would track the hours worked, report those hours to Respondent, and Respondent would record the hours on a whiteboard.[189] The workers would then review the whiteboard and report any errors to Mr. Guzman, who would make the corrections.[190] The only evidence supporting the statements that the workers were paid for all hours worked is that the workers kept track of their own hours; however, Respondent offers no

---

[185] *Id.*

[186] Res. Br. at 14; Tr. at 435-44.

[187] JX S; PX L.

[188] RX 1A-31A.

[189] *Id.*

[190] *Id.*

evidence to substantiate the truthfulness of these statements. Importantly, the affidavits do not support Respondent's contention that the U.S. workers performed more and different hours than the H-2B workers.[191]

Additionally, Respondent argues that the hearing testimony of two U.S. workers, Mr. Garcia and Mr. Gomez, corroborate Mr. Guzman's testimony. But both stated that they did not know whether H-2B workers were paid for all hours worked,[192] and they appeared to not fully understand questions that they answered in the affirmative.[193] On direct examination, Mr. Garcia was asked if "U.S. workers work side-by-side with the H-2B workers," and he replied in the affirmative, but when asked the same question on cross-examination, he said, "I don't understand side-by-side" and clarified that H-2B workers "didn't do the details" when placing the plaster.[194] On cross-examination, Mr. Gomez testified that even though he said in his interview statement that "visa workers do the same jobs as we do, the employees of the company" and "[i]f I work a day, they work it as well," U.S. workers actually do different and additional jobs than H-2B workers.[195] I find these statements inconsistent and therefore afford them little weight.

As previously noted, Respondent admitted that it did not keep original records of hours worked, and Respondent has offered no other evidence that is sufficient to rebut Plaintiff's. Therefore, I find that Respondent failed to pay its workers for all hours worked.

---

[191] *Id.*

[192] Tr. at 547-48, 557.

[193] On direct examination, Mr. Garcia affirmed that "U.S. workers more commonly do the job of damage control than H-2B workers," but on cross-examination, the following exchange occurred:

   Q. Was damage control part of what you normally did as a crew leader?

   A. Sorry, can you repeat the question?

   Q. Was there anyone in your crew responsible for dealing with customers when things went wrong?

   A. No.

   Q. Do you know in 2016 and 2017 if anyone at the company, that was part of their job responsibility?

   A. I don't know. True.

   Tr. at 549, 551-52.

[194] *Id.* at 548, 552-53.

[195] *Id.* at 564.

ii.  *Calculation of Back Wages*

Plaintiff determined that Respondent owes $133,960.50 in back wages to 19 H-2B workers for 2016 and $167,487.55 in back wages to 17 H-2B workers for 2017.[196] Plaintiff based its calculations on its additional finding that Respondent failed to pay its H-2B workers for all hours worked.

To determine the number of hours that H-2B workers actually worked, Plaintiff "reconstructed" the hours based on the weekly average hours worked for the U.S. workers that performed the same work as the H-2B workers.[197] Plaintiff then applied the following equations for each H-2B worker:[198]

| | | | | |
|---|---|---|---|---|
| Reconstructed Non-OT hours | X | Basic Rate*^ | = | Total Basic Pay Due |
| Total Basic Pay Due | − | Regular Gross Paid | = | H-2B PW Due in Particular Work Week |
| Reconstructed OT Hours | X | OT Rate*^ | = | OT Due in Particular Work Week |
| OT Should Have Been Paid | − | OT Paid | = | OT Due in Particular Pay Period |
| H-2B PW Due | + | OT Due | = | Total Due in Particular Work Week |
| *2016 Basic Rate $27.46 & OT Rate $41.19   ^2017 Basic Rate $27.35 & OT Rate $41.03 | | | | |

---

[196] JX A.

[197] PX M at 9-13.

[198] PX M at 9-12; PX H. The "reconstructed hours" for each week are the average hours that the U.S. workers actually worked each week. Tr. at 266. "H-2B PW" refers to the prevailing wage, which "is the hourly rate that the H-2B workers should have been paid per hour based on that specific TEC," which was either the 2016 or 2017 TEC. Tr. at 265. The "H-2B PW Due" is the basic hourly rate multiplied by all the non-overtime hours (40), minus the total gross pay. Tr. at 266; *see also* PX H. The prevailing wage "OT rate" is the overtime rate listed on the TEC. The total due in a particular work week is the sum of the overtime due and the H-2B prevailing wage due. Tr. at 267; *see also* PX H.

For 2016 and 2017, Plaintiff calculated the following as the total back wages due:[199]

| 2016 | | 2017 | |
|---|---|---|---|
| Name | Back Wages Due | Name | Back Wages Due |
| Chrystian Ramon Orozco Villanueva | $9,928.78 | Chrystian Ramon Orozco Villanueva | $9,139.96 |
| Francisco Javier Romo Villanueva | $5,878.44 | Diego Sosa Pina | $15,546.65 |
| Genoveva Gonzalez Soto | $6,450.72 | Francisco E Urbina Sanchez | $4,445.88 |
| Gustavo Pina Vivas | $10,969.01 | Francisco Javier Romo Villanueva | $11,362.71 |
| Heriberto Nuncio Ramirez | $4,397.03 | Gerardo Rubio Jurado | $9,991.36 |
| Hugo Nain Morales Reyes | $6,356.57 | Gustavo Pina Vivas | $12,909.85 |
| Ismael Ulises Orozco Villanueva | $4,733.44 | Heriberto Nuncio Ramirez | $2,876.03 |
| Jesus Bladimir Garcia Villanueva | $9,930.34 | Hugo I Villalobos Molina | $12,998.64 |
| Jose Antonio Barragan Mora | $4,643.14 | Jesus Bladimir Garcia Villanueva | $13,202.36 |
| Josue Alejandro Fuentes Sanchez | $6,507.40 | Jose P Valencia Herrera | $8,439.38 |
| Juan Pablo A Bundiz Serna | $25.20 | Josue Alejandro Fuentes Sanchez | $5,207.40 |
| Luis Fernando Garcia Nevarez | $6,944.18 | Juan Pablo A Bundiz Serna | $11,864.32 |
| Luis Javier Arce Graciano | $10,423.31 | Luis Javier Arce Graciano | $10,163.96 |
| Luis Manuel Betance Burciaga | $6,174.25 | Luis Manuel Betance Burciaga | $12,055.53 |
| Luis Manuel Jurado Gonzalez | $10,218.79 | Mario Alberto Saenz Muniz | $9,575.76 |
| Mario Alberto Saenz Muniz | $11,057.65 | Pedro A Guzman Pules | $4,553.44 |
| Mario Miguel Montenegro Arce | $8,253.14 | Roberto A Arce Aguilar | $13,154.35 |
| Noel Porfirio Soto Fierro | $4,397.03 | TOTAL: | $167,487.55 |
| Sixta Alfredo Arciniega Morales | $6,672.06 | | |
| TOTAL: | $133,960.50 | | |

Because I found that the payroll records are insufficient and Respondent failed to offer evidence to rebut Plaintiff's reasonable inference that H-2B workers were not paid for all hours worked, I find that Plaintiff's method of calculation to determine the back wages is reasonable. Accordingly, I also find that Plaintiff's final determination of back wages for each H-2B worker is appropriate.[200] In total, Respondent owes $133,960.50 in back wages for 2016 and $167,487.55 in back wages for 2017.

---

[199] PX M at 9-12; PX H.

[200] At the hearing, Mr. Guzman testified, after reviewing a list of the workers' names, that H-2B workers Genovevo Gonzalez Soto, Luis Fernando Garcia Nevarez, and Luis Manuel Jurado Gonzalez had personal issues that prevented them from working all of the hours Respondent offered them. Tr. at 532-34. No other evidence corroborates Mr. Guzman's testimony, and I do not find that his testimony alone is sufficient to reduce their back wages. Therefore, I give Mr. Guzman's testimony little weight and affirm Plaintiff's determination of back wages.

**D. Separation of Employment: Attestation 10 and 29 C.F.R. § 503.16(y)[201]**

If an H-2B worker separates from employment before the end date specified in the TEC, Attestation 10 and 29 C.F.R. § 503.16(y) require employers to notify the OFLC no later than two workdays after the separation.[202]

Plaintiff argues that Respondent substantially failed to comply with Attestation 10 when it did not timely report to OFLC that four of its H-2B workers separated from employment before their end date of employment.[203] I agree that Respondent failed to timely report the separations, but I do not find the failure to be substantial.

Respondent represents it was not aware of the requirement to report employee separations until its initial conference with Plaintiff.[204] Respondent stipulated that, on September 11, 2017, it notified OFLC that three H-2B workers separated from Respondent on the following dates: Juan Evelio Carralez Muniz on April 8, 2017, Heriberto Nuncio Ramirez on April 29, 2017, and Mario Alberto Saenz Muniz on August 29, 2017.[205] At the hearing, Respondent admitted that it also failed to notify OFLC of H-2B worker Chrystian Orozco's early employment separation, which was corroborated by Mr. Hernandez's interview with Mr. Orozco, Mr. Orozco's paystubs, and Respondent's payroll records.[206] Therefore, there is no factual dispute that Respondent failed to timely report the separations.[207]

Respondent's actions demonstrate a reckless disregard for the terms and conditions of the TEC, and therefore I find that Respondent acted willfully. However, I do not find that Respondent significantly deviated from the terms and conditions of

---

[201] **Separation of Employment**

| Applicable Attestation & Regulation | Applicable Application | Back Wages Assessed | CMPs Assessed |
|---|---|---|---|
| Attestation 10 & 29 C.F.R § 503.16(y) | 2017 TEC | $0.00 | $1,857.45 |

[202] JX C at 10, Att. 10; JX D at 11, Att. 10; 29 C.F.R. § 503.16(y).

[203] Pl. Br. at 41-42.

[204] PX M at 13; Tr. at 457-58.

[205] ALJ 7; PX D, L, P; Tr. at 193-94, 300.

[206] Tr. at 272-74, 457-58; see also PX B, L, N.

[207] Respondent did not dispute this violation at hearing and did not mention the violation in its brief. See Tr. at 9-527; Res. Br.

the TEC.[208] As previously noted, Respondent has no history of violations under the H-2B program.[209] The gravity of the violation is minimal because only four H-2B workers were involved and Respondent remedied the deficiency upon learning of the requirement.[210] Further, as the factors enumerated at 29 C.F.R. § 503.19(c) are non-exhaustive, I give great weight to Mr. Guzman's credible testimony that he was unaware of the requirement to report employee separations, as he made a good-faith effort to comply by submitting the proper notification three days after the initial conference.[211] Therefore, I find that Plaintiff did not establish by a preponderance of the evidence that Respondent substantially failed to comply with Attestation 10 and 29 C.F.R. § 503.16(y).

### E. Area of Intended Employment: Attestation 11 and 29 C.F.R. § 503.16(x)[212]

Attestation 11 and 29 C.F.R. § 503.16(x) prohibit Employers from placing H-2B workers outside the area of intended employment listed on the TEC.[213] Plaintiff alleges that Respondent substantially failed to comply with Attestation 11 when its H-2B workers performed work outside of the Chicagoland area in 2016 and 2017. I agree.

Respondent stipulated that it required its H-2B workers to work throughout Indiana, Michigan, and Wisconsin, instead of only the Chicagoland area listed on the TECs in 2016 and 2017.[214] Respondent also admits that its H-2B workers worked at least one job in Iowa in 2017.[215] However, Respondent's TECs identify only the Cook County-Chicago-Naperville-Joliet Metropolitan Division in 2016 and the Cook

---

[208] *See* 503.19(a)(2) ("A substantial failure is a willful failure to comply that constitutes a significant deviation from the terms and conditions of such documents . . . .").

[209] *See* PX M.

[210] Plaintiff also agreed that the gravity was minimal in the CMP analysis, although Plaintiff attributed this to Respondent's lack of awareness of the notification requirements. *See* PX M at 14.

[211] *See Three Chimney Farms, LLC*, OALJ No. 2013-TAE-00011, slip op. at 23 (Feb. 2, 2015).

[212] **Area of Intended Employment**

| Applicable Attestation & Regulation | Applicable Application | Back Wages Assessed | CMPs Assessed |
|---|---|---|---|
| Attestation 11 & 29 C.F.R § 503.16(x) | 2016 TEC | $0.00 | $18,574.50 |
| | 2017 TEC | $0.00 | $18,574.50 |

[213] JX C at 10, Att. 11; JX D at 11, Att. 11; 29 C.F.R. § 503.16(x).

[214] ALJ 7.

[215] *Id.*; JX K, L.

County-Chicago-Naperville-Arlington Heights Metropolitan Division in 2017 as the areas of intended employment.[216] Thus, there is no factual dispute Respondent placed its H-2B workers outside the area of intended employment in both 2016 and 2017.[217] Mr. Guzman testified that he was unaware of the requirement to keep the H-2B workers within the Chicagoland area and acknowledged his mistake.[218] He also stated that he would comply in future TEC applications.[219]

Respondent's actions demonstrate a reckless disregard for ensuring that its workers stay within the area of intended employment listed on the TEC.[220] The violation was also a significant deviation from the terms and conditions of the TECs given the large number of times that Respondent sent its H-2B workers outside of the intended area of employment.[221] Therefore, I find that Plaintiff established by a preponderance of the evidence that Respondent substantially failed to comply with Attestation 11 in violation of 29 C.F.R. § 503.16(x).

## F. Transportation and Subsistence Fees: Attestation 17, 29 C.F.R. §§ 503.16(j)(1)(i)-(ii), and Back Wage Assessments

Attestation 17 and 29 C.F.R. §§ 503.16(j)(1)(i)-(ii) require employers to pay all transportation and subsistence costs for its H-2B workers' travel *from* their homes to the place of employment ("inbound") and *to* their homes or where they originally departed from the place of employment ("outbound").[222] Plaintiff alleges that Respondent failed to do so and therefore substantially failed to comply with Attestation 17. I agree.

---

[216] ALJ 7; JX C-D; PX D.

[217] Respondent did not dispute this violation at hearing and did not mention this violation in its brief. *See* Tr. at 9-527; Res. Br.

[218] Tr. at 466-67; PX M at 14.

[219] PX M at 33.

[220] *See* 29 C.F.R. § 503.19(b).

[221] *See id.* § 503.19(c).

[222] JX C at 10, Att. 17; JX D at 11, Att. 17; 29 C.F.R. §§ 503.16(j)(1)(i)-(ii).

### i. *Inbound Transportation and Subsistence*[223]

Employers "may arrange pay for the transportation and subsistence directly, advance at a minimum the most economical and reasonable common carrier cost of the transportation and subsistence to the worker before the worker's departure, or pay the worker for the reasonable costs incurred by the worker."[224] If an employer reimburses an employee's reasonable transportation and subsistence costs, the employer must keep records of the worker's expenses, the amounts reimbursed, and the dates of reimbursement.[225]

In 2016 and 2017, Respondent's workers spent roughly one day and one night riding the bus from their respective hometowns to Monterrey, Mexico, where they were processed at the U.S. consulate.[226] Respondent failed to reimburse those workers for their bus fare from their hometowns to Monterrey.[227] At the hearing, Mr. Guzman asserted that Respondent paid for the workers' hotel costs in Monterrey in 2016 and 2017, but he had no record of those payments.[228] Mr. Guzman also admits that it failed to pay for the workers' required subsistence.[229] When asked whether Respondent paid for the workers food costs during travel, Mr. Guzman testified:

> Not from their hometown to Monterrey, I did not do that. I didn't know I was supposed to. I just took into account for Monterrey. But I did send some of them bigger amounts of money where they were supposed to use that and come. But I didn't have the records for it.[230]

---

[223] Inbound Transportation and Subsistence

| Applicable Attestation & Regulation | Applicable Application | Back Wages Assessed | CMPs Assessed |
|---|---|---|---|
| Attestation 17 & 29 C.F.R § 503.16(j)(1)(i) | 2016 TEC 2017 TEC | $3,196.94 $2,666.62 | $3,196.94 $2,666.62 |

[224] 29 C.F.R. § 503.16(j)(1)(i).

[225] *Id.*

[226] ALJ 7; Tr. at 25-27; JX J.

[227] Tr. at 25-28, 467; JX J; PX B.

[228] Tr. at 467.

[229] *Id.*

[230] *Id.*

In Monterrey, the U.S. consulate processed all of Respondent's workers' visas.[231] The workers stayed in hotels during processing for three to four days.[232] Respondent admits that, in 2016 and 2017, it paid only "some" costs for a "few" of its workers' inbound travel expenses.[233] Respondent paid for each worker's bus ticket to Wheeling, Illinois, in 2016, and Schaumburg, Illinois, in 2017.[234]

Respondent argues that it "did make substantial payments of transportation and subsistence costs in the U.S., and Mr. Hernandez admitted this."[235] Respondent also argues that it relied on Monarch Butterfly and Attorney Robert Kershaw to "handle such matters. . . . Mr. Guzman trusted Monarch to handle all the necessary paperwork and to reimburse necessary costs."[236] Respondent "takes responsibility" for any violations but asserts that "[a]ny noncompliance was not willful or reckless and thus is not a violation of the H-2B program."[237]

*ii. Outbound Transportation and Subsistence*[238]

Employers are required to pay all outbound travel costs for H-2B workers who completed the period of employment included in the job order, or who the employer dismissed from employment for any reason before the end of the period.[239]

In 2016, H-2B workers rode the bus from Illinois back to Mexico, which took approximately three days and two nights.[240] Respondent admitted it paid only some outbound travel and subsistence costs in 2016, but Mr. Guzman testified at deposition

---

[231] PX D, RFA Nos. 92, 101.

[232] Tr. at 25; PX B, K.

[233] PX A; PX D, RFA Nos. 91, 100.

[234] Tr. at 26-27, 285.

[235] Res. Br. at 20. However, Respondent did not provide any documentation or other support to corroborate this statement.

[236] *Id.*; Tr. at 434.

[237] *Id.* at 20-21 (citing 29 C.F.R. §§ 503.19, 503.24).

[238] **Outbound Transportation and Subsistence**

| Applicable Attestation & Regulation | Applicable Application | Back Wages Assessed | CMPs Assessed |
|---|---|---|---|
| Attestation 17 & 29 C.F.R § 503.16(j)(1)(ii) | 2016 TEC | $5,249.13 | $5,249.13 |

[239] 29 C.F.R. § 503.16(j)(1)(ii).

[240] Tr. at 27-28; JX J; PX B.

that "[i]t wasn't like a lot, and [he] didn't think much of it[.]"[241] The workers spent their own money on food for this return trip, and Respondent failed to reimburse them.[242]

### iii. Substantial Failure

Respondent's failure to pay for the entirety of its workers' travel expenses was willful because its actions demonstrate a reckless disregard for whether it paid its H-2B workers for all required expenses.[243] The violation is also significant because a large number of H-2B workers were affected and Respondent achieved some financial gain.[244] Specifically, Plaintiff determined that in 2016, 19 H-2B workers were due $168.26 each for a total of $3,196.94 in inbound and subsistence expenses and $276.27 each for a total of $5,249.13 in outbound expenses.[245] In 2017, 17 H-2B workers were due $156.86 each for a total of $2,666.62 in inbound and subsistence expenses.[246] Although Respondent has no previous history of violations under the H-2B program and no U.S. workers were affected, I give the greatest weight to the fact that all of the H-2B workers had financial loss and Respondent experienced financial gain from the violation. Therefore, I find that Plaintiff established by a preponderance of the evidence that Respondent substantially failed to comply with Attestation 17 in violation of 29 C.F.R. §§ 503.16(j)(1)(i)-(ii).

### iv. Back Wages Determination

As noted, the inbound travel and subsistence cost each of the nineteen workers an average of $168.26 in 2016 and each of the seventeen workers $156.86 in 2017, for their entire five-day trip by bus from rural Mexico to Illinois.[247] The outbound travel and subsistence cost for each of the nineteen workers averaged $276.27 in 2016, for their entire three-day trip from Illinois to Mexico.[248]

---

[241] PX A at 335.

[242] Tr. at 27-28, 267-68, 289; JX J; PX B.

[243] See 29 C.F.R. § 503.19(b); see also 80 Fed. Reg. at 24086-87.

[244] See 29 C.F.R. § 503.19(c).

[245] PX M at 21-22.

[246] Id. at 22.

[247] Pl. Br. at 35-37; Tr. at 267-68; PX H; PX M at 21-22.

[248] Pl. Br. at 37-38; Tr. at 267-68; PX H; PX M at 21-22.

Plaintiff used the price of bus tickets to calculate the transportation costs because it was the cheapest transportation option available to the H-2B workers.[249] Plaintiff calculated the average costs for hotel and transportation by averaging the expenses reported by H-2B workers in their employee interview statements.[250] Daily subsistence costs, however, were pre-determined by the TEC in each year, and Plaintiff added those numbers to the averages calculated.[251] In total, Respondent owes its H-2B workers $5,863.56 for inbound travel and subsistence costs in 2016 and 2017 and $5,249.13 for outbound travel and subsistence costs in 2016.[252]

---

[249] Tr. at 290.

[250] *Id.* at 288-89.

[251] *Id.*

**Inbound Transportation and Subsistence Breakdown**

|      | Transportation: Hometown to Monterrey | Hotel in Monterrey | Subsistence (5 days) | Total per person | Total back wages |
|------|----------------------------------------|--------------------|----------------------|------------------|------------------|
| 2016 | $40.57 | $67.24 | $60.45 ($12.09/day) | $168.26 | $3,196.94 |
| 2017 | $43.81 | $52.70 | $60.35 ($12.07/day) | $156.86 | $2,666.62 |

**Outbound Transportation and Subsistence Breakdown**

|      | Transportation: Illinois to Hometown | Subsistence (3 days) | Total per person | Total back wages |
|------|---------------------------------------|----------------------|------------------|------------------|
| 2016 | $240 | $36.27 ($12.09/day) | $276.27 | $5,249.13 |

[252] Tr. at 288-89; JX A.

### G. Disclosure of Job Order: Attestation 19 and 29 C.F.R. § 503.16(*l*)[253]

Attestation 19 and 29 C.F.R. § 503.16(*l*) require employers to provide a copy of the job order to their H-2B workers in a language understood by the workers.[254] Respondent admits it did not provide any of its 2016 or 2017 H-2B workers with a copy of the job orders, and thus there is no factual dispute.[255]

At the hearing, Mr. Guzman testified that he chose the company, Monarch Butterfly ("Monarch") to help with the H-2B process in Mexico at the recommendation of his attorney, Robert Kershaw. Although he did not know the company's process, he "really believed" that the company was complying with the rules and regulations.[256] Yet he also acknowledged that it was Respondent's responsibility to provide a copy of the job order to the H-2B applicants, and he accepted responsibility for the violation and any associated penalty.[257]

Plaintiff determined that the non-distribution of the job order to the H-2B workers represents a substantial failure to comply with Attestation 19 of the 2016 and 2017 TECs. I agree.

The violation is willful because Respondent independently chose Monarch and was aware of its responsibilities to ensure that Monarch complied with the H-2B program's requirements.[258] The violation is also significant. At the hearing, Mr. Hernandez explained:

---

[253] **Disclosure of Job Order**

| Applicable Attestation & Regulation | Applicable Application | Back Wages Assessed | CMPs Assessed |
|---|---|---|---|
| Attestation 19 & 29 C.F.R § 503.16(*l*) | 2016 TEC | $0.00 | $5,572.35 |
| | 2017 TEC | $0.00 | $5,572.35 |

[254] JX C at 10, Att. 19; JX D at 11, Att. 19; 29 C.F.R. § 503.16(l).

[255] ALJ 7; PX D, RFA Nos. 115-118; Tr. at 435.

[256] Tr. at 434.

[257] *Id.* at 435

[258] The U.S. Supreme Court has observed that "clients must be held accountable for the acts and omissions of their attorneys." *Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396 (1993). Here, Respondent "voluntarily chose this attorney as [its] representation in the action, and [it] cannot now avoid the consequence of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation . . . ." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–34 (1962). *See also* 29 C.F.R. § 503.19(b); 80 Fed. Reg. at 24086.

- 42 -

The purpose of Attestation Number 19 is for the worker -- the prospective H-2B worker that's applying to the visa to have the actual written contract so they know all the terms and conditions of the temporary employment certification that the employer is filing and they know their rights under such contract.[259]

In other words, "[t]he purpose of the disclosure is . . . to strengthen worker protection and promote program compliance."[260] I find that the gravity of the violation is severe because none of the H-2B workers had the information to become aware of the terms and conditions of the employment and their rights under the contract.

Therefore, I find that Plaintiff has established by a preponderance of the evidence that Respondent substantially failed to comply with Attestation 19 in violation of 29 C.F.R. § 503.16(*l*).

## H. Contracts with Third Parties to Comply with Prohibitions: Attestation 22 and 29 C.F.R. § 503.16(p)[261]

Attestation 22 and 29 C.F.R. § 503.16(p) require employers to contractually forbid third parties from seeking payment from employees.[262] As noted, in 2016 and 2017, Respondent employed Monarch to process visas for its H-2B workers at the U.S. consulate in Monterrey.[263] Respondent admits it had no written contract with Monarch in 2016 or 2017,[264] and thus there is no factual dispute.

Plaintiff determined, and I agree, that Respondent's failure was substantial. First, Respondent's actions demonstrate a reckless disregard for ensuring that third parties do not seek payment from its employees.[265] Second, the violation is significant.

---

[259] Tr. at 291.

[260] 80 Fed. Reg. at 24069 (citing 20 C.F.R. § 655.20(*l*)).

[261] **Contracts with Third Parties to Comply with Prohibitions**

| Applicable Attestation & Regulation | Applicable Application | Back Wages Assessed | CMPs Assessed |
|---|---|---|---|
| Attestation 22 & 29 C.F.R. § 503.16(p) | 2016 TEC | $0.00 | $1,238.30 |
| | 2017 TEC | $0.00 | $1,238.30 |

[262] JX C at 11, Att. 22; JX D at 12, Att. 22; 29 C.F.R. § 503.16(p).

[263] ALJ 7; PX A at 337; PX D, RFA Nos. 119, 123.

[264] ALJ 7; PX A at 338-39; PX D, RFA Nos. 120-121, 124-125; JX P.

[265] *See* 29 C.F.R. § 503.19(b); *see also* 80 Fed. Reg. at 24086.

At the hearing, Mr. Guzman explained that the regulation is "a protection mechanism that's in place for prospective H-2B workers."[266] He further testified that all H-2B workers were affected by the violation.[267] For these reasons, I find that Plaintiff has established by a preponderance of the evidence that Respondent substantially failed to comply with Attestation 22 in violation of 29 C.F.R. § 503.16(p).

## I.  Document Retention Requirements: Attestation 26 and 29 C.F.R. § 503.17[268]

Attestation 26 and 29 C.F.R. § 503.17 require employers to retain for three years all documents relating to the TEC and registration, recruitment-related documents, and payroll records.[269] Plaintiff alleges that Respondent substantially violated the terms and conditions of the 2016 and 2017 TECs by failing to do so.[270] I agree.

Respondent failed to retain documents recording its H-2B workers' start and end times and tasks completed, records showing it reimbursed its H-2B workers for their inbound and outbound travel and subsistence, and records relating to its recruitment efforts of U.S. workers.[271] I incorporate here my earlier discussion of Respondent's method for recording the hours its employees worked.[272] After Mr. Guzman calculated and reported the hours to Respondent's accountant for payroll processing, Mr. Guzman would throw away the "sheet of paper" with the job details.[273]

---

[266] Tr. at 296; *see also* 80 Fed. Reg. at 24070 (discussing purpose of parallel regulation at 20 C.F.R. § 655.20(p)).

[267] Tr. at 295-96.

[268] **Document Retention**

| Applicable Attestation & Regulation | Applicable Application | Back Wages Assessed | CMPs Assessed |
|---|---|---|---|
| Attestation 26 & 29 C.F.R § 503.17 | 2016 TEC | $0.00 | $6,191.50 |
| | 2017 TEC | $0.00 | $6,191.50 |

[269] JX C at 11, Att. 26; JX D at 12, Att. 26; 29 C.F.R. § 503.17.

[270] Pl. Br. at 38-41.

[271] Tr. at 198, 209, 234, 263, 454, 459-60, 483-84, 509; PX A, D, K; JX J, M.

[272] *See supra* Section VI.C.i.

[273] Tr. at 461, 474-75.

- 44 -

Respondent argues that the payroll records are a sufficient record of hours worked because they were based on hours the crew reported.[274] I previously found that its records were inadequate, and there is no factual dispute that Respondent does not have an original record of hours worked or any reimbursements for travel or subsistence.[275]

Respondent's failure to retain documents is a substantial violation. Its actions demonstrate that it either knew or should have known that it was required to retain documents, and it had control over its own recordkeeping. Additionally, document retention is critical to the Department's enforcement abilities,[276] and thus Respondent's failure to retain those documents is significant. Therefore, I find that Plaintiff has established by a preponderance of the evidence that Respondent substantially failed to comply with Attestation 26 in violation of 29 C.F.R. § 503.17.

## J.  Civil Money Penalties

A CMP may be assessed for each violation that meets the standards under 20 C.F.R. § 503.19 (Violations).[277] "Each such violation involving the failure to pay an individual worker properly or to honor the terms or conditions" of the TEC, "constitutes a separate violation."[278] If an employer violates any provision under 20 C.F.R. § 503.16 (Assurances and Obligations of H–2B Employers) "related to wages, impermissible deductions or prohibited fees and expenses," a CMP may be assessed in an amount "equal to the difference between the amount that should have been paid and the amount that actually was paid to such worker(s)," but not to exceed $12,383 per violation.[279] A CMP "for any other violation that meets the standards described in § 503.19" may be assessed in an amount not to exceed $12,383 per violation.[280]

---

[274] Res. Br. at 17.

[275] Tr. at 474, 479, 483-84, 509-10; PX A at 247, 325, 329; PX D; JX J.

[276] *See* 80 Fed. Reg. at 24086.

[277] 29 C.F.R. § 503.23(a); *see also* 8 U.S.C. § 1184(c)(14).

[278] 29 C.F.R. § 503.23(a); *see also* 29 C.F.R. § 503.19.

[279] 29 C.F.R. § 503.23(b); *see also* 29 C.F.R. § 503.16. The violations in this case occurred after November 2, 2015, and the CMP was assessed after January 2, 2018. JX A. Thus, the 2018 CMP level of $12,383 applies. *See Department of Labor Federal Civil Penalties Inflation Adjustment Act Annual Adjustments for 2018*, 83 Fed. Reg. 1, 8, 12 (Jan. 2, 2018).

[280] 29 C.F.R. § 503.23(d).

To determine an appropriate CMP, the "type of violation committed and other relevant factors" will be considered.[281] The "highest penalties will be reserved for willful failures to meet any of the conditions of the [TEC] that involve harm to U.S. workers."[282] In addition to considering the willfulness of the violation, other discretionary factors to consider include, but are not limited to, the following:

> (1) Previous history of violation(s) of 8 U.S.C. 1184(c), 20 CFR part 655, subpart A, or the regulations in this part;
> (2) The number of H–2B workers, workers in corresponding employment, or improperly rejected U.S. applicants who were and/or are affected by the violation(s);
> (3) The gravity of the violation(s);
> (4) Efforts made in good faith to comply with 8 U.S.C. 1184(c), 20 CFR part 655, subpart A, and the regulations in this part;
> (5) Explanation from the person charged with the violation(s);
> (6) Commitment to future compliance, taking into account the public health, interest or safety; and
> (7) The extent to which the violator achieved a financial gain due to the violation, or the potential financial loss or potential injury to the workers.[283]

*i. Violation: Rate of Pay - Attestation 5 and 29 C.F.R. §§ 503.16(a)(1)*

Plaintiff assessed $133,960.50 in CMPs in 2016 and $161,590.73 in CMPs in 2017 for Respondent's failure to pay the wage listed on the TEC, for a total CMP of $295,551.23.[284] Plaintiff assessed a separate violation for each worker who was not paid properly and assessed a CMP for each worker equal to the respective back wages owed.[285] For any back wages owed that exceeded the maximum CMP, Plaintiff assessed the CMP at $12,383.[286]

---

[281] *Id.* § 503.23(e).

[282] *Id.*

[283] *Id.*

[284] JX A at 9.

[285] Tr. at 271; PX M at 10-12. *See also* 29 C.F.R. § 503.23(a).

[286] PX M at 10-12.

Plaintiff did not identify any mitigating factors, and pursuant to 29 C.F.R. § 503.23(b), an assessment of a CMP equal to the back wages owed is reasonable. However, because Respondent has no previous history of violations, I reduce the CMP by 10%. Additionally, Respondent has demonstrated a commitment to future compliance. After the investigation, Respondent made changes to its business to comply with the wage requirements. Mr. Guzman credibly testified that they "now have records," that "[t]here's someone doing admin stuff," and that, based on Mr. Hernandez's suggestion, they have implemented an app to track time.[287] Two workers confirmed the changes to the timekeeping system in their interview statements.[288] Accordingly, I reduce the CMP by an additional 10%.

I further modify the CMP in light of the relatively small size of Respondent's business.[289] Respondent's gross revenue was $1,736,953.00 in 2016 and $2,557,892.00 in 2017.[290] I find that a CMP amounting to approximately 6 to 8 percent of a company's gross revenue is excessive and unreasonable. It is not merely punitive; it also runs the risk of harming Respondent's current and prospective U.S. workers. Moreover, the regulations provide that the "highest penalties will be reserved for willful failures to meet any of the conditions of the [TEC] that involve harm to U.S. workers,"[291] but Plaintiff failed to show that Respondent's violation harmed U.S. workers in any way.[292] Therefore, I further reduce the CMP by 50%.

Accordingly, Respondent owes a CMP of $40,188.15 for 2016 and $48,477.22 for 2017. I find that a total CMP of $88,665.37 for the violation is both reasonable and appropriate.

---

[287] Tr. at 538.

[288] PX K at 30-31; JX J ¶ 37.

[289] See A&M Labor Mgmt., Inc., OALJ Nos. 2022-MSP-00002 and 2022-TAE-00004, slip op. at 19 (Mar. 23, 2023).

[290] JX P.

[291] 29 C.F.R. § 503.23(e).

[292] In fact, Plaintiff argues that in contrast to the H-2B workers, Respondent paid its U.S. workers for all hours worked in 2016 and 2017. Pl. Br. at 24; PX D, RFA Nos. 171, 181.

ii. *Violation: Area of Intended Employment - Attestation 11 and 29 C.F.R.*
*§ 503.16(x)*

Plaintiff assessed CMPs of $18,574.50 for 2016 and $18,574.50 for 2017
($37,149.00 total) for Respondent's substantial failure to comply with the prohibition
against placing workers outside the area of intended employment.[293] The base CMP
was $6,191.50 in each 2016 and 2017.[294] Plaintiff multiplied the base CMP for each
year by three because Plaintiff found that Respondent's H-2B employees worked in
three states outside of Illinois – i.e., Indiana, Wisconsin, and Michigan.[295] At the
hearing, Mr. Hernandez testified that Respondent "should have filed temporary
employment certifications for each of those states that they preformed [*sic*] work.
More so the main reason of the violation here is that they failed to do the
advertisement and recruitment, to begin the process of those temporary employment
certifications."[296] Thus, Plaintiff considered each TEC that Respondent should have
filed a separate violation.

Plaintiff applied the same aggravating and mitigating factors to the CMPs for
2016 and 2017. First, Plaintiff increased the CMP by 10% because it found that the
gravity of the violations was significant based on the number of jobs the H-2B workers
performed outside of the intended area of employment.[297] Plaintiff then decreased the
CMP by 10% because of Respondent's commitment to include all work sites with the
appropriate prevailing wage in future TEC applications.[298]

I agree with Plaintiff's application of the aggravating and mitigating factors.
The gravity of the violation "can only be determined in relation to other potential
violations."[299] Gravity has also been assessed based on whether a violation has a
"significant impact," and the Board has not invalidated this method.[300] Here, I agree

---

[293] JX A.

[294] PX M at 14, 15, 17. When a violation is cited but there are no back wages, Mr. Hernandez testified
that the maximum CMP is 50% of the statutory limitation, or $6,191.50. Tr. at 279.

[295] Tr. at 282; PX M at 15, 17.

[296] Tr. at 282; PX M at 15, 17.

[297] PX M. *See* 29 C.F.R. § 503.23(e)(3).

[298] Tr. at 282; PX M at 36. *See* § 503.23(e)(6).

[299] *Wash. Farm Labor Ass'n*, OALJ No. 2018-TAE-00013 (Aug. 25, 2021) (quoting *Castro Harvesting*,
ARB No. 13-082, ALJ No. 2013-PED-00002, slip op. at 12 (Nov. 26, 2013)).

[300] *See Deggeller Attractions Inc.*, slip op. at 30 ("The gravity of the violations I assess as moderate.
The failure to pay overtime for work in North Carolina did not have a significant impact given that it
amounts to roughly $20.00 per week for the few weeks Respondent operated in North Carolina. The

that the gravity of the violation is significant, given that all Respondent's H-2B employees worked in 13 separate locations outside of the Chicagoland area in 2016 and 37 locations in 2017.[301] I also find that Mr. Guzman's commitment to future compliance is credible, especially considering his acknowledgment of his error at the hearing.[302]

Additionally, though, I consider Respondent's explanation of the violation.[303] Mr. Guzman credibly testified at the hearing that he was unaware that H-2B workers could not leave the Chicagoland area. Mr. Guzman's sincerity is supported by his acknowledgement of his mistake. Accordingly, I further reduce the CMP by 10%.

And, as Respondent has no previous history of violations, I reduce the CMP by an additional 10%.

Finally, while the number of times Respondent sent its H-2B workers outside the area of intended employment is certainly an aggravating factor that contributes to the assessment of gravity, I find it unreasonable to multiply the penalty by the number of states Respondent sent its workers outside of Illinois. That Respondent sent its workers to a single worksite outside the area of intended employment is sufficient to constitute a violation of Attestation 11 and 29 C.F.R. § 503.16(x). Plaintiff has not offered any compelling legal authority to support multiplying a single CMP by the number of states to which Respondent sent its workers.[304]

Therefore, I find that a CMP of $4,953.20[305] for each year, totaling $9,906.40, is reasonable and appropriate for Respondent's violation of Attestation 11 and 29 C.F.R. § 503.16(x).

---

$60.00 per week housing deduction, on the other hand, had a moderate impact on most if not all of Respondent's workers for the entire season. As Complainant notes in its brief, $60.00 per week for someone whose gross pay is about $420.00 per week equates to a nearly 15 percent shortfall."), *remanded on other grounds by* ARB Case No. 2020-0004 (Jan. 25, 2022).

[301] PX M at 14-17.

[302] Tr. at 466-67; PX M at 33.

[303] *See* 29 C.F.R. § 503.23(e)(5).

[304] *See A&M Labor Mgmt.*, OALJ No. 2022-MSP-00002 (Mar. 23, 2023) (citing *Bittner v. United States*, No. 21-1195, slip op. (Feb. 28, 2023) (when the legal duty imposed by a statute is violated regardless of the number of errors made, it is not appropriate to multiply the resulting penalty by the number of errors that were actually made)).

[305] $18,574.50 * 0.8 / 3 = $4,953.20.

### iii. *Violation: Transportation and Subsistence Fees - Attestation 17 and 29 C.F.R. §§ 503.16(j)(1)(i)-(ii)*

Plaintiff assessed CMPs equal to the back wages owed for Respondent's substantial failure to pay for transportation and subsistence costs for its H-2B workers' travel *from* their homes in 2016 and 2017 as required by 29 C.F.R. § 503.16(j)(1)(i) and *to* their homes in 2016 as required by 29 C.F.R. § 503.16(j)(1)(ii). In total, Plaintiff assessed a total CMP of $5,863.56 for Respondent's failure to pay inbound expenses ($3,196.94 for the violation of the 2016 TEC and $2,666.62 for the violation of the 2017 TEC), and a CMP of $5,249.13 for Respondent's failure to pay outbound expenses (for the violation of the 2016 TEC).

As discussed, an assessment of a CMP equal to the back wages owed is reasonable under the regulations.[306] Here, however, I find that mitigating factors apply. First, Respondent has no prior violations of the H-2B program. Second, Respondent demonstrated it had made reasonable, good faith efforts to comply with the INA by hiring and relying on Monarch and Attorney Robert Kershaw, as both are experienced in the area to assist with meeting the requirements of the H-2B program.[307] Third, I find that Mr. Guzman credibly testified that he did not know that he was supposed to pay for the transportation and subsistence costs from the H-2B workers' travel from their hometown to Monterrey.[308] That Respondent assumed responsibility for the violation and paid for its H-2B workers' expenses from Monterrey supports Mr. Guzman's credibility. As Plaintiff considered in other CMP assessments, Respondent's explanation that it was not aware of the requirements justifies a decrease in the CMP.[309] Finally, as I previously found, Mr. Guzman demonstrated a commitment to future compliance.[310] Plaintiff noted that Mr. Guzman stated "he will simply keep records in the future."[311] At the hearing, Mr. Guzman again asserted his commitment to future compliance with the H-2B program

---

[306] *Id.* § 503.23(b).

[307] 29 C.F.R. § 503.23(e)(4); *see also C.S. Lawn & Landscape,* OALJ No. 2018-TNE-00023, slip op. at 38 (Sept. 6, 2019) ("I find that Respondent did make a good faith effort to comply with the requirements of the H-2B program, most notably it retained an agent and an attorney who are experienced in this area to assist in meeting the requirements of the program."), *vacated and modified on other grounds,* ARB No. 2020-0005 (Apr. 4, 2022).

[308] Tr. at 467.

[309] 29 C.F.R. § 503.23(e)(5).

[310] *Id.* § 503.23(e)(6).

[311] PX M at 36.

and testified that Respondent has already hired someone to handle administrative matters to ensure compliance.[312]

Each of these mitigating factors warrant a decrease in the CMP by 10%, for a total decrease of 40%. Therefore, Respondent owes a CMP of $3,518.14 for the violation of Attestation 17 and 29 C.F.R. § 503.16(1)(i) in 2016 and 2017, and a CMP of $3,149.48 for the violation of Attestation 17 and 29 C.F.R. § 503.16(j)(1)(ii) in 2016. I find that a total CMP of $6,667.62 for violating Attestation 17 and 29 C.F.R. §§ 503.16(j)(1)(i)-(ii) is reasonable and appropriate.

iv. *Violation: Disclosure of Job Order - Attestation 19 and 29 C.F.R. § 503.16(l)*

Plaintiff assessed CMPs of $5,572.35 in 2016 and $5,572.35 in 2017 ($11,144.70 total) for Respondent's failure to disclose the job order to the H-2B workers.[313] Because Plaintiff did not assess back wages, the base CMP is $6,191.50 for each year ($12,383.00 total).[314] Plaintiff applied only one mitigating factor – Respondent's commitment to future compliance – and reduced the penalty by 10% for each year.[315] Plaintiff did not find that Respondent demonstrated reasonable, good faith efforts to comply with the requirements because Respondent failed to verify that the workers actually received the job order from the processing agent.[316] Similarly, Plaintiff did not account for Respondent's explanation that it was unaware that the processing agent did not provide the job order to the workers. Plaintiff did not apply the following mitigating factors: (1) increase based on a previous investigation where a violation was cited, as Plaintiff found no evidence of prior history of violations; (2) increase based on the U.S. workers, H-2B workers, or improperly rejected U.S. applicants who were or are affected by the violations; (3) increase or decrease based on the gravity of the violations; and (4) increase based on employer's financial gain or the potential financial loss or injury to the workers.[317]

I agree with Plaintiff's reduction of the penalty by 10% due to Respondent's commitment to future compliance. I find Mr. Guzman's testimony that Respondent is committed to future compliance credible, particularly considering his

---

[312] Tr. at 537-38.

[313] JX A.

[314] PX M at 14, 15, 17.

[315] JX A.

[316] *Id.*

[317] PX M at 23-25; 29 C.F.R. §§ 503.23(e)(1)-(4).

acknowledgement that he is responsible for ensuring that the H-2B workers in Mexico receive a copy of the job order in Spanish.[318]

However, I find that Plaintiff's assessment of $5,572.35 per TEC is unreasonable. Respondent has no history of violations and has demonstrated a good faith effort to comply with the INA and the regulations based on its hiring of an experienced attorney and company to ensure its compliance with the H-2B program.[319] Therefore, I reduce the penalty by an additional 20%.

Further, I find that Mr. Guzman's explanation for Respondent's violation is another mitigating factor. Mr. Guzman's testimony at hearing clarifies that the reason for Respondent's violation was a lack of knowledge of Monarch's internal processes and that he trusted the company would comply.[320] As discussed, I find that Mr. Guzman's testimony is credible, and therefore I reduce the penalty by another 10%, for a total penalty of $3,714.90 per violation.

Accordingly, I find that Respondent owes a total CMP of $7,429.80 for violating Attestation 19 and 29 C.F.R. § 503.16(*l*) in 2016 and 2017.

*v. Violation: Contracts with Third Parties to Comply with Prohibitions - Attestation 22 and 29 C.F.R. § 503.16(p)*

Plaintiff assessed CMPs of $1,238.30 in 2016 and $1,238.30 in 2017 ($2,476.60 total) for Respondent's failure to contractually forbid Monarch from seeking payment from the H-2B employees.[321] The base CMP was $6,191.50 per TEC.[322] Plaintiff applied mitigating factors due to "the guidance provided to the firm by their legal counsel that such requirement was not required for processing agents only for recruiters."[323] For this reason, Plaintiff found that the following factors applied: (1) gravity of the violations (50% deduction applied); (2) Respondent's compliance efforts (10% deduction applied); and (3) the explanation from Respondent (10% deduction applied). Plaintiff further reduced the penalty by 10% because it found that Respondent demonstrated a commitment to future compliance by agreeing to add "the

---

[318] Tr. at 435.

[319] *Id.* at 434; *see also C.S. Lawn & Landscape*, 2018-TNE-00023, slip op. at 38.

[320] Tr. at 434.

[321] JX A.

[322] PX M at 25, 27.

[323] *Id.* at 26-27.

required language to any future contract with a processing agent."[324] I agree with Plaintiff's assessment of the applicable mitigating factors. But consistent with the other CMP assessments, I also consider that Respondent has no previous history of violations of the INA. Accordingly, I apply an additional 10% reduction to the CMP. Therefore, I find that Respondent owes a CMP of $619.15 in each 2016 and 2017, and that a total CMP of $1,238.30 for Respondent's violation of Attestation 22 and 29 C.F.R. § 503.16(p) is reasonable and appropriate.

    vi.  *Violation: Document Retention Requirements - Attestation 26 and 29 C.F.R.*
        *§ 503.17*

Plaintiff assessed civil money penalties of $6,191.50 in 2016 and $6,191.50 in 2017 ($12,383 total) for Respondent's substantial failure to comply with document retention requirements.[325] The base CMP was $6,191.50 per TEC.[326] Plaintiff increased the CMPs by 10% for the gravity of the violations and decreased the CMPs by 10% because Respondent committed to comply in the future "by ensuring to correctly record and maintain all the hours worked of the H-2B workers."[327] I incorporate my prior findings pertaining to Respondent's document retention practices in the assessment of back wages for its failure to pay the offered wage.[328] Based on the evidence, I agree with Plaintiff's assessment of the applicable mitigating factors. But I also find that Respondent's lack of history of violations under the INA warrants a further reduction of the CMP by 10%. Therefore, Respondent owes a CMP of $4,953.20 for each 2016 and 2017. I find that a total CMP of $9,906.40 for Respondent's violation of Attestation 26 and 29 C.F.R. § 503.17 is both reasonable and appropriate.

---

[324] *Id.*

[325] JX A.

[326] PX M at 25, 27.

[327] *Id.* at 29-30.

[328] *See supra* VI.C.i.2.

## K. Debarment

An employer may be debarred for a period of not less than 1 year or more than 5 years if it committed a violation that meets the standards of 29 C.F.R. § 503.19.[329] Where those standards are met, debarrable violations include but are not limited to one or more of the following:

(1) Failure to pay or provide the required wages, benefits, or working conditions to the employer's H–2B workers and/or workers in corresponding employment;

(2) Failure, except for lawful, job-related reasons, to offer employment to qualified U.S. workers who applied for the job opportunity for which certification was sought;

(3) Failure to comply with the employer's obligations to recruit U.S. workers;

(4) Improper layoff or displacement of U.S. workers or workers in corresponding employment;

(5) Failure to comply with one or more sanctions or remedies imposed by the Administrator, WHD for violation(s) of obligations under the job order or other H–2B obligations, or with one or more decisions or orders of the Secretary or a court under 20 CFR part 655, subpart A or this part;

(6) Impeding an investigation of an employer under this part;

(7) Employing an H–2B worker outside the area of intended employment, in an activity/activities not listed in the job order, or outside the validity period of employment of the job order, including any approved extension thereof;

(8) A violation of the requirements of § 503.16(o) or (p);

(9) A violation of any of the provisions listed in § 503.16(r);

(10) Any other act showing such flagrant disregard for the law that future compliance with program requirements cannot reasonably be expected;

(11) Fraud involving the H–2B Registration, Application for Prevailing Wage Determination, Application for Temporary Employment Certification, or H–2B Petition; or

---

[329] 29 C.F.R. §§ 503.24(a), (c)

(12) A material misrepresentation of fact during the registration or application process.[330]

Plaintiff argues that Respondent should be debarred for three years based on "three substantial violations" that qualify for debarment: (1) failure to hire a qualified U.S. worker; (2) failure to pay the required wages to H-2B workers; and (3) employment of workers outside of the area of intended employment.[331] I previously determined that Respondent did not violate 29 C.F.R. § 503.16(r) when it rejected Mr. Ochoa's application, but that Respondent did violate 29 C.F.R. §§ 503.16(a)(1), (a)(4), and (b) when it failed to pay the offered wage and that it violated 29 C.F.R. § 503.16(x) when it placed its workers outside of the areas of intended employment listed on the TECs.[332]

Plaintiff also alleges that Respondent "actively impeded" Plaintiff's investigation and "flagrantly misled its potential employees by explicitly lying in its job orders and required recruiting activities regarding providing housing to workers."[333] Plaintiff contends that "future compliance with program requirements cannot reasonably be expected from a company that lies in its job order and to representatives of the federal government."[334] By Order dated November 30, 2021, I denied Plaintiff's motion to amend the Determination to include "impeding an investigation of an employer" as an independent basis for debarment.[335] Thus, I will not consider this argument. Plaintiff's additional assertions are inconsistent with my prior findings that Respondent has credibly committed to future compliance.

---

[330] *Id.* § 503.24(a)(1)-(12).

[331] JX A; Pl. Br. at 43-46. *See also* 29 C.F.R. §§ 502.16(a), 503.16(r), 503.16(x), 503.24(a)(1), 503.24(a)(2), 503.24(a)(7). Additionally, Plaintiff alleges that Respondent "actively impeded" Plaintiff's investigation and "flagrantly misled its potential employees by explicitly lying in its job orders and required recruiting activities regarding providing housing to workers." Pl. Br. at 45. Plaintiff contends that "future compliance with program requirements cannot reasonably be expected from a company that lies in its job order and to representatives of the federal government." By Order dated November 30, 2021, I denied Plaintiff's motion to amend the Determination to include "impeding an investigation of an employer" as an independent basis for debarment." *See Order: (1) Motion to Amend, (2) Evidentiary Objection, (3) Motion to Strike, and (4) Closing Brief Deadline* (Nov. 30, 2021). Thus, I will not consider this argument. But even if it was considered, Plaintiff's assertion is inconsistent with my prior findings that Respondent has credibly committed to future compliance.

[332] *See* Sections VI.A., VI.C., VI.E., *supra.*

[333] Pl. Br. at 45.

[334] *Id.* at 46.

[335] *See Order: (1) Motion to Amend, (2) Evidentiary Objection, (3) Motion to Strike, and (4) Closing Brief Deadline* (Nov. 30, 2021).

Respondent argues that formal debarment is not necessary because "Mr. Guzman felt he had already been debarred when he got Plaintiff's Determination, and while this action was hanging over his head, he did not apply for the H-2B program in the years 2019, 2020 or 2021, which negatively impacted the business."[336] At the hearing, Mr. Guzman expressed that Respondent will follow all the rules and regulations in the future, that Respondent has already implemented a time tracking application, and that it would hire U.S. workers first in the future.[337]

While I find Mr. Guzman's testimony that that he felt he had already been debarred credible, it is not dispositive. Debarment does not begin until "the date of the *final* agency action,"[338] and "[t]he timely filing of an administrative appeal stays the debarment pending the outcome of the appeal[.]"[339] However, I find Respondent's commitment to future compliance sincere.[340] For these reasons, I find that a one-year period of debarment is reasonable and appropriate.[341]

---

[336] Res. Br. at 22 (citing Tr. at 537-38).

[337] Tr. at 538-39.

[338] 29 C.F.R. § 503.24(c) (emphasis added).

[339] *Id.* § 503.24(d).

[340] Plaintiff also found Respondent's commitment to future compliance sincere, as indicated in the application of mitigating factors in the CMP assessment. *See* PX M.

[341] *See Peter's Fine Greek Food,* ARB No. 14-003-A, slip op. at 4-5 (Feb. 26, 2014) (affirming ALJ's reduction of debarment from two years to one where the ALJ found Respondent's failure was not a "significant failure," as Plaintiff proved only one of the two alleged substantial violations and cooperated with Plaintiff's investigation in some instances).

## VII. ORDER

Consistent with the foregoing, it is hereby **ORDERED**:

1. Plaintiff's assessment of $21,634.34 in back wages and $12,383.00 in civil money penalties for Respondent's alleged failure to engage in non-discriminatory hiring practices is **REVERSED**.

2. Plaintiff's civil money penalty assessment of $12,383.00 for Respondent's alleged preferential treatment of foreign workers is **REVERSED**.

3. Plaintiff's assessment of a violation for Respondent's failure to pay the offered wage is **AFFIRMED**. The assessment of **$301,448.06** in back wages is **AFFIRMED**. The civil money penalty assessment is **MODIFIED** and reduced to **$88,665.37**.

4. Plaintiff's assessment of $1,857.45 in civil money penalties for Respondent's alleged failure to notify the appropriate authorities within two days of the H-2B workers' early separation is **REVERSED**.

5. Plaintiff's assessment of a violation for Respondent's placement of H-2B workers outside the area of intended employment is **AFFIRMED**. The civil money penalty assessment is **MODIFIED** and reduced to **$9,906.40**.

6. Plaintiff's assessment of a violation for Respondent's failure to pay for its H-2B workers' inbound transportation and subsistence costs is **AFFIRMED**. Plaintiff's assessment of **$5,863.56** in back wages for inbound travel and subsistence costs is **AFFIRMED**. The civil money penalty is **MODIFIED** and reduced to **$3,518.14**.

7. Plaintiff's assessment of a violation for Respondent's failure to pay for its H-2B workers' outbound transportation and subsistence costs is **AFFIRMED**. Plaintiff's assessment of **$5,249.13** in back wages for outbound travel and subsistence is **AFFIRMED**. The civil money penalty is **MODIFIED** and reduced to **$3,149.48**.

8. Plaintiff's assessment of a violation for Respondent's failure to disclose the job order in a language understood by its H-2B workers is **AFFIRMED**. The civil money penalty is **MODIFIED** and reduced to **$7,429.80**.

9. Plaintiff's assessment of a violation for Respondent's failure to contractually prohibit fees is **AFFIRMED**. The civil money penalty is **MODIFIED** and reduced to **$1,238.30**.

10. Plaintiff's assessment of a violation for Respondent's failure to comply with document retention requirements is **AFFIRMED**. The civil money penalty is **MODIFIED** and reduced to **$9,906.40**.

11. In total, Respondent is responsible for payment of **$436,374.64** to the United States Department of Labor for violations of the Immigration and Nationality Act, with such payment to be received by the Wage and Hour Division no later than 30 days from the date this Decision and Order is final.[342]

12. Respondent is **debarred** for a period of **one year**.



Digitally signed by THEODORE W.
ANNOS
DN: CN=Theodore W. Annos,
OU=Administrative Law Judge, O=US
DOL Office of Administrative Law
Judges, L=Washington, S=DC, C=US
Location: Washington DC

**THEODORE W. ANNOS**
Administrative Law Judge

---

[342] Of the total amount owed, $312,560.75 is for back wages and $123,813.89 is for civil money penalties.

**NOTICE OF APPEAL RIGHTS:** Any party seeking review of this decision and order, including judicial review, shall file a Petition for Review ("Petition") with the Administrative Review Board ("ARB"). The ARB must receive the Petition within 30 calendar days of the date of this decision and order. 29 C.F.R. § 503.51(a).

Copies of the Petition should be served on all parties and on the undersigned Administrative Law Judge. No particular form is prescribed for any petition for the ARB's review permitted by this part. However, any such petition will:

(1) Be dated;

(2) Be typewritten or legibly written;

(3) Specify the issue or issues stated in the ALJ decision and order giving rise to such petition;

(4) State the specific reason or reasons why the party petitioning for review believes such decision and order are in error;

(5) Be signed by the party filing the petition or by an authorized representative of such party;

(6) Include the address at which such party or authorized representative desires to receive further communications relating thereto; and

(7) Include as an attachment the ALJ's decision and order, and any other record documents which would assist the ARB in determining whether review is warranted.

29 C.F.R. § 503.51(b). If the ARB does not issue a notice accepting a petition for review of the decision within 30 days after receipt of a timely filing of the petition, or within 30 days of the date of the decision if no petition has been received, the decision of the ALJ will be deemed the final agency action. 29 C.F.R. § 503.51(c). Whenever the ARB, either on the ARB's own motion or by acceptance of a party's petition, determines to review the decision of an ALJ, a notice of the same will be served upon the ALJ and upon all parties to the proceeding. 29 C.F.R. § 503.51(d).

### FILING AND SERVICE OF AN APPEAL

1. **Use of EFS System:** The Board's Electronic Filing and Service (EFS) system allows parties to initiate appeals electronically, file briefs and motions electronically, receive electronic service of Board issuances and documents filed by other parties, and check the status of appeals via an Internet-accessible interface. Use of the EFS system is free of charge to all users. To file an appeal using the EFS System go to https://efile.dol.gov. All filers are required to comply with the Board's rules of practice and procedure found in 29 C.F.R. Part 26, which can be accessed at https://www.ecfr.gov/current/title-29/subtitle-A/part-26.

   A. **Attorneys and Lay Representatives:** Use of the EFS system is **mandatory for all attorneys and lay representatives** for all filings and all service related to cases filed with the Board, absent an exemption granted in advance for good cause shown. 29 C.F.R. § 26.3(a)(1), (2).

   B. **Self-Represented Parties:** Use of the EFS system is **strongly encouraged for all self-represented parties** with respect to all filings with the Board and service upon all other parties. Using the EFS system provides the benefit of built-in service on all other parties to the case. Without the use of EFS, a party is required to not only file

its documents with the Board but also to serve copies of all filings on every other party. Using the EFS system saves litigants the time and expense of the required service step in the process, as the system completes all required service automatically. Upon a party's proper use of the EFS system, no duplicate paper or fax filings are required.

**Self-represented parties who choose not to use the EFS system must file by mail or by personal or commercial delivery** all pleadings, including briefs, appendices, motions, and other supporting documentation, directed to:

> Administrative Review Board
> Clerk of the Appellate Boards
> U.S. Department of Labor
> 200 Constitution Avenue, N.W., Room S-5220,
> Washington, D.C., 20210

**2.     EFS Registration and Duty to Designate E-mail Address for Service**

To use the Board's EFS system, a party must have a validated user account. To create a validated EFS user account, a party must register and designate a valid e-mail address by going to https://efile.dol.gov, select the button to "Create Account," and proceed through the registration process. If the party already has an account, they may simply use the option to "Sign In."

Once a valid EFS account and profile has been created, the party may file a petition for review through the EFS system by selecting "eFile & eService with the Administrative Review Board" from the main dashboard, and selecting the button "File a New Appeal - ARB." In order for any other party (other than the EFS user who filed the appeal) to access the appeal, the party must submit an access request. To submit an access request, parties must log into the EFS System, select "eFile & eService with the Administrative Review Board," select the button "Request Access to Appeals," search for and select the appeal the party is requesting access to, answer the questions as prompted, and click the button "Submit to DOL."

Additional information regarding registration for access to and use of the EFS system, including for parties responding to a filed appeal, as well as step-by-step User Guides, answers to frequently asked questions (FAQs), video tutorials and contact information for login.gov and EFS support can be found under the "Support" tab at https://efile.dol.gov.

**3.     Effective Time of Filings**

Any electronic filing transmitted to the Board through the EFS e-File system or via an authorized designated e-Mail address by 11:59:59 Eastern Time shall be deemed to be filed on the date of transmission.

**4.     Service of Filings**

**A.     Service by Parties**

- **Service on Registered EFS Users:** Service upon registered EFS users is accomplished automatically by the EFS system.

- **Service on Other Parties or Participants:** Service upon a party that is not a registered EFS user must be accomplished through any other method of service authorized under applicable rule or law.

**B.    Service by the Board**

Registered e-filers will be e-served with Board-issued documents via EFS; they will not be served by regular mail (unless otherwise required by law). If a party unrepresented by counsel files their appeal by regular mail, that party will be served with Board-issued documents by regular mail. Any party may opt into e-service at any time by registering for an EFS account as directed above, even if they initially filed their appeal by regular mail or delivery.

**5.    Proof of Service**

Every party is required to prepare and file a certificate of service with all filings. The certificate of service must identify what was served, upon whom, and manner of service. Although electronic filing of any document through the EFS system will constitute service of that document on all EFS-registered parties, electronic filing of a certificate of service through the EFS system is still required. **Non EFS-registered parties must be served using other means authorized by law or rule.**

**6.    Inquiries and Correspondence**

After an appeal is filed, all inquiries and correspondence related to filings should be directed to the Office of the Clerk of the Appellate Boards by telephone at 202-693-6300 or by fax at 202-513-6832. Other inquiries or questions may be directed to the Board at (202) 693-6200 or ARB-Correspondence@dol.gov.

## SERVICE SHEET

Case Name: **WAGE_AND_HOUR_DIVISI_v_LUCERO_POOL_PLASTERI_**

Case Number: **2019TNE00011**

Document Title: **DECISION AND ORDER**

I hereby certify that a copy of the above-referenced document was sent to the following this 20th day of June, 2023:



Digitally signed by SHEILA SMITH
DN: CN=SHEILA SMITH, OU=LEGAL
ASSISTANT, O=US DOL Office of
Administrative Law Judges, L=Washington,
S=DC, C=US
Location: Washington DC

**SHEILA SMITH**
LEGAL ASSISTANT

zzWHD-ALJ-Orders@dol.gov
Administrator
Wage and Hour Division
U. S. Dept. of Labor
Room S-3502, FPB
200 Constitution Ave., N.W.
WASHINGTON DC 20210
       *{Electronic - Regular Email}*

FLS-Filings@dol.gov
Associate Solicitor
Division of Fair Labor Standards
U. S. Department of Labor
Room N-2716, FPB
200 Constitution Ave., N.W.
WASHINGTON DC 20210
       *{Electronic - Regular Email}*

Brian Farrington, Esq.
bfarrington@cowlesthompson@com
Cowles & Thompson
901 Main Street, Suite 3900
DALLAS TX 75202
       *{Electronic - Regular Email}*

Sim Israeloff, Esq.
sisraeloff@cowlesthompson.com
Cowles and Thompson
901 Main St., Ste. 3900
DALLAS TX 75202
       *{Electronic - Regular Email}*

Nicholas Flores
flores.nicholas.r@dol.gov
Office of the Solicitor, Boston
230 S. Dearborn Street
CHICAGO IL 60604
       *{Electronic - Regular Email}*

Kevin Wilemon
wilemon.kevin@dol.gov
Office of the Solicitor, Chicago
230 S. Dearborn St.
CHICAGO IL 60604
       *{Electronic - Regular Email}*

**U.S. Department of Labor**     Administrative Review Board
200 Constitution Ave. NW
Washington, DC 20210-0001



IN THE MATTER OF:

| | |
|---|---|
| **ADMINISTRATOR, WAGE AND HOUR DIVISION, UNITED STATES DEPARTMENT OF LABOR,** | ARB CASE NOS. 2023-0040<br>2023-0045 |
| **PROSECUTING PARTY,** | ALJ CASE NO. 2019-TNE-00011<br>ALJ THEODORE W. ANNOS |
| v. | DATE: February 27, 2025 |
| **LUCERO POOL PLASTER, INC.,** | |
| **RESPONDENT.** | |

**Appearances:**

*For the Complainant:*
  Jennifer S. Brand, Esq., Rachel Goldberg, Esq., Jennifer Stocker, Esq., Jennifer Huggins, Esq.; *United States Department of Labor, Office of the Solicitor*; Washington, District of Columbia

*For the Respondent:*
  R. Michael Northrup, Esq., Brian T. Farrington, Esq.; *Cowles & Thompson, P.C.*; Dallas, Texas

**Before WARREN and THOMPSON, Administrative Appeals Judges**


### DECISION AND ORDER

WARREN, Administrative Appeals Judge:

  This case arises under the H-2B provisions of the Immigration and Nationality Act (INA),[1] as amended, and its implementing regulations.[2] On June

---
[1]     8 U.S.C. §§ 1101(a)(15)(H)(ii)(b); 1184(c)(14).

[2]     20 C.F.R. Part 655, Subpart A; 29 C.F.R. Part 503.



2

20, 2023, an Administrative Law Judge (ALJ) issued a Decision and Order (D. & O.) finding that Respondent Lucero Pool Plaster, Inc. violated provisions of the INA covering the period April 1, 2016, to September 30, 2017.[3] Both Respondent and the Administrator for the Wage and Hour Division (WHD) of the U.S. Department of Labor (DOL) appealed to the Administrative Review Board (Board). For the following reasons, we affirm in part and vacate and modify in part.

## BACKGROUND

### 1. H-2B Program

The H-2B program permits employers to hire temporary foreign workers to perform nonagricultural services or labor in the United States. Employers may only hire foreign workers under the H-2B program if (1) there are not sufficient U.S. workers who are qualified and available to perform the temporary services or labor, and (2) the employment of foreign workers will not adversely affect the wages and working conditions of U.S. workers similarly employed.[4]

Under the program's regulations, employers seeking to employ H-2B workers must obtain a certification from the U.S. Department of Labor (DOL).[5] To obtain a certification, the employer must file the ETA Form 9142B, Application for Temporary Employment Certification (TEC) with the DOL's Office of Foreign Labor Certification (OFLC).[6] The employer must sign the TEC under the penalty of perjury, attesting to their knowledge of, and agreeing to comply with, the terms and conditions of the H-2B program.[7] The regulations require an employer to abide by conditions that relate to, *inter alia*, non-discriminatory hiring practices, prohibition against preferential treatment of foreign workers, rates of pay, area of intended employment, transportation and visa fees, transportation from the place of employment, disclosure of job order, contracts with third parties, and retention of documents and records.[8]

---

[3]    D. & O. at 1, 3.

[4]    8 U.S.C. § 1101(a)(15)(H)(ii)(b); 29 C.F.R. § 503.1(a); 8 C.F.R. § 214.2(h)(6)(iii)(A).

[5]    20 C.F.R. § 655.1.

[6]    *Id.* § 655.15.

[7]    *Id.* § 655.18; 29 C.F.R. § 503.19(d).

[8]    20 C.F.R. § 655.20; 29 C.F.R. §§ 503.16, 503.17.

3

As part of the certification process, the employer must make an effort to recruit U.S. workers to ensure that there are no qualified U.S. workers available for the position it intends to fill with H-2B workers.[9] The employer must submit a job order to the State Workforce Agency (SWA) serving each geographical area of intended employment listed in the TEC.[10] A job order is a document containing all the material terms and conditions of employment for the position(s) for which H-2B workers are sought.[11] The employer must also advertise the position(s) to U.S. workers, and the advertisements must describe the geographical area of intended employment "with enough specificity to apprise applicants of any travel requirements and where applicants will likely have to reside to perform the services or labor."[12] The employer must offer the same wage and other benefits and terms and conditions of employments to U.S. workers that it will offer H-2B workers.[13]

## 2. Factual Background

Respondent is a swimming pool plastering and remodeling company based in Schaumburg, Illinois, and is co-owned by Hector Alvino Guzman and Carlos Lucero.[14]

On January 26, 2016, Respondent filed a TEC with the OFLC.[15] OFLC accepted the TEC and granted Respondent's request to hire twenty construction laborers from April 1, 2016, to September 30, 2016.[16] Respondent signed Appendix B to the TEC under penalty of perjury, attesting to their knowledge of, and agreeing to comply with, the terms and conditions of the H-2B program.[17]

---

[9]   20 C.F.R. § 655.40(a).

[10]   *Id.* § 655.16(a)(1).

[11]   *Id.* § 655.5.

[12]   *Id.* § 655.541(b)(2).

[13]   *Id.* § 655.518.

[14]   D. & O. at 6.

[15]   *Id.* at 3.

[16]   *Id.*

[17]   *Id.* at 8.

4

On January 12, 2017, Respondent filed another TEC for the 2017 season.[18]
OFLC accepted the TEC and granted Respondent's request to hire twenty
construction laborers from April 1, 2017, to September 30, 2017.[19] Respondent
again signed Appendix B to the TEC under penalty of perjury, attesting to their
knowledge of, and agreeing to comply with, the terms and conditions of the H-2B
program.[20]

During both 2016 and 2017, Respondent failed to follow through on several
attestations made in the TECs. As discussed in below, Respondent: (1) offered
housing to H-2B workers without disclosing that benefit in the job order;[21]
(2) assigned H-2B workers to higher-paying union jobs, without advertising the
potential for hiring paying jobs to U.S. workers;[22] (3) did not pay H-2B workers the
wage rate listed on the TECs for all hours worked;[23] (4) assigned H-2B workers to
work outside the geographic areas certified on the TECS;[24] (5) failed to pay all
inbound and outbound transportation and subsistence costs;[25] (6) failed to provide

---

18      *Id.* at 3.

19      *Id.*

20      *Id.* at 8.

21      *Id.* at 20.

22      *Id.* at 21. The parties stipulated that twelve H-2B workers worked at least one week
on a union paying project in 2016, which paid $75 per hour instead of $27.46 per hour, and
at least one week on a union project in 2017, which paid $75 per hour instead of $27.35 per
hour. *Id.* at 10, 21. Respondent failed to disclose the possibility of higher paying union jobs
in its SWA job order, ETA Form 9142B, and newspaper ads. *Id.*

23      *Id.* at 7-8, 14.

24      *Id.* at 11-12. Specifically, in 2016, Respondent identified the area of intended
employment as Cook County-Chicago-Naperville-Joliet Metropolitan Division area.
However, Respondent's H-2B workers worked in the following locations in Wisconsin:
Sheboygan, Williams Bay, Kenosha, Lake Geneva, Delavan, and Milwaukee; in Michigan:
Union Pier and Three Oaks; and in Indiana: Granger, Syracuse, Merrillville, South Bend,
and Warsaw. Similarly, in 2017, Respondent identified the area of employment as Cook
County-Chicago-Naperville-Arlington Heights Metropolitan Division. However,
Respondent's H-2B workers worked in the following locations in Wisconsin: Milwaukee,
Madison, Greek Lake, Waunakee, Somers, Kenosha, Fedonia, Rice Lake, Waukesha,
Wisconsin Dells, Mequon, Wauwatosa, Menomonee Falls, Glenbeulah, Lakeside, Green
Bay, Lake Geneva, Oak Creek, Baraboo, Middleton, Heartland, Elm Grove, River Falls,
Window, Newton, Glendale, Sheboygan, and Hazel Green; in Michigan: New Buffalo,
Sawyer, Cassopolis, Grand Beach, and Buchanan; in Indiana: Elkhart, Michigan City, and
West Layfayette; and in Decorah, Iowa. *Id.*

25      *Id.* at 12-13, 38-40.

5

H-2B workers with a copy of the job order;.[26] (7) failed to contractually prohibit its agents from seeking or receiving fees from H-2B workers;.[27] and (8) failed to retain documents related to its TECs for three years..[28]

### 3. Procedural Background

On November 14, 2018, the Administrator for the WHD issued a Determination Pertaining to Violations Involving H-2B Nonimmigrant Workers and Notice of Debarment (Determination Letter) to Respondent..[29] The Administrator found that Respondent committed the above violations related to its 2016 and 2017 TECs..[30] The Administrator ordered Respondent to pay $334,195.09 in unpaid wages, $396,440.67 in Civil Money Penalties (CMPs), and debarred Respondent from participating in the H-2B program for three years..[31]

Respondent objected to the Determination Letter and requested a hearing before an ALJ..[32] The ALJ held a hearing from July 27 to 29, 2021..[33] On June 20, 2023, the ALJ issued the D. & O. The ALJ determined that Respondent committed some, but not all, of the violations identified by the Administrator, ordered Respondent to pay a total of $436,374.64 in back wages and CMPs, and debarred Respondent for a period of one year..[34]

Both parties petitioned the Board to review the D. & O..[35]

---

[26]    *Id.* at 13, 42.

[27]    *Id.* at 13, 43-44.

[28]    *Id.* at 12, 44-45.

[29]    *Id.* at 3.

[30]    *Id.*

[31]    *Id.*

[32]    *Id.*

[33]    *Id.* at 4.

[34]    *Id.* at 57-58.

[35]    On July 11, 2023, the parties filed a Joint Motion to Extend Time to Consider and Potentially File Petition for Review (Joint Motion to Extend) with the Board. In the Joint Motion to Extend, the parties jointly requested an extension of time "to consider and potentially file petitions for review of" the D. & O. The ARB granted the Joint Motion to Extend, giving the parties until August 21, 2023, to file petitions for review. Respondent filed a Petition for Review on August 18, 2023, and the Administrator filed a Petition for

6

## JURISDICTION AND STANDARD OF REVIEW

This Board has jurisdiction to hear appeals concerning questions of law or fact from the Administrator's final determinations under the H-2B program.[36] The Board reviews an ALJ's decision de novo.[37] and acts with "all the powers [the Secretary] would have in making the initial decision.".[38]

## DISCUSSION

Upon review of the ALJ's D. & O., the parties' arguments on appeal, and the record, the Board: (1) concludes that Respondent violated the INA and H-2B regulations' prohibition against giving preferential treatment to H-2B workers by failing to advertise the availability of housing to U.S. workers, but did not violate the INA or H-2B regulations by failing to advertise the potential availability of higher-paying union work; (2) affirms the ALJ's findings on all remaining violations; (3) orders Respondent to pay CMPs for giving H-2B workers preferential treatment by failing to advertise housing to U.S. workers; (4) vacates and modifies the ALJ's order of CMPs for the failure to pay the correct wages and for all hours worked; (5) vacates and modifies the CMPs owed for placing workers outside the area of intended employment; and (6) vacates the ALJ's order of a one-year debarment and orders that Respondent be debarred for three years.[39]

---

Review on August 21, 2023. The Administrator's Petition was assigned ARB case number 2023-0040, and Respondent's Petition was assigned ARB case number 2023-0045. The two appeals were consolidated for the purposes of rendering a decision.

[36]    Secretary's Order No. 01-2020 (Delegation of Authority and Assignment of Responsibility to the Administrative Review Board (Secretary's discretionary review of ARB decisions)), 85 Fed. Reg. 13,186 (Mar. 6, 2020).

[37]    *See Adm'r, Wage & Hour Div., U.S. Dep't of Lab. v. Am. Truss*, ARB No. 2005-0032, ALJ No. 2004-LCA-00012, slip op. at 2-3 (ARB Feb. 28, 2007) (citing *Talukdar v. U.S. Dep't of Veterans Affs.*, ARB No. 2004-0100, ALJ No. 2002-LCA-00025, slip op. at 8 (ARB Jan. 31, 2007) (for the proposition that "ARB applies de novo review in INA cases.")).

[38]    5 U.S.C. § 557(b).

[39]    Respondent also argues on appeal that the Administrator's Determination Letter violated its due process rights by failing to cite to any of Respondent's conduct that the Administrator determined to be willful and for classifying every violation as a substantial failure without providing the reasons for rendering that determination. Respondent's Brief (Resp. Br.) at 19, 21-23, 38, 44-45, 50. When an agency initiates enforcement action against a regulated party, due process is satisfied when the party is "reasonably apprised of the

7

## 1. Respondent Violated the INA and the H-2B Regulations

### A. *Legal Standard*

An employer violates the H-2B program requirements when it substantially fails to comply with any of the terms and conditions of the H-2B registration, application for prevailing wage determination, TEC, or the H-2B petition (H-2B Forms).[40] To be "substantial," the employer's failure must be both (1) "willful," and (2) "a significant deviation from the terms and conditions of [the H-2B Forms]."[41]

A willful violation "occurs when the employer, attorney, or agent knows its statement is false or that its conduct is in violation, or shows reckless disregard for the truthfulness of its representation or for whether its conduct satisfies the required conditions."[42] In determining whether a violation is also significant, the regulations identify a non-exhaustive list of factors that the Administrator may consider, including: (1) the employer's previous history of violation(s) under the H-2B program; (2) the number of H-2B workers, workers in corresponding employment, or U.S. workers who were and/or are affected by the violation(s); (3) the gravity of the violation(s); (4) the extent to which the violator achieved a financial gain due to the violation(s), or the potential financial loss or potential

---

issues in controversy" and "not misled." *L.G. Balfour Co. v. F.T.C.*, 442 F.2d 1, 19 (7th Cir. 1971). To prevail on a due process claim in this context, the party must show prejudicial error not present here. *See Abercrombie v. Clarke*, 920 F.2d 1351, 1360 (7th Cir. 1990). Here, Respondent had sufficient notice. In the Determination Letter, the WHD notified Guzman of the investigation into Respondent pursuant to the H-2B provisions of the INA for the period from January 1, 2016, through September 8, 2017. The WHD cited to the INA and its implementing regulations and informed Respondent of the violations that it committed, the amount of back wages and CMPs owed, and that it was debarred for three years. The WHD also informed Respondent of its appeal rights. In addition, the WHD's interpretation of the violations at issue in the Determination Letter is consistent with the TECs, the INA, and previous cases. Further, Respondent had an opportunity to be heard at the hearing held on July 27 to 29, 2021. Thus, we find that Respondent was reasonably apprised of the issues in controversy and had an opportunity to be heard, satisfying constitutional due process.

[40]    8 U.S.C. § 1184(c)(14)(A); 29 C.F.R. § 503.19(a)(2).

[41]    29 C.F.R. § 503.19(a)(2).

[42]    *Id.* § 503.19(b).

8

injury to the worker(s); and (5) whether U.S. workers have been harmed by the violation.[43]

## B. *Preferential Treatment of Foreign Workers: Housing and Union Jobs*

The employer's job offer to U.S. workers must include "no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2B workers."[44] In addition, Attestation 4 of the TEC prohibits employers from giving preferential treatment to H-2B workers. The Administrator asserts that Respondent violated these provisions by (1) failing to advertise to U.S. workers that housing was available; and (2) failing to advertise to U.S. workers that higher paying union jobs were available. We address each alleged violation in turn.

### i. *Respondent's Failure to Advertise Housing was a Willful Violation that Substantially Deviated from the Requirements of the H-2B Program*

An employer's job order must specify if the employer provides the worker with the option of board, lodging, or other facilities, or intends to assist workers in securing such lodging.[45] The preamble to the regulations also states:

> If an employer intends to offer housing to H-2B workers, such housing must also be offered to all U.S. applicants who live outside the area of intended employment. Housing secured for workers can be just as easily occupied by U.S. workers as by H-2B workers, or some combination of U.S. and H-2B workers.[46]

Respondent owned a house in Wheeling, IL where eleven H-2B workers lived in 2016 and seven H-2B workers lived in 2017.[47] This house was immediately adjacent to Respondent's shop in 2016.[48] Each year, Respondent charged these H-

---

43    *Id.* § 503.19(c).

44    *Id.* § 503.16(q).

45    20 C.F.R. § 655.18(b)(10).

46    80 Fed. Reg. 24,042, 24,071 (Apr. 29, 2015).

47    D. & O. at 20.

48    Respondent's (Resp.) Exhibit B at 2. In 2017, Respondent relocated its shop. *Id.*

9

2B workers $200 per month in rent.[49] However, both the 2016 and 2017 job orders stated: "Assistance finding and securing board & lodging is not available."[50]

The ALJ found that Respondent knew or should have known that it would provide housing, but failed to advertise the availability of housing to U.S. workers as required.[51] Thus, the ALJ found that Respondent's failure to advertise housing to U.S. workers was willful.[52] However, the ALJ concluded that Respondent did not significantly deviate from the terms and conditions of the H-2B program because of its lack of a history of violations under the H-2B program, the gravity of harm was "minimal," and the Administrator offered "no evidence showing that US applicants were *actually* deterred" from applying for a position with Respondent due to the perceived lack of available housing.[53]

Respondent contends that the ALJ erred in finding that Respondent willfully violated the H-2B program's requirements and asserts that its actions were mere negligence and did not arise to reckless disregard of its obligations under the H-2B program.[54] The Administrator counters that the ALJ correctly determined that Respondent's failure to advertise housing was willful, but contends that the ALJ erred in finding that Respondent's failure to advertise the availability of housing to U.S. workers did not substantially deviate from the terms and conditions of the H-2B program.[55] Specifically, the Administrator contends that the ALJ erred in analyzing Respondent's history of violations and finding that the Administrator

---

[49]    *Id.*

[50]    Joint Exhibit (JX) E at 1, JX I at 1.

[51]    *Id.* at 20, 22.

[52]    *Id.*

[53]    *Id.* (emphasis original).

[54]    Resp. Response Brief (Br.) at 13-14; Resp. Br. at 29-31, 34-35, 46 n.15. In addition, Respondent contends that "housing assistance" refers to "monetary assistance with housing, reduced rent, or free housing." Resp. Response Br. at 19. Respondent further contends that there is no evidence in the record that U.S. workers were not provided the same opportunity as H-2B workers to lease housing from Respondent. *Id.* We are not persuaded by either argument based on the language of 20 C.F.R. § 655.18(b)(10), which requires an employer's job order to specify if the employer provides the worker with the option of board, lodging, or other facilities. Respondent indicated that board, lodging, or other facilities were unavailable when they were available.

[55]    Administrator's Br. at 23.

10

must produce a U.S. worker who was actually harmed.[56] We find that Respondent's failure to advertise housing to U.S. workers was both willful and a significant deviation from the terms and conditions of the H-2B program.

Guzman contended that he only became aware that housing was available to workers after their arrival in 2016, when he returned from a trip to find that H-2B workers were staying in what he thought was his uncle's house.[57] We are not persuaded by this argument. The record indicates that Respondent offered housing to H-2B workers in 2015, in a home immediately adjacent to Respondent's shop, one year prior to their arrival in 2016.[58] In addition, H-2B workers were informed of the availability of housing prior to their arrival in Illinois.[59] Further, even if Respondent was not aware that housing was available until after H-2B workers arrived in 2016, Respondent offered no explanation as to why Respondent failed to advertise housing in 2017.[60] Thus, we find that Respondent knew or should have known that housing was available.

Respondent's failure to advertise the availability of housing was also willful. On the TEC, the employer must attest that it will abide by the terms and conditions set forth by the H-2B regulations.[61] An employer's submission and signature on the TEC constitutes the employer's representation that the statements are accurate and its acknowledgement and acceptance of the obligations of the program.[62] An employer's failure to read the terms of the TEC or properly learn the H-2B program's requirements amounts to a reckless disregard of the employer's obligations.[63] Thus, we find that Respondent's failure to advertise the availability of house was willful.

---

[56]     *Id.* at 27-28.

[57]     D. & O. at 20.

[58]     Transcript (Tr.) at 37-39, 80-81.

[59]     *Id.*

[60]     D. & O. at 20, 22.

[61]     29 C.F.R. § 503.16.

[62]     *Id.* § 503.19(d).

[63]     80 Fed. Reg. at 24,086-87; *see Adm'r, Wage & Hour Div., U.S. Dep't of Lab. v. C.S. Lawn & Landscape, Inc.*, ARB No. 2020-0005, ALJ No. 2018-TNE-00023, slip op. at 14 n.72 (ARB Apr. 4, 2022) (citing *Adm'r, Wage & Hour Div., U.S. Dep't of Lab. v. Ave. Dental Care*, ARB No. 2007-0101, ALJ No. 2006-LCA-00029, slip op. at 13 (ARB Jan. 7, 2010) (an employer's ignorance of the INA's requirements does not excuse noncompliance.), and

11

We also find that Respondent's failure to disclose the availability of housing substantially deviated from the terms and conditions of the H-2B program. First, we find that the ALJ erred in concluding that Respondent did not have a history of violating the prohibition against the preferential treatment of foreign workers. In *Butler Amusements*, the Board recognized that, while an employer may not have a history of WHD violations, a record that evidences a broader lack of adherence to the H-2B rules may be considered in assessing the previous history of H-2B violations.[64] Here, although WHD did not investigate Respondent in 2015, Respondent's failure to advertise housing in 2016 and 2017 was a continuation of a practice that began in 2015, when Respondent first joined the H-2B program.[65] As stated above, testimony demonstrates that Respondent also offered housing in 2015, and that H-2B workers were informed of the availability of housing prior to their arrival in Illinois.[66] This demonstrates a history of a lack of adherence to the H-2B program requirements.

The gravity of the violation was significant. The failure to advertise the possibility of employer-provided housing was not merely an omission. Given that H-2B workers resided in the house in 2015, Respondent knew or should have known that housing was available. However, the job orders specifically stated that "[a]ssistance finding and securing board & lodging is not available" when it was.[67] In addition, as discussed in the paragraph below, Respondent's housing offered a benefit that was not offered to U.S. workers. In addition, the house was immediately adjacent to Respondent's shop in 2016, a significant benefit.[68]

Lastly, U.S. workers were harmed by Respondent's failure to advertise housing. The ALJ found that the Administrator must demonstrate that a U.S.

---

*Adm'r, Wage & Hour Div., U.S. Dep't of Lab. v. Home Mortg. Co. of Am.*, 2004-LCA-00040, slip op. at 15 (ALJ Mar. 6, 2006) (an employer's failure to read the terms of the TEC or properly learn about the H-2B program requirements amounts to "reckless disregard.")).

[64]    *Adm'r, Wage & Hour Div., U.S. Dep't of Lab. v. Butler Amusements, Inc.*, ARB No. 2021-0007, ALJ No. 2018-TNE-00019 slip op. at 36-37 (ARB July 28, 2023).

[65]    Tr. at 37-39, 80-81.

[66]    *Id.*

[67]    *Id.*; D. & O. at 20.

[68]    Resp. Exhibit B at 2.

12

worker was "*actually* deterred" from applying.[69] However, the regulations do not require that the Administrator procure a U.S. worker who was deterred, but rather, the prohibition of preferential treatment presumes that U.S. workers are harmed when H-2B workers are offered better pay and/or benefits.[70] Here, H-2B workers were offered better benefits than U.S. workers. The house was immediately adjacent to Respondent's shop in 2016, a proximity which could have been a benefit to potential applicants. Thus, we find that U.S. workers were harmed by Respondent's failure to advertise housing.[71]

Therefore, we find that Respondent's failure to advertise the availability of housing is a substantial deviation from the job order,[72] and that Respondent substantially failed to meet the terms and conditions of Attestation 4 in violation of 29 C.F.R. § 503.16(q).

---

[69]    D. & O. at 22.

[70]    *See* 80 Fed. Reg. at 24,062 ("So long as the employer offers U.S. workers at least the same level of benefits, wages, and working conditions as will be provided to the H-2B workers, the employer will be in compliance with [the prohibition against preferential treatment].").

[71]    Respondent contends that the ALJ erred by not weighing each of the five factors listed above when determining whether its actions significantly deviated from the terms and conditions of the H-2B program. Respondent's Response Br. at 14-18; Resp. Br. at 11, 19, 27-28, 37-43. The Administrator counters that these factors reflect different ways to measure the significance of a broad array of H-2B employer obligations and the failure to satisfy those obligations. Administrator's Br. at 22. The language of the regulation states that the decision-maker "may consider, but [is] not limited to" considering, the five factors listed above. As such, these factors are discretionary in application. Consideration of these factors must be reasonably related to determining whether the employer significantly deviated from their obligations. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (decision by an agency not based on consideration of the relevant factors or based on a clear error of judgment is arbitrary and capricious).

[72]    Respondent also argues that housing assistance should be taken to mean subsidized housing. The language in the job order contradicts Respondent's argument. Specifically, the job orders state that "[a]ssistance *finding and securing* board & lodging is not available" (emphasis added). This language focuses on finding and securing housing and is not limited to reducing or subsidizing costs.

13

ii.    *Failure to Advertise the Potential Availability of Union Jobs was a Willful Violation but Did Not Substantially Deviate from the Requirements of the H-2B Program*

Respondent assigned H-2B workers to at least one higher-paying union job in both 2016 and 2017.[73] The parties stipulated that twelve H-2B workers worked at least one week on a union paying project in 2016, which paid $75 per hour instead of the regular $27.46 per hour certified in the 2016 TEC, and at least one week on a union project in 2017, which paid $75 per hour instead of the regular $27.35 per hour certified in the 2017 TEC.[74] However, Respondent did not advertise the potential for higher paying union-rate jobs to U.S. workers in its SWA job order, ETA Form 9142B, or newspaper ads.[75]

The ALJ found that Respondent's failure to advertise the possibility of higher paying union jobs did not violate Attestation 4 of the TEC or 29 C.F.R. § 503.16(q).[76] The ALJ found that, despite the fact that union jobs were rare and unpredictable, at least one higher paying union job was available every year since 2013.[77] Accordingly, the ALJ concluded that Respondent intended to offer union jobs as they became available, and was therefore required to advertise the opportunity.[78] However, the ALJ found that the failure to advertise the possibility of union jobs was not a significant deviation from the terms and conditions of the TECs because Respondent had no history of violating the H-2B program, the Administrator showed no evidence that U.S. applicants were "actually deterred," and because the gravity was "at most, minimal."[79]

---

[73]    D. & O. at 21. The parties stipulated that twelve H-2B workers worked at least one week on a union paying project in 2016, which paid $75 per hour instead of $27.46 per hour, and at least one week on a union project in 2017, which paid $75 per hour instead of $27.35 per hour. Respondent failed to disclose the possibility of higher paying union jobs in its SWA job order, ETA Form 9142B, and newspaper ads. *Id.*

[74]    *Id.* at 10, 21.

[75]    *Id.*

[76]    *Id.* at 21-22.

[77]    *Id.* at 21.

[78]    *Id.*

[79]    *Id.* at 22.

14

The Administrator agrees with the ALJ's finding that Respondent's failure to advertise the potential for higher-paying work was willful, but contends that the ALJ erred in finding that this failure was not a significant deviation.[80] The Administrator contends that the failure to advertise was extremely grave because Respondent "had a consistent history of booking union rate jobs every year since at least 2013" and because "[a] job's pay rate is a key concern to any potential applicant."[81]

Respondent counters that it had no way of knowing in advance if it would have a higher-paying union contract in advance.[82]

We agree with the ALJ that Respondent's failure to advertise the availability of union job was willful. Based on Respondent's history of booking at least one higher-paying union job per year since 2013,[83] Respondent knew or should have known that it would offer these jobs as they became available. Thus, we find that Respondent acted in reckless disregard of its obligations by failing to advertise the potential availability of higher-paying union jobs.

However, we also agree with the ALJ that Respondent's failure to advertise the potential availability of higher-paying union jobs did not substantially deviate from the terms and conditions of the H-2B program. Although Respondent had a history of booking at least one higher-paying union job per year, the work was infrequent and the availability of such jobs was not within Respondent's control.[84]

Thus, we conclude that Respondent's failure to advertise the potential availability of higher paying union jobs was willful, but did not substantially deviate from the terms and conditions of the H-2B program. Therefore, we affirm the ALJ's conclusion that Respondent did not substantially fail to meet the terms and conditions of Attestation 4 in violation of 29 C.F.R. § 503.16(q) by failing to advertise the possibility of union jobs.

---

[80]    Administrator's Br. at 23.

[81]    *Id.* at 25.

[82]    Resp. Response Br. at 20.

[83]    Tr. at 508.

[84]    However, we disagree with the ALJ's finding that the Administrator must demonstrate that a U.S. worker was actually harmed for the reasons stated above.

Case 1:25-cv-02349-JMC    Document 1    Filed 04/14/25    Page 82 of 125
USCA Case #25-1108    Document #2111373    Filed: 04/14/2025    Page 82 of 125

15

## C. _Underpayment of Wages_

Section 503.16(a)(1) states, "[t]he offered wage in the job order equals or exceeds the highest of the prevailing wage or Federal minimum wage, State minimum wage, or local minimum wage. The employer must pay at least the offered wage, free and clear, during the entire period of the [TEC] granted by OFLC."[85] Section 503.16(a)(4) states that if, at the end of a workweek, the piece rate does not at least equal the amount the worker would have earned based on the offered hourly rate, the employer must supplement the worker's pay to equal at least what the "worker would have earned during the workweek if the worker had instead been paid at the offered hourly wage _for each hour worked_."[86] In addition, Attestation 5 states, "[t]he offered wage equals or exceeds the highest of the most recent prevailing wage for the occupation that is or will be issued by the Department to the employer for the time period the work is performed, or the applicable Federal, State, or local minimum wage."[87]

The ALJ found that Respondent failed to pay H-2B workers both the correct hourly wage rate and for all hours they worked.[88] For the reasons that follow, we affirm the ALJ's findings.

### i. _Respondent Failed to Pay the Correct Hourly Wage Rate_

Respondent did not pay its H-2B workers the wage rate listed on the 2016 and 2017 TECs. On the 2016 TEC, Respondent certified it would pay its H-2B workers a basic pay rate of $27.46 per hour and an overtime rate of $41.19 per hour.[89] However, Respondent only paid its H-2B workers a regular rate of $27.11 and an overtime rate of $40.67.[90] Likewise, on the 2017 TEC, Respondent certified it would pay its H-2B workers a basic pay rate of $27.35 per hour and an overtime

---

85    29 C.F.R. § 503.16(a)(1).

86    _Id._ § 503.16(a)(4) (emphasis added).

87    D. & O. at 22-23.

88    _Id._ at 23-32.

89    _Id._ at 7-8.

90    _Id._ at 14.

Case 1:25-cv-02349-JMC     Document 1     Filed 04/14/25     Page 83 of 125
USCA Case #25-1108     Document #2111373     Filed: 04/14/2025     Page 83 of 125

16

rate of $41.03 per hour.[91] However, Respondent only paid its H-2B workers an hourly rate of $27.11 and an overtime rate of $40.67.[92]

The ALJ concluded that Respondent's failure to pay the required wage was willful because it acted in reckless disregard of its wage obligation under the H-2B program.[93] The ALJ found that this violation was a significant deviation from the terms and conditions of the TEC because all H-2B workers were affected, the gravity was severe, and Respondent experienced a financial gain.[94]

Respondent contends that the facts do not support a finding of a "willful failure"[95] and asserts that the mere fact that an employer might not have complied with its wage obligations does not demonstrate anything more than negligence, and the ALJ did not otherwise find any facts that would establish Respondent's actions in this case were willful.[96] Respondent also contends that it did not significantly deviate from its wage obligations, and that the ALJ failed to consider Respondent's lack of a history of violations before concluding that the gravity of the violation was severe.[97]

We find that Respondent acted in reckless disregard of its wage obligations under the H-2B program by failing to pay the correct hourly wage rate to its H-2B workers. Respondent did not dispute that it paid its works lower wages than those indicated in the TECs.[98] And, as noted above, in signing the TECs, Respondent attested, under the penalty of perjury, that it knew and accepted its obligations under the H-2B program, including the duty to pay the workers the wages indicated in the TEC. This evidences a reckless disregard for Respondent's obligations under the program.[99]

---

[91]     *Id.* at 8.

[92]     *Id.* at 14.

[93]     *Id.* at 24.

[94]     *Id.*

[95]     Resp. Br. at 19-23.

[96]     *Id.* at 32-33.

[97]     *Id.* at 38-39.

[98]     D. & O. at 23.

[99]     80 Fed. Reg. at 24,086-87; *C.S. Lawn & Landscape, Inc.*, ARB No. 2020-0005, slip op. at 9.

Case 1:25-cv-02349-JMC    Document 1    Filed 04/14/25    Page 84 of 125
USCA Case #25-1108    Document #2111373    Filed: 04/14/2025    Page 84 of 125

17

Respondent's actions also demonstrate a substantial deviation from the terms and conditions of the H-2B program. First, Respondent did not dispute that H-2B workers were all underpaid.[100] Thus, we find that all H-2B workers were harmed by the violation. Second, we find that the gravity of H-2B workers' underpayment is severe. The H-2B regulations are meant to protect both U.S. and foreign workers, and underpaying H-2B workers undermines this purpose.[101] In addition, Respondent underpaid H-2B workers by $133,960.50 in 2016, and $167,487.55 in 2017, a significant underpayment.[102] Third, by paying all H-2B workers less than the required wage rate, Respondent achieved a financial gain and H-2B workers suffered a financial loss.[103] Fourth, we find that U.S. workers were harmed. The purpose of paying the prevailing wage is to ensure that the employment of H-2B workers does not adversely affect U.S. workers.[104] Underpaying H-2B workers harms U.S. workers by depressing wages in their industry. Thus, we conclude that Respondent has significantly deviated from the terms and conditions of the H-2B program.

Therefore, we find that Respondent substantially failed to comply with Attestation 5 in violation of 29 C.F.R. §§ 503.16(a)(1), (a)(4), and (b) for not paying the required hourly wage rate.

### ii. Respondent Failed to Pay H-2B Workers for All Hours Worked

The ALJ also determined that Respondent failed to pay H-2B workers for all the hours they worked.[105] In total, the ALJ concluded that Respondent owed H-2B workers $133,960.50 in back wages for 2016, and $167,487.55 in 2017.[106]

---

[100]    D. & O. at 23.

[101]    80 Fed. Reg. at 24,065 ("the payment of the prevailing wage is necessary to ensure that the employment of foreign workers does not adversely affect the wages and working conditions of similarly employed U.S. workers").

[102]    D. & O. at 22 n.131.

[103]    *Id.* at 22-23.

[104]    *See* 80 Fed. Reg. at 24,065 (". . . the payment of the prevailing wage is necessary to ensure that the employment of foreign workers does not adversely affect the wages and working conditions of similarly employed U.S. workers").

[105]    D. & O. at 24-32.

[106]    *Id.*

18

As a threshold matter, Respondent claims that the INA does not require it to pay H-2B workers for all hours worked.[107] However, this argument contradicts the protective purpose of the regulations.[108] Moreover, the regulations make it abundantly clear that the offered wage is the "effective minimum wage" and must be paid for each hour worked.[109]

Next, Respondent contends that the ALJ misapplied the two-step burden-shifting framework articulated in *Anderson v. Mt. Clemens Pottery Co.*[110] in concluding that the evidence established that Respondent failed to pay its H-2B employees for all hours worked.[111] We disagree.

When an employer fails to keep records, an ALJ may use the *Anderson v. Mt. Clemens Pottery Co.* burden-shifting framework.[112] Under the *Mt. Clemens* framework, if the employer's records are "inaccurate or inadequate," the Administrator must show that the workers "in fact performed work for which [they were] improperly compensated" by producing "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."[113] If the Administrator meets its burden, then the burden shifts to the employer to produce evidence of the precise amount owed.[114] If the employer fails to do so, the court may award damages "even though the result may be only approximate."[115]

---

[107]   Resp. Br. at 21-23.

[108]   *See* 80 Fed. Reg. at 24,065.

[109]   *Id.* at 24,063, 24,068-69; 29 C.F.R. § 503.16(a).

[110]   328 U.S. 680 (1946).

[111]   Resp. Br. at 12.

[112]   *Adm'r, Wage & Hour Div., U.S. Dep't of Lab. v. Sun Valley Orchards, LLC*, ARB No. 2020-0018, ALJ No. 2017-TAE-00003, slip op. at 17 (ARB May 27, 2021) (affirming the ALJ's application of the *Mt. Clemens* framework).

[113]   *Mt. Clemens Pottery Co.*, 328 U.S. at 687. This case was superseded by statute. *See Integrity Staffing Sols., Inc.*, 574 U.S. 27 (2014). However, the Board still utilizes this framework. *See Sun Valley Orchards, LLC*, ARB No. 2020-0018, slip op. at 17 (ARB May 27, 2021) (affirming the ALJ's application of the *Mt. Clemens* framework); *Adm'r, Wage & Hour Div., U.S. Dep't of Lab. v. Hearn's Enters., LLC*, ARB No. 2022-0050, ALJ No. 2017-SCA-0006, slip op. at 6 (ARB Mar. 10, 2022) (same).

[114]   *Mt. Clemens Pottery Co.*, 328 U.S. at 687-88.

[115]   *Id.* at 688.

19

The ALJ correctly applied the *Mt. Clemens* burden-shifting framework. Employers are required to maintain accurate records of the number of hours each H-2B worker worked.[116] The only records Respondent kept of the hours H-2B workers worked were payroll records.[117] However, Respondent's payroll records are not a reliable indicator of the hours H-2B workers actually worked. Guzman testified that each worker wrote the hours they worked on a sheet of paper and then he transferred that data to a whiteboard, tallied the total number of hours, and then sent the hours to his accountant.[118] After he sent his accountant the data, he discarded the H-2B workers' sheets of paper.[119] Fernando Hernandez, the Assistant District Director of the WHD, testified that crew leaders recorded hours rounding to a whole number on slips of paper, which were not retained, and that the recorded numbers were an estimate.[120]

In addition, U.S. workers and an H-2B worker stated that U.S. workers and H-2B workers worked the same jobs and the same hours. Even so, Respondent compensated U.S. workers for more hours than H-2B workers.[121] Further, several H-2B workers also reported that they worked five to seven days per week for ten to eleven hours per day.[122] Yet, Respondent's payroll records reflected that the H-2B workers only worked 31.79 hours per week in 2016, and 36.42 hours per week in 2017, far below the numbers reported by H-2B workers.[123]

Relying on this evidence, the Administrator reconstructed the hours worked by the H-2B employees. Given the statements and evidence that H-2B workers and

---

[116]    29 C.F.R. § 503.16(i)(1).

[117]    D. & O. at 24-25.

[118]    *Id.* at 26.

[119]    *Id.*

[120]    *Id.* at 26-27.

[121]    *Id.* at 28. Specifically, the ALJ found that five U.S. workers stated that H-2B workers worked the same jobs and the same hours as U.S. workers. *Id.* at 28. Likewise, one former H-2B worker testified at the hearing that "U.S. workers and H-2B workers worked side by side, doing the same work. There were no tasks at any job that were exclusively for U.S. workers and not H-2B workers . . . Generally, the nature of each job-related task made it impossible for only the U.S. workers to complete them." *Id.* However, U.S. workers were paid for 12.16 hours more than H-2B workers in 2016, and 16.36 hours more in 2017. *Id.* at 29 n.172.

[122]    *Id.* at 29.

[123]    *Id.* at 27.

20

U.S. workers performed the same duties and worked the same hours, the Administrator calculated wages owed to H-2B workers based on the weekly average hours worked by U.S. workers.[124] From this, we agree with the ALJ that Respondent's payroll records are "inaccurate or inadequate" and that the Administrator carried its burden to produce sufficient evidence to show the amount and extent of the H-2B workers' work as a matter of just and reasonable inference."[125]

We also agree with the ALJ that Respondent failed to produce evidence to show the precise amount of work performed by H-2B workers or otherwise negate the reasonableness of the inference drawn from the Administrator's evidence. First, Respondent contends that U.S. workers worked longer hours than H-2B workers because U.S. workers performed additional tasks that H-2B workers did not perform. However, Respondent failed to produce evidence to show that U.S. workers in fact worked longer hours than H-2B workers. Although Respondent contends that U.S. workers performed different jobs, such as driving forklifts, testimony demonstrates that H-2B workers performed these tasks on occasion as well.[126] Moreover, regardless of the specific job duties workers performed, U.S. workers stated that they worked the same hours as H-2B workers.[127]

---

[124]    *Id.* at 33-34.

[125]    Respondent asserts that the ALJ prematurely shifted the burden to Respondent after deciding that Respondent did not keep adequate records. Resp. Br. at 13. In support, Respondent cites a single sentence of the D. & O. in which the ALJ stated "[b]ecause I found that the payroll records are inadequate, the burden shifts to Respondent [Lucero] to proffer evidence of the precise amount of work performed or to negate the reasonableness of the inference to be drawn from the Plaintiff's evidence." *Id.* (quoting D. & O. at 31). Although that specific sentence, taken out of context, seems to suggest that the ALJ may have prematurely shifted the burden to Respondent under *Mt. Clemens*, it is clear from the remainder of the ALJ's analysis that he found both that Respondent's records were "inaccurate or inadequate" and that the Administrator carried its burden to produce sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *E.g.,* D. & O. at 29 (finding based on the Administrator's evidence that "H-2B workers, on average, worked 10 to 11 hours a day for 5 to 7 days a week"), 31 (stating, before moving on to Respondent's burden, that "[c]onsistent with the foregoing, I find that Plaintiff demonstrated that Respondent's records are 'inaccurate and inadequate' and provided sufficient evidence to reasonably infer the amount and extent of that work").

[126]    Tr. at 548-49, 558.

[127]    D. & O. at 30-31.

21

Additionally, Respondent asserts that the ALJ erred in not crediting the affidavits from eighteen H-2B workers who attested that they were paid for all hours worked.[128] However, the ALJ reasonably gave less weight to these affidavits because they do not specify the number hours each H-2B worker worked or whether those hours differed from U.S. workers' hours. Respondent also did not offer evidence to substantiate the truthfulness of these affidavits because Respondent failed to keep records that would corroborate their statements.[129]

Thus, we agree with the ALJ's application of the *Mt. Clemens* framework and find that Respondent failed to pay H-2B workers for all hours worked.

Next, Respondent contends that, even if the evidence supports a finding that it failed to pay its H-2B workers for all hours worked, the facts do not support a finding that their failure to pay was "willful."[130] Respondent asserts that the mere fact that an employer might not have complied with its wage obligations under the H-2B program does not demonstrate that its lack of compliance was anything more than negligence, and that the ALJ did not otherwise find any facts that would establish Respondent's actions in this case were willful.[131]

Respondent's failure to pay H-2B workers for all hours worked demonstrates a reckless disregard for its obligations under the H-2B program. Respondent attested that it would pay H-2B workers at least the offered wage "during the entire period of the [TEC],"[132] yet it did not.[133] As we noted above, "[t]he fact that employers submit a signed [TEC] attesting under penalty of perjury that they know and accept the obligations of the program" supports a finding of willfulness.[134]

Lastly, Respondent contends that its failure to pay H-2B workers for all hours worked does not arise to a substantial deviation of its obligations under the

---

[128]    Resp. Br. at 17-18, 24-25.

[129]    *Id.* at 31-32.

[130]    *Id.* at 19-23.

[131]    *Id.* at 32-33.

[132]    *Id.* at 22-23; JX C; JX D.

[133]    D. & O. at 32.

[134]    80 Fed. Reg. at 24,086-87.

Case 1:25-cv-02349-JMC    Document 1    Filed 04/14/25    Page 89 of 125
USCA Case #25-1108    Document #2111373    Filed: 04/14/2025    Page 89 of 125

22

H-2B program because the ALJ failed to consider all five discretionary factors, including Respondent's lack of a history of violations.[135]

Although Respondent did not have a history of incorrectly paying H-2B workers, the combination of the remaining substantial deviation factors weighs against Respondent. First, because Respondent failed to adequately track the hours each H-2B worker worked and failed to keep appropriate records, the Administrator's initial assessment that its failure to adequately keep records of hours worked affects all H-2B workers is reasonable. Second, the gravity of the underpayment of H-2B workers is severe based on the number of workers affected and the amount the workers were underpaid. The purpose of the INA is to protect U.S. and foreign workers.[136] Paying H-2B workers less than the prevailing wage for all hours worked undermines this purpose.[137] Third, because Respondent did not pay H-2B workers for all hours, Respondent achieved a financial gain and H-2B workers suffered a financial loss.[138] Specifically, the ALJ ordered Respondent to pay $133,960.50 in back wages for 2016, and $167,487.55 for 2017.[139] Fourth, the purpose of paying the prevailing wage is to ensure that the employment of H-2B workers does not adversely affect U.S. workers.[140] Not paying H-2B workers for all hours worked harms U.S. workers by depressing wages in their industry. Thus, we find that Respondent significantly deviated from the terms and conditions of the H-2B program.

Therefore, we find that Respondent substantially failed to comply with Attestation 5 in violation of 29 C.F.R. §§ 503.16(a)(1), (a)(4), and (b) for not paying the required wage rate.

### D. *Area of Intended Employment*

Attestation 11 and 29 C.F.R. § 503.16(x) prohibit employers from placing H-2B workers outside the area of intended employment listed on the TEC. The TEC

---

[135]    Resp. Br. at 38-39.

[136]    *See* 80 Fed. Reg. at 24,042 (the regulations were issued "to provide for increased worker protections for both [U.S.] and foreign workers").

[137]    *See id.* at 24,065.

[138]    D. & O. at 22-23.

[139]    *Id.* at 33.

[140]    *See* 80 Fed. Reg. at 24,065.

23

instructs an employer to "identify the geographic place(s) of employment with as much specificity as possible."

On the 2016 TEC, Respondent identified the area of intended employment as Cook County-Chicago-Naperville-Joliet Metropolitan Division area.[141] However, Respondent's H-2B workers actually worked beyond this metropolitan area, and completed jobs in Wisconsin, Michigan, and Indiana.[142] Likewise, on the 2017 TEC, Respondent identified the area of employment as Cook County-Chicago-Naperville-Arlington Heights Metropolitan Division.[143] Again, however, Respondent's H-2B workers actually worked beyond this metropolitan area, and completed jobs in Wisconsin, Michigan, Indiana, and Iowa.[144]

The ALJ found that there was no factual dispute that Respondent placed H-2B workers outside the area of intended employment in 2016 and 2017.[145] The ALJ also concluded that Respondent acted in reckless disregard for ensuring that H-2B workers stayed within the area of intended employment and that this substantially deviated from the terms and conditions of the H-2B program.[146]

Respondent contends that assigning its H-2B workers to work outside the intended area of employment did not arise to a willful violation of the TEC, but rather that its non-compliance was a mistake.[147] Respondent also asserts that the

---

[141]    D. & O. at 11.

[142]    *Id.* at 11-12. Specifically, H-2B workers worked in the following locations in Wisconsin: Sheboygan, Williams Bay, Kenosha, Lake Geneva, Delavan, and Milwaukee; in Michigan: Union Pier and Three Oaks; and in Indiana: Granger, Syracuse, Merrillville, South Bend, and Warsaw. *Id.*

[143]    *Id.* at 12.

[144]    *Id.* Specifically, H-2B workers worked in the following locations in Wisconsin: Milwaukee, Madison, Greek Lake, Waunakee, Somers, Kenosha, Fedonia, Rice Lake, Waukesha, Wisconsin Dells, Mequon, Wauwatosa, Menomonee Falls, Glenbeulah, Lakeside, Green Bay, Lake Geneva, Oak Creek, Baraboo, Middleton, Heartland, Elm Grove, River Falls, Window, Newton, Glendale, Sheboygan, and Hazel Green; in Michigan: New Buffalo, Sawyer, Cassopolis, Grand Beach, and Buchanan; in Indiana: Elkhart, Michigan City, and West Layfayette; and in Decorah, Iowa. *Id.*

[145]    *Id.* at 36-37.

[146]    *Id.* at 37.

[147]    Resp. Br. at 34.

24

ALJ erred in finding this constituted a substantial deviation because he did not weigh all five discretionary factors.[148] We disagree.

Respondent's actions demonstrated a reckless disregard for the requirements of the H-2B program. As stated above, an employer's submission and signature on the TEC constitutes the employer's representation that the statements are accurate and its acknowledgement and acceptance of the obligations of the program.[149] Although Guzman asserted that he did not realize that H-2B workers could only work in the areas of intended employment, an employer's failure to read the terms of the TEC or properly learn the H-2B program's requirements amounts to reckless disregard.[150] Thus, we affirm the ALJ's finding that Respondent acted in reckless disregard of its obligations by having H-2B workers work outside the areas of intended employment.

Respondent's actions also demonstrate a substantial deviation from the terms and conditions of the H-2B program. First, every worker was affected during 2016 and 2017.[151] Second, the gravity of this violation is significant. The regulations require employers to identify the area and employment so that the DOL and the Department of Homeland Security (DHS) can determine whether U.S. workers capable of performing at the relevant service or labor cannot be found in the U.S. prior to approving an H-2B petition.[152] Respondent failed to identify forty-five cities across four states in which H-2B workers worked outside the areas of intended employment during 2016 and 2017.[153] Because Respondent failed to identify these additional locations, DOL and DHS were unable to assess whether qualified U.S. workers were available in these locations.

In *5 Star Forestry*, H-2B workers worked in four locations that were not identified in the area of intended employment.[154] The Board found that this

---

[148]    *Id.* at 40. As we found above, these factors are discretionary in application.

[149]    29 C.F.R. § 503.19(d).

[150]    80 Fed. Reg. at 24,086-87; *C.S. Lawn & Landscape, Inc.*, ARB No. 2020-0005, slip op. at 14.

[151]    D. & O. at 11-12, 36-37.

[152]    *See* 80 Fed. Reg. at 24,045.

[153]    D. & O. at 11-12, 36-37.

[154]    *Adm'r, Wage & Hour Div., U.S. Dep't of Lab. v. 5 Star Forestry, LLC*, ARB No. 2013-0056, ALJ No. 2012-TNE-00010, slip op. at 2 (ARB Nov. 6, 2014).

25

constituted a substantial deviation from the H-2B regulations, and highlighted the importance of engaging in recruitment efforts to ensure that there are no U.S. workers available to perform the work and because it "advances the INA's goals to protect both domestic and foreign workers by assuring proper enforcement of the INA's H-2B provisions."[155] Because Respondent failed to conduct recruitment efforts of U.S. workers in forty-five cities across four states in this case, we find that the gravity is significant and that this weighs against Respondent.

Respondent was required to conduct recruitment efforts of U.S. workers in the area of intended employment and had forty-five cities in which it did not.[156] As a result, Respondent never demonstrated that capable U.S. workers were unavailable to perform this labor in these locations. Since U.S. workers were not advised of this opportunity in forty-five cities across four states, we find that U.S. workers were harmed and that this factor weighs against Respondent.

Therefore, we find that Respondent substantially failed to meet the terms and conditions of Attestation 11 in violation of 29 C.F.R. § 503.16(x).

E. *Transportation and Subsistence Costs*

Attestation 17 and 29 C.F.R. §§ 503.16(j)(1)(i)-(ii) require employers to pay all transportation and subsistence costs for H-2B workers' inbound and outbound travel. Respondent only paid some, but not all, of these costs in 2016 and 2017.[157] During both years, H-2B workers stayed in hotels in Monterrey, Mexico for approximately three-to-four days while their paperwork was processed.[158] Guzman testified that he paid for the workers' hotel costs, but did not produce a record of such payments.[159] Guzman admitted that Respondent failed to pay for workers' subsistence from their hometowns to Monterrey and that Respondent only paid "some" costs for a "few" workers.[160]

---

[155]    *Id.* at 6.

[156]    D. & O. at 36-37.

[157]    *Id.* at 38-39.

[158]    *Id.*

[159]    *Id.* at 38.

[160]    *Id.*

26

The ALJ found that Respondent failed to pay all required inbound and outbound transportation and subsistence costs for H-2B workers' travel.[161] The ALJ concluded that Respondent's failure to pay for the entirety of workers' inbound and outbound costs was willful because it demonstrated a reckless disregard for whether it paid for its H-2B workers' required expenses.[162] The ALJ also concluded its failure to pay the required expenses was a significant deviation of its obligations under the H-2B program because a large number of workers were affected and Respondent achieved some financial gain.[163] The ALJ recognized that Respondent did not have a previous history of violations; however, the ALJ gave greater weight to the fact that H-2B workers suffered a financial loss and Respondent experienced a financial gain from this violation.[164]

Respondent contends that the failure to pay for all the H-2B workers' travel expenses was not a willful violation, but rather a mistake that amounts to mere negligence.[165] Respondent contends this alleged violation was also not a significant deviation because the ALJ did not weigh all five factors.[166] Once again, we disagree.

Respondent's actions demonstrated a reckless disregard for the requirements of the H-2B program based on the fact that, by Respondent's own admission, it paid some but not all of the required expenses and its failure to keep adequate records.[167] Although Guzman stated that he was unaware that Respondent had to pay for all inbound and outbound travel and subsistence, an employer's failure to read the terms of the TEC or properly learn the H-2B program's requirements amounts to reckless disregard of its obligations under the program.[168] In addition, before the ALJ, Respondent contended that it relied on the advice of Monarch Butterfly (Monarch), a third-party company Respondent hired to process H-2B workers' visas, and its attorney to handle "all the necessary paperwork and to

---

[161]     *Id.* at 37-40.

[162]     *Id.* at 40.

[163]     *Id.*

[164]     *Id.*

[165]     Resp. Br. at 34.

[166]     *Id.* at 40-41, 53. As we found above, these factors are discretionary in application.

[167]     *Id.* at 38-39.

[168]     80 Fed. Reg. at 24,086-87; *see C.S. Lawn & Landscape, Inc.*, ARB No. 2020-0005, slip op. at 14 ("an employer's failure to know the H-2B program's requirements does not excuse a violation").

27

reimburse necessary costs."[169] However, parties are responsible for the acts and omissions of their freely chosen representatives.[170] Thus, we find that Respondent acted in reckless disregard of its H-2B obligations for failing to pay inbound and outbound travel and subsistence costs.

Respondent's actions also demonstrate a substantial deviation from the terms and conditions of the H-2B program. First, Respondent's failure to pay for H-2B workers' inbound and outbound travel and subsistence expenses affected many H-2B workers. Although Respondent contends that the ALJ erred by not specifying the number of workers affected, Respondent admitted it did not pay for any workers' travel expenses to Monterrey, Mexico, and did not pay for any outbound subsistence expenses.[171] Based on this admission, all H-2B workers were affected, at least, in part.

Second, this violation had a moderate impact on the H-2B workers. As discussed above, Respondent covered some, but not all, expenses and all of Respondent's H-2B workers were affected to at least some extent. In addition, as discussed in the section *infra*, H-2B workers were not compensated a total of $5,863.56 for inbound travel expenses for 2016 and 2017, and $5,249.13 for outbound travel expenses in 2016.[172]

Third, Respondent achieved a financial gain due to the violation, and the H-2B workers suffered a financial loss. Specifically, for inbound expenses, the ALJ found that nineteen workers were owed an average of $168.26 in 2016 and an average of $156.86 in 2017.[173] For outbound expenses, the ALJ found that nineteen workers were owed an average of $276.27 in 2016.[174] In total, the ALJ found that

---

[169]    D. & O. at 39.

[170]    *See Mikami v. Adm'r, Wage & Hour Div., U.S. Dep't of Lab.*, ARB No. 2013-0005, 2012-LCA-00025, slip op. at 2-3 n.9 (ARB June 16, 2014) ("[P]arties are ultimately responsible for the acts and omissions of their freely chosen representatives."); *Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396 (1993) ("[C]lients must be held accountable for the acts and omissions of their attorneys."); *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633-34 (1962) (stating that where a party voluntarily chose its representation it cannot "avoid the consequence of the acts or omissions of this freely selected agent.").

[171]    D. & O. at 38-40.

[172]    *Id.* at 41.

[173]    *Id.* at 41 n.251.

[174]    *Id.*

28

Respondent owed H-2B workers $5,863.56 for inbound travel expenses for 2016 and 2017, and $5,249.13 for outbound travel expenses in 2016.[175] Respondent has not challenged this calculation.[176]

Therefore, we find that Respondent substantially failed to meet the terms and conditions of Attestation 17 in violation of 29 C.F.R. §§ 503.16(j)(1)(i)-(ii).

F. *Disclosure of Job Order*

Attestation 19 and 29 C.F.R. § 503.16(l) require employers to provide a copy of the job order to H-2B workers in a language understood by workers. However, Respondent did not provide any of its H-2B workers in 2016 or 2017 with a copy of the job orders.[177] Guzman testified that he hired Monarch at the recommendation of his attorney to process H-2B workers' visas in Mexico and assumed Monarch complied with the rules and regulations of the H-2B program.[178]

The ALJ found that Respondent failed to provide H-2B workers with a copy of the job order in a language they understood.[179] The ALJ concluded the violation was willful because Respondent chose Monarch and was aware of its responsibilities to ensure that Monarch complied with the H-2B program's requirements.[180] The ALJ further concluded that this violation was a significant deviation of Respondent's obligations under the H-2B program because the gravity of the violation was severe as none of the workers had information to become aware of the terms and conditions of their employment and their rights under the contract.[181]

Respondent did not specifically challenge the ALJ's finding that it acted in reckless disregard by failing to disclose the job order but does broadly contend that its failures were mere negligence.[182] Respondent also contends that the ALJ erred

---

[175]    *Id.*

[176]    *See* Resp. Br. at 34, 40-41.

[177]    D. & O. at 42.

[178]    *Id.*

[179]    *Id.*

[180]    *Id.*

[181]    *Id.*

[182]    Resp. Br. at 31-36.

Case 1:25-cv-02349-JMC    Document 1    Filed 04/14/25    Page 96 of 125
USCA Case #25-1108    Document #2111373    Filed: 04/14/2025    Page 96 of 125

29

in finding a significant deviation because the ALJ did not address all five regulatory factors.[183] We disagree with Respondent.

Respondent's actions demonstrated a reckless disregard for the requirements of the H-2B program. Again, an employer's submission and signature on the TEC constitutes that employer's acknowledgement and acceptance of the obligations of the H-2B program.[184] Respondent voluntarily chose to hire Monarch to process visas in Mexico and was ultimately obligated for ensuring that Monarch complied with the H-2B programs requirements.[185] Respondent failed to do so.[186] In addition, Respondent's payment of some, but not all, expenses demonstrates that it was aware that it was required to pay these expenses. Thus, we find that Respondent's failure to pay all inbound and outbound costs demonstrates a reckless disregard for the requirements of the H-2B program.

Respondent's actions were also a significant deviation from terms and conditions of the H-2B program. First, Respondent admitted that it did not provide any of its H-2B workers with a copy of the job orders in either 2016 or 2017.[187] As such, this violation affected every worker.

Second, the gravity of Respondent's failure to disclose the job order to H-2B workers is severe. The purpose of the disclosure requirement is "to strengthen worker protection and promote program compliance."[188] Because Respondent failed to disclose the job order to H-2B workers in a language they understood, they were not informed about the terms and conditions of their employment or their rights under the contract. As such, they were unaware that Respondent was violating its obligations under the H-2B program.

Third, H-2B workers were injured because Respondent committed numerous violations and workers had no way of knowing that, since Respondent failed to disclose the terms and conditions of their employment.

---

[183]    *Id.* at 41. As we found above, these factors are discretionary in application.

[184]    29 C.F.R. § 503.19(d).

[185]    *See Pioneer Inv. Servs.* 507 U.S. at 396; *Link*, 370 U.S. at 633-34.

[186]    D. & O. at 42.

[187]    *Id.*

[188]    80 Fed. Reg. at 24,069.

30

Therefore, we find that Respondent substantially failed to meet the terms and conditions of Attestation 19 in violation of 29 C.F.R. § 503.16(l).

G. *Contracts with Third Parties to Comply with Prohibitions*

Attestation 22 and 29 C.F.R. § 503.16(p) requires employers to contractually forbid third parties from seeking payment from employees. In 2016 and 2017, Respondent employed Monarch to process visas for its H-2B workers in Monterrey, Mexico.[189] However, Respondent admitted that it had no written contract with Monarch for either 2016 or 2017, and it failed to contractually forbid Monarch from seeking payment from Respondent's H-2B workers.[190]

The ALJ found that Respondent failed to contractually forbid third parties from seeking payment from H-2B workers in violation of Attestation 22 and 29 C.F.R. § 503.16(p).[191] The ALJ also concluded that Respondent's actions demonstrated a reckless disregard for ensuring that third parties do not seek payments from employees.[192] Finally, the ALJ also concluded that this violation was a significant deviation of Respondent's H-2B obligations because Guzman acknowledged that this regulation is meant to protect prospective H-2B workers, and because all H-2B workers were affected.[193]

Respondent contends that failing to contractually forbid Monarch from collecting payments from H-2B workers was merely a mistake and was not willful.[194] Respondent also contends that this alleged violation was also not a significant deviation, and that the ALJ failed to consider all five factors.[195] We disagree.

Respondent's failure to contractually forbid Monarch from seeking payments from H-2B workers demonstrates a reckless disregard for the requirements of the H-2B program. Although Respondent contends that this failure was a mere

---

[189]    D. & O. at 43.

[190]    *Id.* at 43-44.

[191]    *Id.*

[192]    *Id.* at 43.

[193]    *Id.* at 43-44.

[194]    Resp. Br. at 34-35.

[195]    *Id.* at 41-42. As we found above, these factors are discretionary in application.

Case 1:25-cv-02349-JMC    Document 1    Filed 04/14/25    Page 98 of 125
USCA Case #25-1108    Document #2111373    Filed: 04/14/2025    Page 98 of 125

31

oversight, Respondent's failure to contractually forbid third parties from seeking payment from H-2B workers two years in a row demonstrates a pattern. As discussed above, Respondent's submission and signature on the TEC constitutes its acknowledgment and acceptance of the obligations of the H-2B program.[196] In addition, an employer's failure to read the terms of the TEC or properly learn the H-2B program's requirements amounts to a reckless disregard of the employer's obligations.[197] Thus, we find that Respondent acted in reckless disregard for the requirements of the H-2B program.

Respondent's failure to contractually forbid Monarch from collecting payments from H-2B workers also constitutes a substantial deviation from the terms and conditions of the H-2B program. First, Respondent admitted that this violation affected every H-2B worker.[198] Second, the gravity of this violation is severe. The purpose of this provision is to protect prospective workers,[199] and here every worker was affected.[200]

Therefore, Respondent substantially failed to meet the terms and conditions of Attestation 22 in violation of 29 C.F.R. § 503.16(p).

### H. *Document Retention Requirements*

Attestation 26 and 29 C.F.R. § 503.17 require employers to retain for three years all documents relating to the TEC and registration, recruitment-related documents, and payroll records. The ALJ found that Respondent failed to retain documents as required.[201] The ALJ found that, although Respondent kept payroll records, Respondent failed to retain all of the remainder of the required documents, which includes records of H-2B workers' start and stop times, tasks completed, records showing it reimbursed workers for inbound and outbound travel and

---

[196]    29 C.F.R. § 503.19(d).

[197]    80 Fed. Reg. at 24,086-87; *see C.S. Lawn & Landscape, Inc.*, ARB No. 2020-0005, slip op. at 14, 14 n.72.

[198]    D. & O. at 44.

[199]    *See* 80 Fed. Reg. at 24,070.

[200]    D. & O. at 44.

[201]    *Id.*

32

subsistence, and records relating to its recruitment efforts of US workers.[202] The
ALJ concluded that Respondent knew or should have known that it was required to
retain documents, and that Respondent's failure to do so amounted to reckless
disregard of its H-2B obligations.[203] The ALJ further concluded that this was a
significant deviation.[204]

Respondent contends that merely knowing about a requirement is not enough
to rise to the level of willfulness.[205] Respondent also contends that this alleged
violation was not a significant deviation from its obligations because the ALJ failed
to consider all five discretionary factors.[206] Once more, we disagree.

Respondent's failure to retain documents demonstrated a reckless disregard
of its requirements under the H-2B program. As stated above, an employer's failure
to read the terms of the TEC or properly learn the H-2B program's requirements
amounts to reckless disregard.[207]

Respondent's failure to retain records also constituted a substantial deviation
from the terms and conditions of the H-2B program. First, Respondent's failure to
keep records affected every worker.[208] Second, document retention is critical to the
DOL's enforcement abilities, and as such, Respondent's failure to do so represents
an extremely grave violation.[209]

Therefore, we find that Respondent substantially failed to meet the terms
and conditions of Attestation 26 in violation of 29 C.F.R. § 503.17.

---

[202]    *Id.* Respondent argued that its payroll records were a sufficient record of hours
worked; however, we have found that its method of recording hours was inadequate.

[203]    *Id.* at 45.

[204]    *Id.*

[205]    Resp. Br. at 35.

[206]    *Id.* at 42. As we found above, these factors are discretionary in application.

[207]    *See C.S. Lawn & Landscape, Inc.*, ARB No. 2020-0005, slip op. at 14, 14 n.72.

[208]    D. & O. at 44-45.

[209]    *See* 80 Fed. Reg. at 24,086.

33

## 2. Remedies

If the Administrator determines that an employer has violated the requirements of the H-2B program, the Administrator may assess remedies, including the recovery of unpaid wages, CMPs, and debarment from the H-2B program.[210]

The Administrator may assess a CMP for each violation that is either a willful misrepresentation of a material fact; a substantial failure to meet any of the terms and conditions of the H-2B forms; or a willful misrepresentation of a material fact to the Department of State during the H-2B nonimmigrant visa application process.[211] "Each such violation involving the failure to pay an individual worker properly or to honor the terms or conditions of [the aforementioned H-2B forms] constitutes a *separate violation*."[212]

For violations related to wages, impermissible deductions, or prohibited fees and expenses, Section 503.23(b) provides that the Administrator may assess CMPs "that are equal to the difference between the amount that should have been paid and the amount that actually was paid to such worker(s)," subject to a maximum of $12,383.[213] Back wages further the purposes of the H-2B program by reducing the employer's incentive to bypass U.S. workers in order to hire H-2B workers who are more easily exploited.[214]

For all other violations, Section 503.23(d) provides that the Administrator may assess CMPs up to the maximum of $12,383 per violation.[215] Section 503.23(e) provides that, when assessing CMPs pursuant to paragraph (d), the Administrator may consider the following factors: (1) any previous history of H-2B violations by the employer; (2) the number of workers affected by the violation; (3) the gravity of

---

[210]    29 C.F.R. § 503.20(a).

[211]    29 C.F.R. §§ 503.19, 503.23(a).

[212]    *Id.* § 503.23(a) (emphasis added).

[213]    *Id.* § 503.23(b). This maximum is adjusted by regulation. Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. No. 114-74, § 701, 129 Stat 584, 599 (2015). The maximum in effect in the present case was $12,383. *See Department of Labor Federal Civil Penalties Inflation Adjustment Act Annual Adjustments for 2018*, 83 Fed. Reg. 7-01, 12 (Jan. 2, 2018).

[214]    *Butler Amusements*, ARB No. 2021-0007, slip op. at 31.

[215]    29 C.F.R. § 503.23(d).

34

the violation; (4) the good-faith efforts by the employer to comply; (5) the employer's explanation for the violation; (6) the employer's commitment to future compliance; and (7) the extent to which the employer achieved a financial gain or workers suffered a potential financial loss.[216] The "highest penalties" are reserved for willful failures to meet any of the conditions in the TEC and H-2B petition that "involve harm to U.S. workers."[217]

A. *Respondent's Preliminary Arguments*

Respondent challenges the ALJ's imposition of CMPs.[218] Respondent contends that the INA does not mandate CMPs and that, if CMPs are assessed, the Administrator must provide a reason in the determination letter.[219] Respondent argues that the Administrator's failure to provide a reason raises constitutional concerns.[220] However, as stated above, the Administrator may assess a CMP for each violation that is a substantial failure to meet any of the terms and conditions of the H-2B forms.[221] The Administrator and ALJ's imposition of CMPs against Respondent for their numerous violations of the H-2B program are consistent with the INA. In addition, as we found above, Respondent was reasonably apprised of the issues in controversy and had an opportunity to be heard, satisfying constitutional due process.

Respondent next argues that the ALJ should have used the three guideposts laid out by the Supreme Court in *State Farm Mut. Auto. Ins. Co. v. Campbell*, which includes: (1) the degree of reprehensibility of the conduct; (2) the disparity between the harm or potential harm and the penalty; and (3) the difference between the remedy imposed and the penalties imposed in comparable cases.[222] Respondent

---

[216]    *Id.* § 503.23(e). Respondent contends that this provision applies to Section 503.23(a) as well. However, we find that this language only applies to Section 503.23(d).

[217]    8 U.S.C. § 1184(c)(14)(C); 29 C.F.R. § 503.23(e).

[218]    Resp. Br. at 43.

[219]    *Id.* at 43-44.

[220]    *Id.* at 45.

[221]    29 C.F.R. §§ 503.19, 503.23(a).

[222]    Resp. Br. at 45 (citing to *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416-18 (2003); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-75 (1996)).

35

contends that, under these guideposts, CMPs should not be awarded for any of the violations.[223]

    The cases Respondent relies on pertain to punitive damages awarded in jury trials, and these guideposts are analyzed to determine whether a punitive damage award is excessive.[224] Punitive damage awards are common law creations guided by general principles of reasonableness.[225] Because CMPs are dictated by statute or regulation, that framework does not apply here.[226]

    In the alternative, Respondent contends that the ALJ failed to analyze the seven Section 503.23(e) factors.[227] We find that the seven Section 503.23(e) factors are discretionary in application. The language of the regulations state that the Administrator "*may* consider".[228] the seven factors listed above. As such, these factors are nonmandatory. Consideration of these factors must be reasonably related to determining whether the employer significantly deviated from their obligations.

    B.  *The ALJ Properly Determined the Amount of Back Wages Owed*

    The ALJ ordered Respondent to pay back wages for failing to pay H-2B workers the correct hourly wage rate, for failing to pay H-2B workers for all hours worked, and for failing to pay all inbound and outbound transportation and subsistence costs.[229] For the reasons stated below, we affirm the ALJ's findings.

---

[223]   *Id.* at 45-47.

[224]   *Campbell*, 538 U.S. at 429 (reversing a judgment of punitive damages for being excessive and remanding for further proceedings); *Gore*, 517 U.S. at 586 (same).

[225]   *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 15, 18 (1991); *Campbell*, 538 U.S. at 428.

[226]   *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 187-88 (1973) (upholding administrative sanction that was more severe than sanctions imposed in other cases where the agency found it necessary to deter violations and achieve its statutory objectives).

[227]   Resp. Br. at 48-54.

[228]   29 C.F.R. § 503.23(e).

[229]   D. & O. at 57-58.

36

>    i.  *The Administrator's Reconstruction of Hours Worked and Methodology in*
>        *Calculating the Amount of Back Wages Owed is Reasonable*

The ALJ ordered Respondent to pay $133,960.50 in back wages to nineteen H-2B workers for 2016, and $167,487.55 in back wages to seventeen H-2B workers for 2017, for a total of $301,448.06.[230] Respondent contends that the ALJ erred in ordering back wages because the ALJ failed to find a Section 503.19 violation or the underlying determinations of "willfulness" and "significant deviation."[231]

The Board has repeatedly acknowledged the Administrator's authority to reconstruct hours worked and payments made to determine back wages when the employer's records are unreliable.[232] As discussed above, we find that Respondent's records are unreliable and that Respondent substantially failed to both pay H-2B workers the offered wage rate and failed to pay H-2B workers for all hours worked in violation of Attestation 5 and 29 C.F.R. §§ 503.16(a)(1), (a)(4), and (b). The Administrator reconstructed the hours worked by H-2B workers, as a matter of just and reasonable inference, based on the weekly average hours of U.S. workers who performed the same work as H-2B workers.[233] The Administrator then recalculated the amount of back wages Respondent owed each H-2B worker, for a total of $133,960.50 in 2016 and $167,487.55 in 2017.[234]

For the reasons set forth above, Respondent failed to adequately track the hours H-2B workers worked, failed to keep accurate records and its methodology was prone to errors, and the Administrator appropriately reconstructed the hours worked as a matter of just and reasonable inference. We find that the Administrator's recalculation is reasonable and supported by the record. Thus, we affirm the ALJ's finding that Respondent owes $301,448.06 in back wages.

---

[230]    *Id.* at 33-34, 57.

[231]    Resp. Br. at 19, 25.

[232]    *Butler Amusements*, ARB No. 2021-0007, slip op. at 31. (citing to *Adm'r, Wage & Hour Div., U.S. Dep't of Lab. v. Peter's Fine Greek Foods*, ARB No. 2014-0003-B, ALJ No. 2011-TNE-00002, 2012-PED-00001, slip op. at 6 (ARB Sept. 17, 2014)).

[233]    D. & O. at 33.

[234]    *Id.* at 33-34.

37

> ii. *The ALJ's Calculation of Back Wages Owed for Inbound and Outbound*
> *Transportation and Subsistence Costs is Reasonable*

The ALJ ordered Respondent to pay $5,863.56 in back wages for inbound travel and subsistence expenses in 2016 and 2017.[235] The ALJ based this on Administrator's calculations, which found an average of $168.26 per person multiplied by nineteen H-2B workers in 2016, and $156.26 per person multiplied by seventeen H-2B workers in 2017 for the five-day trip by bus from Mexico to Illinois.[236] Similarly, the ALJ ordered Respondent to pay $5,249.13 in back wages for outbound travel and subsistence expenses in 2016 based on the average cost of $267.27 per person for each of the nineteen H-2B workers for the three-day trip from Illinois to Mexico.[237] In calculating these averages, the Administrator used the average cost of hotels and bus tickets based on H-2B workers' employee interview statements.[238] For daily subsistence costs, the Administrator used the pre-determined price in the TEC.[239]

As discussed above, we find that Respondent substantially failed to pay all inbound transportation and subsistence costs for its H-2B workers in violation of Attestation 17 and 29 C.F.R. §§ 503.16(j)(1)(i)-(ii). The ALJ's calculation of back wages owed for all inbound and outbound transportation and subsistence costs is reasonable and supported by the record.[240] Moreover, Respondent has neither challenged this figure nor pointed to evidence that would contradict this calculation. Thus, we affirm the ALJ's finding that Respondent owes $5,863.56 in back wages for inbound travel and subsistence expenses in 2016 and 2017 and $5,249.13 in back wages for outbound travel and subsistence expenses for 2016.

### C. *Respondent is Liable for Civil Money Penalties*

The ALJ found that Respondent was liable for CMPs. For the reasons stated below, we affirm the ALJ in part and vacate and modify the ALJ in part.

---

[235]    *Id.* at 40-41, 57.

[236]    *Id.* at 40.

[237]    *Id.* at 40-41, 57.

[238]    *Id.* at 41.

[239]    *Id.*

[240]    *Id.* at 40-41.

38

### i. *Respondent is Ordered to Pay CMPs for Preferential Treatment of Foreign Workers*

The Administrator initially assessed CMPs in the amount of $6,191.50 for 2016 and $6,191.50 for 2017 for both the failure to advertise housing and higher paying union jobs.[241] Because the ALJ found that neither Respondent's failure to advertise housing nor its failure to advertise union jobs constituted a substantial failure, the ALJ did not order Respondent to pay CMPs.[242]

For the reasons stated above, we find that Respondent failed to comply with the requirement that housing be advertised to U.S. workers if it was offered to foreign workers, which is a failure to comply with Attestation 4 and 29 C.F.R. § 503.16(q), and that CMPs are warranted. As stated above, we find that Respondent had a previous history of failing to advertise housing, the gravity was severe, and U.S. workers were harmed by Respondent's failure to advertise the availability of housing. We also find that Respondent did not make a good faith effort to comply. The record demonstrates that Respondent knew prior to the 2016 season that housing was available, but specifically said it was not available in the job orders for both 2016 and 2017.[243] Respondent has also failed to point to anything that would demonstrate that it acted in good faith.[244] Respondent also did not offer an adequate explanation for its actions. Although Guzman testified that he did not know housing would be available until he returned to Chicago in 2016 to find H-2B workers residing in his uncle's house, the record shows that H-2B workers stayed in that house in 2015 as well.[245] As such, Respondent's explanation is not credible. In addition, Respondent offered no explanation regarding the 2017 season.[246]

---

[241]    *Id.* at 19 n.109.

[242]    *Id.* at 22.

[243]    *Id.*

[244]    *Adm'r, Wage &Hour Div., U.S. Dep't of Lab. v. Five M's LLC*, ARB No. 2019-0014, ALJ Nos. 2015-FLS-00010, -00011, slip op. at 9, 11, 13 (ARB Nov. 13, 2020) (finding that the respondent failed to make a good faith effort to comply with the regulations because it produced no evidence that it acted reasonably or in good faith).

[245]    Tr. at 37-39, 80-81.

[246]    D. & O. at 20-22.

39

Thus, we find that Respondent must pay $3,095.75 for 2016 and $3,095.75 for 2017, for a combined total of $6,191.50. This amount is fair and reasonable given that this violation harmed U.S. workers, and it is also under the $12,383 maximum.

### ii. Respondent is Ordered to Pay CMPs for Failing to Pay the Offered Wage

As stated above, we affirm the ALJ's finding that Respondent substantially failed to comply with Attestation 5 in violation of 29 C.F.R. §§ 503.16(a)(1), (a)(4), and (b) by failing to pay the offered wage. Thus, we find that CMPs are warranted.

The Administrator initially assessed $133,960.50 in CMPs in 2016 and $161,590.73 in CMPs in 2017 for Respondent's failure to pay the wage listed on the TEC, for a total CMP of $295,551.23.[247] The Administrator assessed a separate violation for each worker.[248] The ALJ reduced the CMP to $40,188.15 for 2016 and $48,477.22, for a total CMP of $88,665.37.[249] The ALJ opined that the Administrator did not assess any mitigating factors, and found that the following mitigating factors applied: (1) Respondent's lack of a history of violations; (2) Respondent's commitment to future compliance demonstrated by changes it made; (3) the relatively small size of Respondent's business;[250] and (4) the fact that U.S. workers were not harmed.[251]

The Administrator contends that the ALJ erred in applying the Section 503.23(e) discretionary factors to a wage violation.[252] We agree. The Section 503.23(e) factors only apply to Section 503.23(d), and do not apply to Section 503.23(b) wage violations.[253] Rather, for wage violations, the Administrator may assess CMPs equal to the back wages owed.[254] In addition, Section 503.23(a) states that "[e]ach such violation involving the failure to pay an individual worker

---

[247]    *Id.* at 46.

[248]    *Id.*

[249]    *Id.* at 47.

[250]    *Id.* (citing to *A&M Labor Mgmt., Inc.*, ALJ Nos. 2022-MSP-00002, 2022-TAE-00004, slip op. at 19 (ALJ Mar.23, 2023)).

[251]    *Id.*

[252]    Administrator's Br. at 20.

[253]    29 C.F.R. § 503.23(e).

[254]    *Id.* § 503.23(b).

40

properly or to honor the terms or conditions of [the aforementioned H-2B forms] constitutes a *separate violation*."[255]

Next, the Administrator contends that the ALJ erred in reducing the amount of CMPs based on Respondent's business size.[256] The Administrator asserts that business size is not a factor listed anywhere in the statute or regulations, and that even if business size were a proper consideration, here it would be arbitrary, capricious, and is not supported by substantial evidence because the ALJ relied on nothing more than Respondent's self-reported annual gross sales.[257]

Respondent counters that the excessive fines clause of the Eighth Amendment requires the evaluation of a penalty in terms of its relationship to the revenues of the business.[258] Respondent contends that the ALJ was within his discretion to consider Respondent's business size and revenue in reducing the CMPs.[259]

As the Administrator correctly notes, the H-2B regulations do not provide for an employer's business size, revenue, or financial hardship as a mitigating factor.[260] Thus, we find that the ALJ erred in considering the size of Respondent's business. Therefore, we vacate the ALJ's finding and order Respondent to pay $133,960.50 in CMPs in 2016 and $161,590.73 in CMPs in 2017 for Respondent's failure to pay the wage listed on the TEC, for a total CMP of $295,551.23. We find that this amount is reasonable and supported by the record.[261]

---

[255]   *Id.* § 503.23(a) (emphasis added).

[256]   Administrator's Br. at 20.

[257]   *Id.*

[258]   Resp. Response Br. at 26-29.

[259]   *Id.* at 29.

[260]   Administrator's Br. at 30-32; 29 C.F.R. § 503.23(e).

[261]   In addition, Respondent contends that the ALJ's CMP award for back wages constitutes an improper double punishment. Resp. Br. at 54. However, back wages do not punish employers, but instead make employees whole. *See, e.g., Brooklin Sav. Bank v. O'Neil*, 324 U.S. 697, 707 (2022) (stating that FLSA back wages and liquidated damages are not penal in nature but are "compensation for the retention of a workman's pay which might result in damages too obscure and difficult of proof for estimate other than by liquidated damages"); *Birbalas v. Cuneo Printing Indus.*, 140 F.2d 826, 828 (7th Cir. 1944) (stating that FLSA back wages and liquidated damages are "not a penalty or punishment by the Government").

Case 1:25-cv-02349-JMC    Document 1    Filed 04/14/25    Page 108 of 125
USCA Case #25-1108    Document #2111373    Filed: 04/14/2025    Page 108 of 125

41

### iii. Respondent is Ordered to Pay CMPs for Employing H-2B Workers Outside the Area of Intended Employment

As stated above, we find that Respondent substantially failed to comply with Attestation 11 in violation of 29 C.F.R. § 503.16(x). Thus, we find that CMPs are warranted.

The Administrator initially assessed $18,574.50 in CMPs for 2016 and $18,574.50 for 2017.[262] In calculating CMPs, the WHD used a base CMP of $6,191.50 per violation. WHD then determined there were three separate violations, one for each of the three states in which Respondent employed H-2B workers that were not listed in the areas of intended employment.[263] The ALJ reduced the CMPs, finding that although the gravity of the violation was significant, Respondent had a lack of history of violations, Guzman committed to future compliance, and Guzman was unaware that H-2B workers could not leave the area of intended employment.[264] The ALJ also found that it was unreasonable to multiply the penalty by the number of states outside the area of intended employment that Respondent sent workers, finding that WHD did not offer "any compelling legal authority to support multiplying a single CMP by the number of states to which Respondent sent its workers."[265] The ALJ reduced the CMP to $4,953.20 per year for a total of $9,906.40.[266]

The Section 503.23(e) factors weigh against Respondent. First, every H-2B worker was affected during 2016 and 2017.[267] Second, we agree with the ALJ that the gravity of this violation is significant. The regulations require employers to identify the area of employment so that the DHS and DOL can determine whether qualified U.S. workers cannot be found in the U.S. prior to approving an H-2B petition.[268] Respondent failed to identify forty-five cities across four states in which H-2B workers worked outside the areas of intended employment during 2016 and

---

[262]    D. & O. at 48.

[263]    *Id.*

[264]    *Id.* at 49.

[265]    *Id.*

[266]    *Id.*

[267]    *Id.* at 11-12, 36-37.

[268]    *See* 80 Fed. Reg. at 24,045.

42

2017.[269] Because Respondent failed to identify these additional locations, DHS and DOL were unable to assess whether qualified U.S. workers were available in these locations.

Third, Respondent did not make a good faith effort to comply. Respondent contends it was unaware of this obligation.[270] However, pleading ignorance is not sufficient to show that one acted in good faith.[271]

Fourth, we are not persuaded by Respondent's explanation that "workers worked outside of the area of intended employment was of brief duration and sporadic and not subject to advance anticipation such that it was impossible to ascertain in advance and conduct" recruitment efforts.[272] Respondent further claims that it was unaware that it was required to specify all locations.[273] However, the TEC instructions were clear that Respondent was to "identify the geographic place(s) of employment with *as much specificity as possible*. If necessary, submit an attachment to *continue and complete* a listing of all anticipated workplaces".[274] As stated above, an employer's submission and signature on the TEC constitutes the employer's representation that the statements are accurate and its acknowledgement and acceptance of the obligations of the program.[275] Again, an employer's failure to read the terms of the TEC or properly learn the H-2B program's requirements amounts to a reckless disregard of the employer's obligations.[276] In addition, Respondent's excuse that it was impossible to ascertain that it would send workers outside the area of intended employment may have been plausible for 2016, but we find it unconvincing for 2017 given the number of times that Respondent sent workers outside the area of intended employment in 2016. Thus, we find that $6,191.50 per violation is appropriate.

---

[269]    D. & O. at 11-12, 36-37.

[270]    Resp. Br. at 34.

[271]    *Butler Amusements, Inc.*, ARB No. 2021-0007, slip op. at 27.

[272]    Resp. Response Br. at 33.

[273]    Resp. Br. at 34.

[274]    JX C; JX D (emphasis added).

[275]    29 C.F.R. § 503.19(d).

[276]    80 Fed. Reg. at 24,086-87; *see C.S. Lawn & Landscape, Inc.*, ARB No. 2020-0005, slip op. at 14, 14 n.72.

43

Next, we find that the ALJ erred in holding that it was unreasonable to multiply the penalty by the number of states outside the area of intended employment that Respondent sent workers. Section 503.23(a) states that each violation involving the failure to pay an individual worker properly constitutes a separate violation.[277] In addition, in *5 Star Forestry*, the employer placed H-2B workers in four locations outside of the area of intended employment and did not undertake recruitment measures at any of these four locations.[278] The Board held that each location constituted a separate violation, reasoning that:

> [B]ecause, for each location, the employer has failed to conduct the recruitment and hiring efforts necessary to ensure that there are no workers in the U.S. available to perform the work. By holding employers financially accountable for each location (rather than assessing a single violation regardless of the number of unidentified employment areas), the policy also intends to diminish employers' motivation to commit multiple employment area violations.[279]

Thus, we find Respondent committed a separate violation for each state in which Respondent placed H-2B workers that was outside the area of intended employment.[280] Accordingly, we vacate the ALJ's finding and order Respondent to pay $6,191.50 per violation, for a total of $18,574.50 in CMPs for 2016 and $18,574.50 for 2017.

---

277     29 C.F.R. § 503.23(a) (emphasis added).

278     *5 Star Forestry*, ARB No. 2013-0056, slip op. at 6.

279     *Id.*

280     Respondent contends that this case is different from *5 Star Forestry* because in that case the workers spent more time outside the area of intended employment. However, this argument ignores the fact that there were 45 cities across several states that H-2B workers worked in that were not listed in the area of intended employment and that Respondent failed to undertake recruitment efforts in any of these locations.

44

*iv. Respondent is Ordered to Pay CMPs for Failing to Pay for All
Transportation and Subsistence Fees*

As stated above, we find that Respondent substantially failed to comply with
Attestation 17 in violation of 29 C.F.R. §§ 503.16(j)(1)(i)-(ii). Thus, we find that
CMPs are warranted.

The Administrator initially assessed $5,863.56 in CMPs for Respondent's
failure to pay inbound expenses for 2016 and 2017, and $5,249.13 for Respondent's
failure to pay outbound expenses in 2016.[281] The ALJ reduced the CMPs because
WHD failed to assess the following mitigating factors: (1) Respondent's lack of a
history of violations, (2) Respondent's good faith efforts to comply; (3) Guzman's
explanation that he was unaware that he was responsible for inbound and outbound
transportation and subsistence expenses, and (4) Respondent's commitment to
future compliance.[282] The ALJ reduced the CMP by ten percent for each factor.[283]

However, as with subsection two, the ALJ erred in assessing the mitigating
factors in Section 503.16(e), which do not apply here because this is a wage
violation.[284] Because the ALJ used the wrong standard, we vacate the ALJ's finding
and order Respondent to pay the initial amount of CMPs assessed by the WHD.
The WHD's amount is reasonable given that it assessed one amount of CMPs for
inbound violations and another for outbound. These numbers are also under the
$12,383 limit. Thus, Respondent is ordered to pay $5,863.56 in CMPs for
Respondent's failure to pay inbound expenses for 2016 and 2017, and $5,249.13 for
Respondent's failure to pay outbound expenses in 2016, for a total of $11,112.69.

*v. Respondent is Ordered to Pay CMPs for Failing Disclose a Copy of the Job
Order*

For failing to disclose a copy of the job order, the Administrator initially
assessed CMPs of $5,572.35 for 2016 and $5,572.35 for 2017.[285] The ALJ reduced
the CMP based on the following mitigating factors: (1) a twenty percent reduction

---

[281]    D. & O. at 50.

[282]    *Id.* at 50-51.

[283]    *Id.* at 51.

[284]    29 C.F.R. § 504.23(b).

[285]    D. & O. at 51.

45

based on Respondent's lack of a history of violations, and (2) a ten percent reduction based on Guzman's explanation that he was unaware of Monarch's internal processes and trusted that the company would comply with all requirements.[286] The ALJ ordered Respondent to pay a CMP of $3,714.90 per violation for a total of $7,429.80.[287]

      We agree with the ALJ's analysis. The ALJ's D. & O. was well reasoned and is supported by the record. We also find that the ALJ's calculations in determining the amount of CMPs owed was reasonable and within the limit. Thus, Respondent is ordered to pay $7,429.80 for their substantial failure to comply with 29 C.F.R. § 503.16(l).

      vi. *Respondent is Ordered to Pay CMPs for Failing to Contractually Prohibit Third Parties from Seeking Payment from H-2B Workers*

      For failing to contractually forbid third parties from seeking payment from H-2B workers, the Administrator initially assessed CMPs of $1,238.30 in 2016 and $1,238.30 in 2017.[288] The Administrator applied the following mitigating factors: (1) the gravity of the violation; (2) Respondent's compliance efforts; (3) Respondent's explanation; and (4) Respondent's commitment to future compliance.[289] The ALJ agreed with these reductions and further reduced the CMP by ten percent because of Respondent's lack of prior violations.[290] Thus, the ALJ ordered Respondent to pay a CMP of $619.15 for each violation in 2016 and 2017, for a total of $$1,238.80.[291]

      We agree with the ALJ's analysis. The ALJ's D. & O. was well reasoned and is supported by the record. We also find that the ALJ's calculations in determining the amount of CMPs owed was reasonable and within the limit. Thus, Respondent is ordered to pay $1,238.30 for Respondent's substantial failure to comply with 29 C.F.R. § 503.16(p).

---

[286]  *Id.* at 51-52.

[287]  *Id.* at 52.

[288]  *Id.*

[289]  *Id.* at 52-53.

[290]  *Id.* at 53.

[291]  *Id.*

46

### vii.    Respondent is Ordered to Pay CMPs for Failing to Retain Documents

The Administrator initially assessed CMPs of $6,191.50 in 2016 and $6,191.50 in 2017 for Respondent's substantial failure to comply with document retention requirements..[292] The base CMP was $6,191.50..[293] The Administrator had increased the CMPs by ten percent for the gravity of the violation, but decreased the CMPs by ten percent because Respondent committed to future compliance..[294] The ALJ agreed with the Administrator's mitigating factors and further reduced the CMP by ten percent based on Respondent's lack of prior violations..[295] Thus, the ALJ ordered Respondent to pay a CMP of $4,953.20 for each violation in 2016 and 2017, for a total of $9.906.40..[296]

We agree with the ALJ's analysis. The ALJ's D. & O. was well reasoned and is supported by the record. We also find that the ALJ's calculations in determining the amount of CMPs owed was reasonable and within the limit. Thus, Respondent is ordered to pay $9,906.40 for Respondent's substantial failure to comply with 29 C.F.R. § 503.17.

## 3. Debarment

An employer may be debarred from the H-2B program for one to five years if it: (1) committed a willful misrepresentation[297] of a material fact in its H-2B forms; (2) substantially failed to meet any of the terms and conditions of the wage determination, TEC, or H-2B petition;.[298] or (3) committed a willful

---

[292]    *Id.*

[293]    *Id.*

[294]    *Id.*

[295]    *Id.*

[296]    *Id.*

[297]    "A willful misrepresentation of a material fact or a willful failure to meet the required terms and conditions occurs when the employer, attorney, or agent knows a statement is false or that the conduct isn't violation, or shows reckless disregard for the truthfulness of its representation or for whether its conduct satisfies the required conditions." 20 C.F.R. § 655.73(d).

[298]    In determining whether a violation is a significant deviation from the terms and conditions of the H-2B forms, an ALJ may consider factors including, but not limited to the factors listed in 20 C.F.R. § 655.73(e) (previous history of violations, numbers of affected

47

misrepresentation of a material fact during the visa application process..[299] The regulations list twelve violations that may justify debarment, which includes the failure to pay required wages, the employment of H-2B workers outside the area of intended employment, and "[a]ny other act showing such flagrant disregard for the law that future compliance with program requirements cannot reasonably be expected.".[300] "The appropriate period of debarment [is] based on the severity of the violation.".[301]

Because Respondent violated 29 C.F.R. §§ 503.16(a)(1), (a)(4), and (b), and 503.16(x), the ALJ debarred Respondent..[302] The Administrator argued that Respondent should be debarred for three years..[303] Respondent countered that a formal debarment was unnecessary because Guzman had not applied for the H-2B program in 2019, 2020, or 2021 while this case was pending..[304] The ALJ found that this argument was not dispositive because debarment does not begin until "the date of the *final* agency action.".[305] The ALJ credited Respondent's commitment to future compliance, and found that a one-year debarment was reasonable and appropriate..[306]

The Administrator contends that the ALJ erred in reducing Respondent's debarment to one year..[307] The Administrator argues that the ALJ did not give due consideration to the gravity of Respondent's violations and gave undue weight to the Respondent's promise of future compliance..[308] The Administrator further

---

workers, gravity of the violations, extent of financial gain or potential loss or injury, and whether U.S. workers were harmed).

[299]    *Id.* § 655.73(a); 29 C.F.R. § 503.24(c).

[300]    29 C.F.R. § 503.24(a).

[301]    80 Fed. Reg. at 24,084.

[302]    D. & O. at 54-56.

[303]    *Id.* at 55.

[304]    *Id.* at 56.

[305]    *Id.* (citing 29 C.F.R. § 503.24(c) (emphasis added)).

[306]    *Id.*

[307]    Administrator's Br. at 43.

[308]    *Id.*

48

contends that, by reducing the debarment period to the minimum, the ALJ ignored his conclusions that Respondent "flagrantly disregarded the law."[309]

In *Administrator v. Peter's Fine Greek Food*, the Board held that, when analyzing the issue of debarment, the Board must consider two questions: first, do grounds exist to debar the employer; and second, if so, how long should the employer be debarred.[310] The Board also held that an employer's commitment to future compliance is one of the many factors that an ALJ may consider.[311] However, the Board warned that such compliance should be considered cautiously where "the Administrator had no opportunity to investigate assertions of post investigation compliance."[312]

Regarding whether grounds exist to debar Respondent, as stated above, we have found that Respondent substantially failed to meet the terms and conditions set forth in the H-2B forms for the reasons discussed above for two violations that justify debarment: (1) the failure to pay required wages and (2) employing H-2B workers outside the area of intended employment.

Regarding the length of debarment, we vacate the ALJ's order of a one-year debarment and order that Respondent be debarred for three years. Although Respondent has demonstrated a commitment to future compliance, given the severity of Respondent's failure to pay the required wage, the number of times it employed H-2B workers outside of the areas of intended employment, and Respondent's disregard for the rules and regulations of the H-2B program, we find that a three-year debarment is appropriate.

---

[309] *Id.* at 44.

[310] *Peter's Fine Greek Food*, ARB No. 2014-0003-A, slip op. at 3.

[311] *Id.* at 5.

[312] *Id.*

49

CONCLUSION.[313]

Accordingly, we **AFFIRM** the ALJ's Decision and Order in part and
**VACATE** and **MODIFY** in part. Respondent is ordered to pay the following back
wages and CMPs:

- $301,448.06 in back wages for failing to pay H-2B workers the offered
  wage;
- $11,112.69 in back wages for inbound and outbound travel and
  subsistence costs;
- $6,191.50 in CMPs for substantially failing to comply with Attestation 4
  in violation of 29 C.F.R. § 503.16(q);
- $295,551.23 in CMPs for substantially failing to comply with Attestation 5
  in violation of 29 C.F.R. §§ 503.16(a)(1), (a)(4), and (b);
- $37,149 in CMPs for substantially failing to comply with Attestation 11 in
  violation of 29 C.F.R. § 503.16(x);
- $11,112.69 in CMPs for substantially failing to comply with Attestation 17
  in violation of C.F.R. §§ 503.16(j)(1)(i)-(ii);
- $7,429.80 in CMPs for substantially failing to comply with Attestation 19
  in violation of 29 C.F.R. § 503.16(l);
- $1,238.30 in CMPs for substantially failing to comply with Attestation 22
  in violation of 29 C.F.R. § 503.16(p); and
- $9,906.40 in CMPs for substantially failing to comply with Attestation 26
  in violation of 29 C.F.R. § 503.17.

**SO ORDERED.**

_____
**IVEY S. WARREN**
**Administrative Appeals Judge**

_____
**ANGELA W. THOMPSON**
**Administrative Appeals Judge**

---

[313]    In any appeal of this Decision and Order that may be filed, we note that the
appropriately named party is the Secretary, Department of Labor (not the Administrative
Review Board).

# CERTIFICATE OF SERVICE

---

ARB-2023-0040 Principal Deputy Administrator, Wage and Hour Division v. Lucero Pool Plaster, Inc.  (Case No: 2019-TNE-00011)

ARB-2023-0045 Lucero Pool Plaster, Inc. v. Lucero Pool Plaster, Inc.  (Case No: 2019-TNE-00011)

I certify that the parties below were served this day.

_Young Joo Ch_

_____02/27/2025_____                    _____
(DATE)                                   Young Joo "Kristen" Chung, Esq.
                                         Clerk of the Appellate Boards

Brian T. Farrington, Esq.
901 Main Street
Suite 3900
Dallas, TX 75202
        --Electronic

Jennifer L. Huggins, Esq.
200 Constitution Avenue, NW
N-2716
Washington, DC 20210
        --Electronic

R. Michael Northrup, Esq.
901 Main Street
Suite 3900
Dallas, TX 75202
        --Electronic

Office of the Solicitor, Division of Fair Labor
Standards
200 Constitution Ave, NW
Room N-2716
Washington, DC 20210
        --Electronic

U.S. Department of Labor, Office of Administrative
Law Judges
200 Constitution Avenue, N.W.
Room S-4325
Washington, DC 20210
        --Electronic

**U.S. Department of Labor**     Administrative Review Board
200 Constitution Ave. NW
Washington, DC 20210-0001



IN THE MATTER OF:

**ADMINISTRATOR, WAGE AND HOUR**     ARB CASE NOS. 2023-0040
**DIVISION, UNITED STATES**                          2023-0045
**DEPARTMENT OF LABOR,**

      **PROSECUTING PARTY,**     **ALJ CASE NO. 2019-TNE-00011**
**ALJ THEODORE W. ANNOS**

      v.     **DATE: March 26, 2025**

**LUCERO POOL PLASTER, INC.,**

      **RESPONDENT.**

Appearances:

*For the Complainant:*
Jennifer S. Brand, Esq., Rachel Goldberg, Esq., Jennifer Stocker, Esq., Jennifer Huggins, Esq.; *United States Department of Labor, Office of the Solicitor*; Washington, District of Columbia

*For the Respondent:*
R. Michael Northrup, Esq., Brian T. Farrington, Esq.; *Cowles & Thompson, P.C.*; Dallas, Texas

**Before JOHNSON, Chief Administrative Appeals Judge, THOMPSON and ROLFE, Administrative Appeals Judges**


EXHIBIT
C

2

## NOTICE OF NON-REFERRAL TO THE SECRETARY

PER CURIAM:

This case arises under the H-2B provisions of the Immigration and Nationality Act (INA),[1] as amended, and its implementing regulations.[2] On June 20, 2023, an Administrative Law Judge (ALJ) issued a Decision and Order (D. & O.) finding that Respondent Lucero Pool Plaster, Inc. violated provisions of the INA covering the period April 1, 2016, to September 30, 2017.[3] Both Respondent and the Administrator for the Wage and Hour Division (WHD) of the U.S. Department of Labor appealed to the Administrative Review Board (Board). On February 27, 2025, the Board issued a Decision and Order (ARB D. & O.) affirming in part and vacating and modifying in part. On March 13, 2025, Respondent filed a Petition Seeking Further Review by the Secretary of Labor. On March 21, 2025, the Administrator filed a response in opposition.

A party to a case before the Board may, within 14 calendar days after the Board issues its decision, request that the Board refer the case for further review by the Secretary of Labor.[4] However, the circumstances under which we may refer the case to the Secretary are extremely narrow. Per the Secretary's delegation of authority to the Board, we may only refer the case to the Secretary if a majority of the Board determines that the case involves: (1) a question of law, (2) that is of "exceptional importance," <u>and</u> (3) that warrants Secretary review.[5] If the Board refers the matter to the Secretary, the Secretary retains the discretion to decline, accept, or take no action on the Board's referral, as the Secretary deems appropriate.[6]

None of the arguments that Respondent sets forth involve a question of law that is of exceptional importance and warrants review by the Secretary of Labor.

---

[1]   8 U.S.C. §§ 1101(a)(15)(H)(ii)(b); 1184(c)(14).

[2]   20 C.F.R. Part 655, Subpart A; 29 C.F.R. Part 503.

[3]   D. & O. at 1, 3.

[4]   Secretary's Order No. 01-2020 (Delegation of Authority and Assignment of Responsibility to the Administrative Review Board (Secretary's discretionary review of ARB decisions)), 85 Fed. Reg. 13,186, 13,188, ¶6(b)(1) (Mar. 6, 2020)

[5]   *Id.*

[6]   *Id.*

3

Rather, Respondent takes issue with factual determinations and the application of well-settled law.[7] Thus, we deny Respondent's petition.

Therefore, unless the Secretary directs the Board to refer this matter to her, the Board's decision will become the final action of the Department on April 10, 2025 (after the passage of 28 calendar days from the date on which the petition was filed).[8]

**SO ORDERED.**

_____

**RANDEL K. JOHNSON**
**Chief Administrative Appeals Judge**

_____

**ANGELA W. THOMPSON**
**Administrative Appeals Judge**

_____

**JONATHAN ROLFE**
**Administrative Appeals Judge**

---

[7]    Respondent faults the Board for not addressing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988) in its analysis. Yet, as noted by the Administrator in its opposition to Respondent's request for review, the Board cited and repeatedly applied the regulatory definition of willfulness in its decision. ARB D. & O. at 7, 10, 21, 24, 26-27, 29, 30-31, 32. Importantly, the regulatory definition of willfulness is consistent with *Richland Shoe Co. See* 29 C.F.R. § 503.19(b) (a willful violation "occurs when the employer, attorney, or agent knows its statement is false or that its conduct is in violation, or shows reckless disregard for the truthfulness of its representation or for whether its conduct satisfies the required conditions"); *Richland Shoe Co.*, 486 U.S. at 133 (violations of the Fair Labor Standards Act are willful when "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute"); Temporary Non-Agricultural Employment of H-2B Aliens in the United States, 80 Fed. Reg. 24,042, 24,086 (Apr. 29, 2015) (stating that section 503.19(b)'s definition of willfulness "is consistent with the longstanding definition of willfulness" in *Richland Shoe Co.*).

[8]    Secretary's Order No. 01-2020, 85 Fed. Reg. at 13,187, ¶6(a)(2) ("In the case of a decision for which a petition has been filed under subsection (b)(1), but that the Board has not referred to the Secretary for review, such decision shall become the final action of the Department after the passage of 28 calendar days from the date on which the petition was filed.").

## CERTIFICATE OF SERVICE

ARB-2023-0040 Principal Deputy Administrator, Wage and Hour Division v. Lucero Pool Plaster, Inc.  (Case No: 2019-TNE-00011)

ARB-2023-0045 Lucero Pool Plaster, Inc. v. Lucero Pool Plaster, Inc.  (Case No: 2019-TNE-00011)

I certify that the parties below were served this day.

_03/26/2025_
(DATE)

Young Joo "Kristen" Chung, Esq.
Clerk of the Appellate Boards

Brian T. Farrington, Esq.
901 Main Street
Suite 3900
Dallas, TX 75202
--Electronic

Jennifer L. Huggins, Esq.
200 Constitution Avenue, NW
N-2716
Washington, DC 20210
--Electronic

Mike L. Northrup, Esq.
901 Main Street
Suite 3900
Dallas, TX 75202
--Electronic

Office of the Solicitor, Division of Fair Labor
Standards
200 Constitution Ave, NW
Room N-2716
Washington, DC 20210
--Electronic

U.S. Department of Labor, Office of Administrative
Law Judges
200 Constitution Avenue, N.W.
Room S-4325
Washington, DC 20210
--Electronic

**U.S. Department of Labor**     Administrative Review Board
200 Constitution Ave. NW
Washington, DC 20210-0001



IN THE MATTER OF:

ADMINISTRATOR, WAGE AND HOUR          ARB CASE NOS. 2023-0040
DIVISION, UNITED STATES                                    2023-0045
DEPARTMENT OF LABOR,

     PROSECUTING PARTY,          ALJ CASE NO. 2019-TNE-00011
                                                                     ALJ THEODORE W. ANNOS

     v.          DATE: March 26, 2025

LUCERO POOL PLASTER, INC.,

     RESPONDENT.

Appearances:

*For the Complainant:*
    Jennifer S. Brand, Esq., Rachel Goldberg, Esq., Jennifer Stocker,
    Esq., Jennifer Huggins, Esq.; *United States Department of Labor,*
    *Office of the Solicitor*; Washington, District of Columbia

*For the Respondent:*
    R. Michael Northrup, Esq., Brian T. Farrington, Esq.; *Cowles &*
    *Thompson, P.C.*; Dallas, Texas

Before JOHNSON, Chief Administrative Appeals Judge, THOMPSON and
ROLFE, Administrative Appeals Judges



2

## NOTICE OF NON-REFERRAL TO THE SECRETARY

PER CURIAM:

This case arises under the H-2B provisions of the Immigration and Nationality Act (INA),[1] as amended, and its implementing regulations.[2] On June 20, 2023, an Administrative Law Judge (ALJ) issued a Decision and Order (D. & O.) finding that Respondent Lucero Pool Plaster, Inc. violated provisions of the INA covering the period April 1, 2016, to September 30, 2017.[3] Both Respondent and the Administrator for the Wage and Hour Division (WHD) of the U.S. Department of Labor appealed to the Administrative Review Board (Board). On February 27, 2025, the Board issued a Decision and Order (ARB D. & O.) affirming in part and vacating and modifying in part. On March 13, 2025, Respondent filed a Petition Seeking Further Review by the Secretary of Labor. On March 21, 2025, the Administrator filed a response in opposition.

A party to a case before the Board may, within 14 calendar days after the Board issues its decision, request that the Board refer the case for further review by the Secretary of Labor.[4] However, the circumstances under which we may refer the case to the Secretary are extremely narrow. Per the Secretary's delegation of authority to the Board, we may only refer the case to the Secretary if a majority of the Board determines that the case involves: (1) a question of law, (2) that is of "exceptional importance," and (3) that warrants Secretary review.[5] If the Board refers the matter to the Secretary, the Secretary retains the discretion to decline, accept, or take no action on the Board's referral, as the Secretary deems appropriate.[6]

None of the arguments that Respondent sets forth involve a question of law that is of exceptional importance and warrants review by the Secretary of Labor.

---

[1]    8 U.S.C. §§ 1101(a)(15)(H)(ii)(b); 1184(c)(14).

[2]    20 C.F.R. Part 655, Subpart A; 29 C.F.R. Part 503.

[3]    D. & O. at 1, 3.

[4]    Secretary's Order No. 01-2020 (Delegation of Authority and Assignment of Responsibility to the Administrative Review Board (Secretary's discretionary review of ARB decisions)), 85 Fed. Reg. 13,186, 13,188, ¶6(b)(1) (Mar. 6, 2020)

[5]    *Id.*

[6]    *Id.*

3

Rather, Respondent takes issue with factual determinations and the application of well-settled law.[7] Thus, we deny Respondent's petition.

Therefore, unless the Secretary directs the Board to refer this matter to her, the Board's decision will become the final action of the Department on April 10, 2025 (after the passage of 28 calendar days from the date on which the petition was filed).[8]

**SO ORDERED.**

RANDEL K. JOHNSON
**Chief Administrative Appeals Judge**

ANGELA W. THOMPSON
**Administrative Appeals Judge**

JONATHAN ROLFE
**Administrative Appeals Judge**

---

[7]     Respondent faults the Board for not addressing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988) in its analysis. Yet, as noted by the Administrator in its opposition to Respondent's request for review, the Board cited and repeatedly applied the regulatory definition of willfulness in its decision. ARB D. & O. at 7, 10, 21, 24, 26-27, 29, 30-31, 32. Importantly, the regulatory definition of willfulness is consistent with *Richland Shoe Co. See* 29 C.F.R. § 503.19(b) (a willful violation "occurs when the employer, attorney, or agent knows its statement is false or that its conduct is in violation, or shows reckless disregard for the truthfulness of its representation or for whether its conduct satisfies the required conditions"); *Richland Shoe Co.*, 486 U.S. at 133 (violations of the Fair Labor Standards Act are willful when "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute"); Temporary Non-Agricultural Employment of H-2B Aliens in the United States, 80 Fed. Reg. 24,042, 24,086 (Apr. 29, 2015) (stating that section 503.19(b)'s definition of willfulness "is consistent with the longstanding definition of willfulness" in *Richland Shoe Co.*).

[8]     Secretary's Order No. 01-2020, 85 Fed. Reg. at 13,187, ¶6(a)(2) ("In the case of a decision for which a petition has been filed under subsection (b)(1), but that the Board has not referred to the Secretary for review, such decision shall become the final action of the Department after the passage of 28 calendar days from the date on which the petition was filed.").

# CERTIFICATE OF SERVICE

ARB-2023-0040 Principal Deputy Administrator, Wage and Hour Division v. Lucero Pool Plaster, Inc. (Case No: 2019-TNE-00011)

ARB-2023-0045 Lucero Pool Plaster, Inc. v. Lucero Pool Plaster, Inc. (Case No: 2019-TNE-00011)

I certify that the parties below were served this day.

_03/26/2025_
(DATE)

Young Joo "Kristen" Chung, Esq.
Clerk of the Appellate Boards

Brian T. Farrington, Esq.
901 Main Street
Suite 3900
Dallas, TX 75202
--Electronic

Jennifer L. Huggins, Esq.
200 Constitution Avenue, NW
N-2716
Washington, DC 20210
--Electronic

Mike L. Northrup, Esq.
901 Main Street
Suite 3900
Dallas, TX 75202
--Electronic

Office of the Solicitor, Division of Fair Labor
Standards
200 Constitution Ave, NW
Room N-2716
Washington, DC 20210
--Electronic

U.S. Department of Labor, Office of Administrative
Law Judges
200 Constitution Avenue, N.W.
Room S-4325
Washington, DC 20210
--Electronic